1  Linton Joaquin*
   Karen C. Tumlin*
2  Shiu-Ming Cheer*
   Melissa S. Keaney*
3  NATIONAL IMMIGRATION LAW
   CENTER
4  3435 Wilshire Boulevard, Suite 2850
   Los Angeles, California 90010
5  Telephone: (213) 639-3900
   Facsimile: (213) 639-3911
6  joaquin@nilc.org
   tumlin@nilc.org
7  cheer@nilc.org
   keaney@nilc.org
8
   Omar C. Jadwat*
9  Andre Segura*
   Elora Mukherjee*
10 AMERICAN CIVIL LIBERTIES
   UNION
11 FOUNDATION
   125 Broad Street, 18th Floor
12 New York, New York 10004
   Telephone: (212) 549-2660
13 Facsimile: (212) 549-2654
   ojadwat@aclu.org
14 asegura@aclu.org
   emukherjee@aclu.org
15

Cecilia D. Wang*
Katherine Desormeau*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950
cwang@aclu.org
kdesormeau@aclu.org

Darcy M. Goddard (USB No. 13426)
Esperanza Granados (USB No. 11894)
AMERICAN CIVIL LIBERTIES
UNION OF UTAH FOUNDATION,
INC.
355 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 521-9862
Facsimile: (801) 532-2850
dgoddard@acluutah.org
egranados@acluutah.org

Bradley S. Phillips*+
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702
Brad.Phillips@mto.com

16

17

18        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF UTAH
19                 CENTRAL DIVISION

20

| Utah Coalition of La Raza; Service Employees International Union; Workers' United Rocky Mountain Joint Board; Centro Civico Mexicano; Coalition of Utah Progressives; Latin American Chamber of Commerce; Salt Lake City Brown Berets; Jane Doe #1; John Doe #1; Milton Ivan Salazar-Gomez; Eliana Larios; Alicia Cervantes; John Doe #2 | No. |
| --- | --- |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| | **CLASS ACTION** |

21

22

23

24

25                      Plaintiffs,

26            v.

1

2 | Gary R. Herbert, Governor of the State
3 | of Utah, in his official capacity; Mark
    | Shurtleff, Attorney General of the State
    | of Utah, in his official capacity,
4
5 | Defendants.

6

7 +Attorney for all plaintiffs except Service Employees International Union and the
   Workers' United Rocky Mountain Joint Board

8 *Application for admission *pro hac vice* forthcoming

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**PRELIMINARY STATEMENT**

1.      This action challenges Utah's immigration enforcement law, House Bill ("HB") 497.  HB 497 was enacted by the State of Utah along with two other immigration laws—HB 469 and HB 116—to create a comprehensive system of immigration regulation.  This Utah scheme includes: (1) a punitive immigration enforcement system requiring state and local law enforcement officers to verify the immigration or citizenship status of individuals they encounter in numerous circumstances, to detain those deemed by Utah law enforcement officers to be unlawfully present in the United States, to arrest individuals on immigration-related grounds that differ from federal standards, and to enforce Utah-specific criminal immigration laws (HB 497); (2) a state scheme to admit non-citizens from outside the United States to live, work, or study in Utah (HB 469); and (3) a state program to provide state work authorization for non-citizens without federal employment authorization (HB 116).

2.      The laws were signed by Governor Gary Herbert on March 15, 2011, and HB 497 is scheduled to take effect on May 10, 2011, long before the other laws are to have any effect.

3.      If allowed to take effect, HB 497 will significantly harm Utahans, particularly Utahans of color.  According to law enforcement officials in Utah and elsewhere, HB 497 will cause widespread racial profiling and will subject many persons of color—including countless U.S. citizens and non-citizens who have federal permission to remain in the United States—to unlawful interrogations, searches, seizures, and arrests.  People of color in the state will be compelled to carry additional paperwork on them at all times in order to prove to law

enforcement officials that their presence in the country is approved by the federal government.

4.      HB 497 fundamentally changes the primary role and day-to-day operations of local law enforcement officials.  In the state of Utah, a law enforcement officer's "primary and principal duties consist of the prevention and detection of crime and the enforcement of criminal statutes or ordinances of this state or any of its political subdivisions."  Utah Code Ann. § 53-13-103.  HB 497, however, undermines this state goal by injecting an immigration enforcement directive into every police encounter.

5.      HB 497 requires law enforcement officers to demand documentation reflecting immigration status from individuals they stop, detain, or arrest.  During a stop, if a person is able to produce one of four enumerated types of identity documents he will be presumed to be lawfully present in the United States.  Thus, the four enumerated documents (hereinafter, "qualifying identity documents") are not simply documents that establish identity; they are explicitly intended to function as proof of lawful presence in the United States.

6.      HB 497's document requirement amounts to a mandatory initial immigration status check by law enforcement officers out in the field.  If an individual cannot produce a qualifying identity document, law enforcement officers are authorized, and in many cases required, to detain the individual in order to attempt to verify their immigration status— a process that takes more than an hour on average.

7.      By requiring persons to produce a qualifying identity document and providing for immigration verification during stops, HB 497 establishes a de facto state alien registration scheme.  If implemented, HB 497 would require everyone

in the State of Utah, but particularly persons of color, to carry specific forms of documentation with them at all times or risk interrogation and detention by law enforcement.

8.    In enacting its state immigration laws, the State of Utah sought to displace various aspects of federal immigration authority.  Indeed, in signing these bills, Governor Herbert issued a press release stating that "combined, [they] constitute" "the Utah solution" for immigration reform.  *See* Press Release, Governor Herbert Signs Immigration Reform Legislation (Mar. 15, 2011).

9.    This system of state immigration laws constitutes a pervasive regulation of immigration and non-citizens touching on areas that are constitutionally committed to the exclusive control of the federal government— from the admission of non-citizens to the country, to their ability to work, and the identification of those immigrants whom Utah deems to be unlawfully present in the United States.  These laws impermissibly encroach into an area of sole federal authority and will interfere and conflict with the comprehensive federal immigration system enacted by Congress and implemented through a complex scheme of federal regulations and policies.

10.   HB 497 is unconstitutional in myriad ways.  It violates the Supremacy Clause and core civil rights and liberties secured by the U.S. and Utah Constitutions, including the Fourth Amendment right to freedom from unreasonable searches and seizures, the Right to Travel, the Equal Protection Clause's protection from arbitrary state classifications, and the Utah Constitution's guarantee of the uniform operation of laws.

11.   The plaintiffs in this action will suffer serious and irreparable violations of their constitutional rights and civil liberties if HB 497 is allowed to

take effect.  The named plaintiffs bring this action on behalf of themselves and a class of all others similarly situated to obtain preliminary and permanent injunctive relief and a declaration that HB 497 violates the U.S. and Utah Constitutions.

**JURISDICTION AND VENUE**

12.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under the U.S. Constitution, which are brought directly and under 42 U.S.C. §§ 1981 and 1983.

13.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to secure equitable or other relief for the violation of those rights.

14.   This Court has supplemental jurisdiction over Plaintiffs' state law claims. Pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims that it forms part of the same case or controversy under Article III of the U.S. Constitution.

15.   This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure Rule 57.

16.   Venue is proper in this District under 28 U.S.C. § 1391(b).  All Defendants are sued in their official capacity and their official places of business are all located within this District.  All of the events giving rise to this Complaint occurred within this District.

**PARTIES**

**Organizational Plaintiffs**

17.     Plaintiff Utah Coalition of La Raza ("UCLR") is an affiliate of the National Council of La Raza, the largest national Latino civil rights advocacy and service organization in the United States.  UCLR was established in 1992 to improve conditions and opportunities for Latinos living in Utah.  UCLR focuses its advocacy and work on a range of civil rights issues including: education, economic development, immigration, and leadership development.  The primary geographic areas for UCLR's activities are the four counties of Salt Lake, Davis, Utah, and Weber.  Hundreds of people routinely attend UCLR co-sponsored events.  A large percentage of individuals who attend UCLR events and activities are undocumented immigrants.  UCLR has had to shift resources from its existing priority areas to focus more attention on immigration issues because of the passage of HB 497 and related bills.  UCLR board members have spent much of their time on immigration issues this year. This has led to other key organizational issues being put on hold.  Individuals who regularly attend UCLR co-sponsored events, including U.S. citizens and lawful immigrants as well as undocumented immigrants, have expressed serious concern about HB 497.  They have indicated they will refrain from attending UCLR events if HB 497 takes effect because they fear being stopped by police based on their Latino appearance and asked for their immigration papers.

18.     Plaintiff Service Employees International Union ("SEIU") is one of the largest labor organizations in the world, representing 2.2 million working men and women employed primarily in the public sector and in the janitorial, health services, long-term care, and security industries.  Many of SEIU's members are

recent immigrants to the United States and many of its members are racial minorities. SEIU has long called for and worked toward comprehensive reform of U.S. immigration laws. Another priority for SEIU is fighting discrimination against minorities, women, and other groups in the workplace and in society. In Utah, SEIU has a local affiliate, Workers' United Rocky Mountain Joint Board ("Rocky Mountain Joint Board") (*see* ¶ 19, *infra*). This affiliate has approximately 70 members in the state, over 50 percent of whom are Latino. SEIU works in partnership with Workers' United Rocky Mountain Joint Board and other groups to combat discrimination and advocate for immigration reform at the national level. Because so many of SEIU members are public sector employees, the impact of HB 497 on already distressed county and municipal budgets will harm SEIU's members to the extent that it will result in further pay cuts, furloughs, and layoffs. Furthermore, some of SEIU's Latino members and their families have already been subjected to stops by local law enforcement, during which they have been asked to produce proof of immigration status. SEIU is concerned that its minority members in Utah, including U.S. citizens and lawful immigrants as well as undocumented immigrants, will be even more likely to be stopped, detained, arrested, and questioned by state and local police after HB 497 goes into effect. This will cause hardship for members of SEIU. In addition, SEIU is concerned that members and potential members, regardless of nationality and immigration status, will refrain from exercising their rights to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by police under HB 497. This will significantly impede the ability of SEIU to protect its current members and to organize new members in Utah. SEIU joins this lawsuit to preserve its ability to

organize new members and to protect the rights and interests of its members and prospective members.

19.     Plaintiff Workers' United Rocky Mountain Joint Board ("Rocky Mountain Joint Board"), is a labor union and an affiliate of Plaintiff SEIU.  Rocky Mountain Joint Board represents 70 workers in Utah.  Over 50 percent of Rocky Mountain Joint Board's Utah membership is Latino.  The primary mission of Rocky Mountain Joint Board is to organize, represent, and empower employees in Utah.  In addition, Rocky Mountain Joint Board works in partnership with SEIU and other groups to combat discrimination and mobilize for immigration reform at the national level.  Rocky Mountain Joint Board is concerned that its minority members, including U.S. citizens and lawful immigrants, are likely to be unlawfully stopped, detained, arrested, and questioned by state and local police after HB 497 goes into effect.  This will cause hardship for members of Rocky Mountain Joint Board.  In addition, Rocky Mountain Joint Board is concerned that members and potential members will refrain from exercising their rights to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by police under HB 497.  This will significantly impede the ability of Rocky Mountain Joint Board to protect its current members and to organize new members.  Rocky Mountain Joint Board joins this lawsuit to preserve its ability to organize new members and to protect the rights and interests of its members and prospective members.

20.     Plaintiff Centro Civico Mexicano ("Centro") is the oldest nonprofit Latino organization in Utah.  Centro serves the Latino community in the Salt Lake Valley by offering educational, cultural, social, and athletic activities and by

fostering greater appreciation and awareness of the rich heritage and history of Mexican and other Latino cultures.  Centro has a community center where educational, cultural, social, and athletic activities are held.  The large majority of individuals who use Centro's facilities are Latino immigrants.  Since HB 497 was first introduced in the Utah legislature, Centro has had to divert significant organizational resources to respond to its members' concerns about the law.  This has taken valuable staff time away from other priority issues and work for Centro.  This year, Centro had intended to focus its resources on addressing mental health issues in the Latino community.  Because of HB 497 and the other immigration bills, however, Centro has devoted virtually no resources to mental health issues this year and instead has focused intensely on educating the Latino community about HB 497.  Members of the community who regularly attend Centro events or use the Centro's facility space, including U.S. citizens and lawful immigrants have reported that if HB 497 takes effect they will cease using Centro's facilities because they will be too afraid to leave their homes for fear of being stopped by police based on their Latino appearance and being asked for immigration papers.

21.   Plaintiff Coalition of Utah Progressives ("CUP") is a membership-based, non-profit organization in Utah that advocates for policies that prohibit and prevent discrimination based on race, ethnicity, religion, national origin, sexual orientation, gender identity or expression, and ability.  CUP's membership consists of approximately 40 people, about 15 percent of whom are undocumented immigrants.  One of CUP's primary activities is to host community meetings and rallies for its members and prospective members on key policy issues.  Immigration, and particularly advocating for reform of federal immigration policy, is a primary issue for CUP.  Plaintiff CUP will be harmed if HB 497 is allowed to

take effect.  CUP's members and other community members who participate in CUP activities, including U.S. citizens and lawful permanent residents, have reported that they will be too afraid to come to CUP's public events if HB 497 takes effect because police are often present at CUP rallies and they are worried they will be stopped, questioned, and detained by police for not having proper immigration papers under HB 497.  Attendance at CUP events has already dropped since HB 497 was signed by the Governor, and the drop in attendance is directly attributable to HB 497.  This year, CUP intended to use its scarce organizational resources to work towards opening a thrift store to raise money to benefit people suffering from AIDS.  Because of HB 497 and the other immigration bills, CUP has devoted virtually no resources to setting up the thrift store and instead has focused on educating the community about HB 497.

22.      Plaintiff Latin American Chamber of Commerce ("LACC") was founded in 2004 in order to help both local and Latino immigrant businesses make the most of their business opportunities through education, networking and solid integration dynamics.  Currently, LACC has 488 members in the state.  LACC's members operate businesses in the retail, light manufacturing, and services industries.  LACC works with Latino business owners who are usually first generation immigrants, many of whom do not speak English well.  Approximately half of LACC's members are undocumented immigrants.  In a year, LACC typically hosts three large events that are attended by thousands of people from across Utah and 36 smaller events for 20 to 100 people.  If HB 497 takes effect, attendance at LACC events will be lower.  LACC members have said that if HB 497 takes effect, they will be afraid to attend events where large numbers of Latinos are gathering because they fear the police will stop them at the event and

ask them for their documents.  LACC has been forced to devote significant organizational resources to responding to HB 497 and educating its members about the law.  As a result, LACC has had to divert organizational resources away from other core areas of their mission.  LACC has seen a 300 percent increase in calls related to HB 497, which its current six-person staff cannot handle.

23.     Plaintiff Salt Lake City Brown Berets ("SLC Brown Berets") is a statewide organization founded in 2006 to empower and educate youth in underprivileged communities in Utah.  Plaintiff SLC Brown Berets organizes youth programs for elementary and high school children and provides food for the afterschool FACE movement program at Kearns High School in Utah.  Plaintiff SLC Brown Berets has approximately 30 members—most of whom are Latino, but some of whom are also Asian and White.  Every member of the SLC Brown Berets has a story of being racially profiled by law enforcement; this is equally true for SLC Brown Berets members who are documented and those who are undocumented.  Because of HB 497, Plaintiff SLC Brown Berets has had to divert significant organizational resources to educate the community about the law.  This takes precious organizational resources away from other priorities—such as expanding programming to more elementary schools and middle schools or starting a scholarship fund for high school students.  In addition, Plaintiff SLC Brown Berets' organizational goal is to work on issues of importance to all underrepresented communities, however, because of HB 497 SLC Brown Berets has had to singularly focus on immigration as its key issue—stalling other important work of the organization.

**Individual Plaintiffs**

24.   Plaintiff Jane Doe #1 is a resident of Murray, Utah.  She is a Mexican national, is married to a U.S. citizen, and has two U.S. citizen children who are teenagers.  Jane Doe #1 has built her life in Utah and has been in the United States for more than 20 years.  Plaintiff Jane Doe #1 was in a previous relationship with an abuse partner who reported her to federal immigration officials after she left him.  Jane Doe #1 was put into deportation proceedings; however, the court administratively closed her case.  Although the federal government knows that she is present in the United States without a visa or other immigration status, it has opted not to remove her.  Jane Doe #1 had a valid Utah driver's license, but that license expired on April 24, 2011.  She has applied for a Utah driving privilege card (a document issued under Utah law that permits persons who are unable to show lawful immigration status to drive) because she lacks valid federal immigration status and no longer qualifies for a state driver's license.  Once HB 497 goes into effect, Jane Doe #1 will be too afraid to drive for fear of being stopped by state or local police.  As a result, she will drastically reduce her day-to-day activities outside her home.  Plaintiff Jane Doe #1 is afraid that if she is stopped by law enforcement for any reason, she will be subjected to prolonged questioning, arrest, and detention because she will only be able to present a valid Utah driving privilege card and will not be able to prove to a police officer's satisfaction that the federal government is aware she is in the country, but has elected not to remove her.  Plaintiff Jane Doe #1 will not travel to see her family members in neighboring areas of the state if HB 497 is implemented out of fear that she will be stopped by local law enforcement and asked to show her "papers." She will also stop running errands, including buying groceries, for the same

reason.  Instead, Jane Doe #1 will only make these trips when her husband can drive her, which is infrequently due to his work obligations.

25.    Plaintiff John Doe #1 has been in the United States since he was a young child.  He is a Mexican national who was brought to the United States by his parents when he was nine years old.  Utah is his home.  Since he was six years old, Plaintiff John Doe #1 has wanted to be a pastor.  After graduating from high school in Utah, he applied and was accepted to an academy in Louisiana to study to become a pastor.  While he was traveling to this academy, he was stopped at a Border Patrol checkpoint and arrested.  He spent the next 17 days in immigration detention.  He was then released from detention into the Intensive Supervision Appearance Program (ISAP), which requires him to report to a program officer twice a month.  Currently, his immigration case is on-going.  His only form of Utah identification is a Utah driving privilege card.  He has no document establishing that the federal government is aware that he is in the country and has allowed him to be free while his immigration case proceeds.  Plaintiff John Doe #1 is afraid that if HB 497 takes effect he will be detained for a prolonged period if stopped by law enforcement for any reason because he does not have one of the four documents establishing presumption of lawful status under HB 497.  In addition, John Doe #1 is afraid that if he is detained for even a brief period of time it could violate the terms of his release program.  If HB 497 is implemented, Plaintiff John Doe #1 will reduce his driving substantially in order to avoid encounters with law enforcement.  As a result, he will not be able to attend church as often as he usually does—five days a week.

26.    Plaintiff Milton Ivan Salazar-Gomez is a resident of west Salt Lake City, Utah.  He has lived in the United States for nearly his entire life.  He is a

Mexican national who was brought by his parents to the United States when he was ten months old.  The United States is the only country that he knows as his home.  He has two U.S. citizen children.  In August 2010, he was stopped by a sheriff's deputy because the registration tags on his car had expired.  Although the deputy did not ticket Mr. Salazar-Gomez for the expired tags, he did turn Mr. Salazar-Gomez over to federal immigration officials.  After two months in immigration detention, Mr. Salazar-Gomez was ordered released after he paid an immigration bond.  Mr. Salazar-Gomez's immigration case is moving forward and he is contesting his removability from the United States.  Mr. Salazar-Gomez is extremely fearful of being stopped and detained by local law enforcement officers if HB 497 takes effect because although he has a Utah driving privilege card he has no document that he could produce to satisfy law enforcement officers that he is known to federal immigration officials but has been ordered release on bond.  As a result, Plaintiff Salazar-Gomez will greatly curtail his travel and activities outside of his home if HB 497 is implemented.

27.    Plaintiff Eliana Larios is a U.S. citizen and resident of the State of Washington, where she has lived for the past three years.  Plaintiff Larios has a Washington State driver license.  Prior to living in Washington, Plaintiff Larios lived in Salt Lake City for over ten years.  She still has many family members and friends who live in Utah, whom she visits on a regular basis.  Plaintiff Larios travels to Utah at least a few times a year to visit family and friends.  When she visits Utah, she usually travels only with her Washington State driver license.  This year, Plaintiff Larios was planning to visit Utah approximately five times, however because of the passage of HB 497, she will curtail her travel to Utah for fear that presenting her Washington driver license will subject her to police interrogation

and detention because of her Latina appearance and the fact that her home state does not verify immigration status as a prerequisite to issuance of its driver licenses.  In addition, some of Plaintiff Larios' family and friends living in Utah are undocumented.  When she is in Utah, she regularly travels with them throughout the state, however because of HB 497, Plaintiff Larios fears that driving her undocumented family and friends could subject her to liability under the provisions that criminalize encouraging or inducing undocumented individuals to remain in the state.  As a result, Plaintiff Larios will limit her driving of her undocumented family and friends, if HB 497 takes effect.

28.     Plaintiff Alicia Cervantes is a U.S. citizen, born in Utah, where she lives with her four children.  Plaintiff Cervantes is Latina.  Approximately one month ago, Plaintiff Cervantes was driving in the South Salt Lake area when she was pulled over by a police officer.  Although she was driving the speed limit, the officer told Plaintiff Cervantes that he pulled her over because he thought she was driving a stolen vehicle.  With no other explanation, Plaintiff Cervantes was let go. Plaintiff Cervantes feels that she was targeted by the police officer because of her Latina appearance and because she was listening to Mexican music.  When Plaintiff Cervantes drives in Utah, she usually carries only her Utah driver license, issued on February 4, 2009.  She fears that if HB 497 goes into effect, she will be subject to police interrogation and detention based on her Latina appearance. Because Plaintiff Cervantes has a Utah driver license that was issued before 2010, this document does not entitle her to a presumption of lawful presence under HB 497.  Only Utah driver licenses issued after January 1, 2010 give rise to this presumption according to the law.  As a result, Plaintiff Cervantes fears being subjected to prolonged detention by law enforcement after HB 497 takes effect

because she does not regularly carry either her U.S. passport or other documentation to show that she is a U.S. citizen out of fear that she will lose them. Plaintiff Cervantes' boyfriend is undocumented and she drives with on a daily basis. She also has undocumented family and friends whom she drives to various places about twice a week. If HB 497 is implemented, Plaintiff Cervantes is afraid that she will be subjected to prolonged interrogation and detention by law enforcement officers if she is stopped while driving her boyfriend or undocumented family members or friends. Plaintiff Cervantes will limit her driving with undocumented family, friends, and her boyfriend because of her fear that doing so may lead to inquiries into their immigration status. Plaintiff Cervantes feels the passage of HB 497 has contributed to an increase in anti-immigrant sentiment in the state. Recently her daughter reported to her that classmates have been saying "Send the Mexicans home." Plaintiff Cervantes feels that her daughter should not have to hear statements like this.

29.     Plaintiff John Doe #2 is a U.S. citizen who was born and raised in Salt Lake City Utah. He is White and speaks Spanish fluently. Because he speaks Spanish fluently people often think he is Latino. Plaintiff John Doe #2's wife is a Guatemalan national who is currently undocumented. His wife has a prior deportation order against her. She is currently in federal immigration proceedings that have been stayed pending the outcome of her application for a U-visa based on her assistance in helping law enforcement prosecute a crime. Even though the federal government is aware of her presence in the country, they have not opted to detain her. John Doe #2 is afraid that if HB 497 takes effect and he is driving with his wife, she could be subject to prolonged detention because she cannot easily prove that the federal government is aware that she is in the country. John Doe

1

2   #2's wife does not have a document that shows that the government is aware of her

3   presence and has opted not to detain her.  In addition, John Doe #2 regularly drives

4   undocumented people to church on Tuesdays and Sundays.  He is concerned that if

5   HB 497 is implemented that he could be stopped and accused of smuggling

6   immigrants under the law and that the immigration status of everyone in his car

7   would be verified.  John Doe #2 is also a Scout Master for the Latino unit of the

8   Boy Scouts.  Most of the scouts in that group are undocumented and John Doe #2

9   regularly drives them to scouting events around the state.  If HB 497 takes effect

10   John Doe #2 will drive his church friends and his boy scout troop less out of fear

11   that he will be stopped by law enforcement and potentially subject to prosecution

12   for alien smuggling or for encouraging immigrants to remain in the State of Utah.

13   **Defendants**

14   30.    Defendant Gary Herbert is the Governor of Utah.  According to Utah

15   law, the Governor is responsible for "supervis[ing] the official conduct of all

16   executive and ministerial officers" and "see[ing] that all offices are filled and the

17   duties thereof performed."  Utah Code Ann. § 67-1-1.  As such, Defendant Herbert

18   is responsible for the enforcement of HB 497 in the State of Utah.  Defendant

19   Herbert is sued in his official capacity.

20   31.    Defendant Mark Shurtleff is the Attorney General of Utah.

21   According to Utah law, the Attorney General's powers and duties include:

22   "defend[ing] all causes to which . . . any officer, board, or commission of the state

23   in an official capacity is a party."  Utah Code Ann. § 67-5-1(2).  In addition, under

24   Utah law, the Attorney General shall: "exercise supervisory powers over the

25   district and county attorneys of the state in all matters pertaining to the duties of

26   their offices."  Utah Code Ann. § 67-5-1(6).  As such, Defendant Shurtleff is

1

2   responsible for the enforcement of HB 497 in the State of Utah.  Defendant

3   Shurtleff is sued in his official capacity.

4                               **FACTUAL ALLEGATIONS**

5                     <u>**History and Intent of the Three Bills**</u>

6          32.    On March 7 and 8, 2011, the Utah Legislature enacted three pieces of

7   legislation (HB 497, HB 116, and HB 469), which together comprise a

8   comprehensive system of state laws touching upon virtually every aspect of

9   immigration regulation.  The full text of HB 497, which is the subject of this

10  challenge, is attached hereto as Exhibit 1 and incorporated herein by reference.

11         33.    Although four separate state immigration laws were signed by

12  Governor Herbert on March 15, 2011, these bills are widely regarded as a package

13  meant to work together to implement Utah's vision for immigration reform.[1]  The

14  legislators' statements during the floor debates on these bills make clear that the

15  legislature intended the laws to work hand-in-hand to achieve a comprehensive

16  and new Utah vision for state immigration regulation.  For example, several

17  legislators commented that it was essential to enact the enforcement provisions in

18  HB 497 side-by-side with the provisions allowing for the sponsorship of

19  immigrants to Utah in HB 469 and the state "guest worker" program in HB 116.

20  *See* Debate on H.B. 116 Before the House, Day 30 (2011) (remarks of Rep.

21  Wright) ("[W]e can have enforcement, and we can also have guest worker

22  [legislation], we can coordinate these things and they can go hand-in-hand to be

23  able as a state to accomplish what we really want to accomplish"); *see also* Debate

24
_____

25  [1] HB 466, which was also signed by Governor Herbert on the same day does not
    create a new state immigration scheme, but rather calls for the creation of a
    commission to study a possible program between the state of Utah and the
26  Mexican State of Nuevo Leon to encourage promotion of federal non-immigrant
    visas.

on H.B. 469 Before the Senate, Day 43 (2011) (remarks of Sen. Niederhauser) ("[HB 497] works in conjunction with and not in opposition to other legislation that has already passed"); Debate on H.B. 116 Before the House, Day 30 (2011) (remarks of Rep. Draxler) (calling the combination of the guest worker and enforcement bills a "pragmatic approach to trying to deal with this situation" and noting that "[w]e need this kind of approach [HB 116], side-by-side with stricter enforcement [HB 497]," and that HB 497, "deal[ing] with enforcement, will not by itself help this problem go away.").  Thus, the legislative history makes clear that the Utah legislature intentionally enacted HB 497 along with HB 116, and HB 469 as a comprehensive solution to the perceived problem of the federal government's failure to regulate immigration to Utah's liking.

34.    Of the new Utah immigration laws, only HB 497 is expected to take effect in 2011.[2]  Absent court intervention, HB 497 is due to be implemented on May 10, 2011.

35.    In enacting these state immigration bills, Utah legislated in an area committed to the federal government under the U.S. Constitution.  Indeed, Utah expressly intended not only to intrude into an area of exclusive federal control but indeed to supplant the federal government. The legislative debate on these bills makes clear that a key motivating factor in passing these laws was the state legislature's disagreement with the federal government's handling of immigration policy.  For example, during the debate on HB 497, Senator Dayton commented:

[2] HB 469 provides for the Governor to implement the program by no later than July 1, 2013 and to end the program on June 30, 2018.  Utah Pilot Sponsored Resident Immigrant Program Act, H.B. 469, 2011 Gen. Session Ch. 20 (2011). HB 116 is to take effect the sooner of the date 120 days after the state is granted a federal waiver, exemption, or authorization for the program, or on July 1, 2013. Utah Immigration Accountability and Enforcement Amendments, H.B. 116, 2011 Gen. Session Ch. 18 (2011).

"[O]ne of the few and defined duties of the federal government is to protect our borders and they are utterly failing to do their duty."  Debate on H.B. 497 Before the Senate, Day 39 (2011).  Similarly, during the debate on HB 469, Representative Ivory asked rhetorically: "Having assumed power over immigration, how well has the federal government exercised that power that it's usurped?  We see a border that's completely porous.  In fact, southern states have a war zone on their borders.  We see that the federal government, in assuming powers never delegated to it, has done largely what the federal government is good at, and that is destroying things."  Debate on H.B. 469 Before the House, Day 38 (2011).  During the same debate, the Sponsor of HB 469, Representative Dougall, commented that the federal government had failed in its handling of immigration as evidenced by "the problems that we face in regards to a broken immigration process."  Debate on H.B. 469 Before the House, Day 38 (2011).  During the House debate on HB 116, Representative Sagers commented: "[I]t's shameful that the federal government cannot take the position they need to and lead on this matter."  Debate on H.B. 116 Before the House, Day 30 (2011).

36.    Without question, the Governor and the Utah legislature intended to supplant the federal government's authority over immigration with this state package of immigration laws.  In signing the bills into law, Governor Gary Herbert called the package a "Utah solution."  *See* Press Release, Governor Herbert Signs Immigration Reform Legislation (Mar. 15, 2011).  Previously, in response to an earlier version of HB 497 Governor Herbert had stated: "Absent any meaningful leadership from the federal government on this issue, individual states are being forced to take up the charge."  *See* Press Release, Governor Herbert Issues Statement on Illegal Immigration Reform in Utah (Aug. 13, 2010).

37.    In addition, during the legislative debate on these three state immigration bills, several legislators expressly stated that they intended for the State of Utah to wrest control over immigration regulation away from the federal government.  For example, Senator Dayton stated during debate on HB 497: "What we have in this bill are federal laws put into state statutes so that we can enforce the federal laws since the federal government is not."  Debate on H.B. 497 Before the Senate, Day 39 (2011).  She explained that HB 497 "empowers law enforcement to enforce, on the state level, federal law."  *Id.*

38.    Similarly, during the debate on HB 469 several legislators indicated a clear intent to take over immigration regulation from the federal government.  For example, the sponsor, Representative Dougall stated: "This bill also recognizes that historically . . . the states ran immigration for about the first 100 years of our nation before the feds started assuming more and more authority over immigration.  And so this recognizes and speaks to the states' rights issue regarding immigration."  Debate on H.B. 469 Before the House, Day 38 (2011).  Contrary to the Supremacy Clause and settled Supreme Court jurisprudence, Representative Ivory stated during the debate on HB 469 that he "applaud[ed]" the bill's sponsor for "reclaiming a right that was never delegated [to the federal government] and exercising power over immigration in the state of Utah."  Debate on H.B. 469 Before the House, Day 38 (2011).  In addition, Representative Dougall also stated in response to a question about the bill's constitutionality by the Legislative Research and General Counsel: "if that means that we need to push back against the federal government and the tradition [of federal control over immigration] that built up in the courts, I would suggest that we push back."  Debate on H.B. 469 Before the House, Day 38 (2011).  He also stated, "I would suggest that there is a

lot of wrongness, if that is a word, with what the Supreme Court has said in regards to immigration.  I believe that states who deal with the frontline benefits and issues, [and] challenges regarding immigration stand in the best position to deal with it." *Id*.

### Key Provisions of HB 497

39.    HB 497 establishes a comprehensive state immigration enforcement scheme complete with new state immigration crimes and immigration verification requirements for state and local law enforcement officials conducting field stops. The interrelated provisions of HB 497 work together to compel law enforcement officers to investigate individuals' immigration status—a complex question of federal law—and authorizes law enforcement officers to make warrantless arrests on immigration grounds in situations where even federal immigration officers would not be authorized to make an arrest.  HB 497 also sets out new state crimes related to unlawful presence in the country and requires state officers and prosecutors to take over enforcement of 8 U.S.C. § 1306, a federal misdemeanor criminal statute penalizing certain violations of a federal registration scheme that is now obsolete in key respects.

40.    Under HB 497, law enforcement officers must demand that individuals they lawfully stop, detain, or arrest produce one of four enumerated types of identity documents.  Utah Code Ann. §§ 76-9-1004.  Only individuals who can produce a document from this statutory list receive a presumption of lawful status in the country.  *Id*.  Other individuals will be subject to immigration status verification on a mandatory or discretionary basis, depending on the circumstances of their initial stop.  This "show me your papers" provision requires Utah police officers to verify immigration status at the outset of every stop; only

documents that require proof of immigration status as a pre-condition for issuance

will satisfy the documentation requirement and allow a person to avoid having the

stop extended for a lengthy and intrusive immigration status investigation.

41.    Under HB 497, immigration verification is <u>required</u> where (1) the

stop or arrest concerns a suspected class A misdemeanor or felony, (2) the

individual is unable to provide the officer with a qualifying document, and (3) the

officer is "otherwise unable to verify the identity of the person."  Utah Code Ann.

§ 76-9-1003(1).  Immigration status verification is also required in any case where

a suspect is arrested and booked on a class B or C misdemeanor.  *Id*.  Finally,

immigration status verification is required when an individual is "arrested <u>or</u>

booked into a jail, juvenile detention facility, or correctional facility" for <u>any</u> of

these types of offenses.  Utah Code Ann. § 76-9-1003(3) (emphasis added).  This

would include instances where individuals are cited with minor traffic violations,

even though under current police practices these individuals would usually be

released after a citation is given.

42.    In addition, for any stops based on suspected B or C misdemeanors,

the law authorizes officers to verify status.  Utah Code Ann. § 76-9-1003(1)(a)(ii).

43.    The statute also requires that a law enforcement officer must detain

all occupants of the vehicle while their immigration status is verified any time the

officer develops "reasonable suspicion" that any occupant in that vehicle is

violating the newly created provision of state law that makes it a crime to transport

or smuggle "illegal aliens."  Utah Code Ann. § 76-9-1003(2).

44.    HB 497 invites racial profiling by law enforcement officials.  First,

the law allows an officer to deny the presumption of lawful status to individuals

who provide one of the four enumerated types of identity documents specified in

HB 497 if "the officer has a reasonable suspicion that the document is false or identifies a person other than the person providing the document."  Utah Code Ann. § 76-9-1004.  This caveat permits a police officer to second-guess an individual's documentation, opening the door to racial profiling and discrimination based on an individual's appearance, language choice, or English-language ability.  Second, section 76-9-1004 affords a presumption of citizenship or nationality status for individuals who affirm to a law enforcement officer that they are U.S. citizens or nationals, "unless the officer has a reasonable suspicion that the statement or affirmation is false."  *Id*.  This provision similarly permits a police officer to discredit an individual's affirmation, which necessarily entails a high risk of discrimination based on stereotypes about what an undocumented immigrant might look or sound like.

45.    HB 497 also allows state or local law enforcement officials to make warrantless arrests when the officer has "reasonable cause" to believe the individual is an alien who is (1) subject to a removal order by an immigration judge; (2) subject to an immigration detainer request; or (3) charged or convicted in another state with one or more "aggravated felonies" as defined by federal immigration law.  Utah Code Ann. § 77-7-2.  This provision will result in unlawful detentions without suspicion of criminal wrongdoing while state and local enforcement officers attempt to verify federal immigration information.  In addition, this provision inappropriately requires state and local law enforcement officials to make independent assessments of an individual's federal immigration status as well as what offenses qualify as aggravated felonies, both complex questions of immigration law.  Moreover, it authorizes the warrantless arrest of individuals who are not subject to removal or detention under federal law.

46.   HB 497 also prohibits any state or local governmental agency, or any representative of such an agency, from having any policy limiting or restricting the authority of any law enforcement agency to investigate or enforce violations of the federal misdemeanor offenses of willful failure to register as an alien or willful failure to personally possess an alien registration document, under 8 U.S.C. §§ 1304(e) and 1304(a).  Utah Code Ann. § 76-9-1006(2).  These federal code provisions were designed to create a single, uniform, national scheme.  The preemptive effect of the federal alien registration scheme was expressly recognized by the President of the United States when the scheme was created and has been expressly upheld by the U.S. Supreme Court, and the provisions are not susceptible to enforcement by state or local officers.

47.   The federal alien registration provisions have long been regarded as obsolete, impracticable to enforce, and outside the federal government's enforcement priorities.

48.   For example, the federal regulation implementing 8 U.S.C. §§ 1302, 1304, and 1306 specifies forms that will serve as "evidence of registration."  *See* 8 C.F.R. § 264.1.  The list, however, has not been kept up to date with current federal immigration forms and procedures.  As a result, there are categories of noncitizens who have applied for immigration benefits, have been granted a lawful status in the United States,  or whose presence in the country is otherwise known to federal immigration agencies, but who do not have registration documents that would satisfy the federal regulation.

49.   The Bureau of Justice Services reports that there have been only 30 prosecutions for misdemeanor offenses of 8 U.S.C. §§ 1304(e) and 1306(a) in the

past 15 years.  Decl. of Susan T. Boyd, *Friendly House, et al., v.* Whiting, No. 10-1061 (June 14, 2010).

50.    HB 497's provisions not only improperly require enforcement of the <u>federal</u> alien registration scheme, but they also impose a <u>state</u> alien registration scheme by requiring non-citizens to obtain and carry specific documents if they wish to avoid lengthy and intrusive immigration status investigation and verification at the hands of Utah state and local police.

51.    Section 10 of HB 497 also creates a new state criminal offense of encouraging or inducing a non-citizen "to come to, enter, or reside" in Utah "knowing or in reckless disregard of the fact" that the non-citizen's "coming to, entry, or residence is or will be in violation of law," as well as other related offenses.  Utah Code Ann. § 76-10-2901(2)(c).  Federal law already establishes penalties for the conduct covered in Section 10.

**Comprehensive Federal Immigration System**

52.    The federal government has exclusive power over immigration matters.  The U.S. Constitution grants the federal government the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3.  In addition, the Supreme Court has held that the federal government's power to control immigration is inherent in the nation's sovereignty.

53.    The U.S. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the Immigration and Nationality Act ("INA").  *See* 8 U.S.C. § 1101 *et seq.*  This extensive statutory scheme leaves no room for supplemental state immigration laws.

54.     The federal government has also issued numerous regulations, policies, and procedures interpreting the provisions of the INA and has established a large and complex administrative apparatus to carry out its mandates.

55.     The INA carefully calibrates the nature (criminal or civil) and degree of penalties applicable to each possible violation of its terms.

56.     The INA contains complex and exclusive procedures for determining immigration and citizenship status, deciding whether the civil provisions of the immigration laws have been violated, and determining whether an individual may lawfully be removed from the United States.

57.     Under the INA, a non-citizen's immigration status may be fluid and subject to change over time.  For example, a non-citizen who enters the United States with authorization, with a student visa for example, may overstay and thus no longer be in status.  Conversely, a non-citizen who enters the United States without authorization may subsequently gain lawful status, such as through a successful asylum application or U-visa application.

58.     Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not remain in the United States.  The answer to that question is a legal conclusion that can only be reached through the processes set forth in the INA and may depend on the discretionary determinations of federal officials.

59.     There are many non-citizens who are present in the United States without formal permission who lack the documents that would establish a presumption of "lawful presence" under HB 497, yet would not be removed if placed in federal removal proceedings or who actually have temporary permission from the federal government to be in the United States.  For example, an

individual without federal immigration status may be eligible for a form of immigration relief, such as asylum, adjustment of status, or withholding of removal.  Some of these individuals are known to the federal government; others will not be identified until they are actually placed in proceedings by the federal government and their cases are adjudicated.  In addition, some individuals like those granted Temporary Protected Status due to turmoil or natural disasters in their native countries have permission to be in the United States, but are unlikely to have one of the enumerated identity documents that establish a presumption of lawful presence under HB 497.

60.    Federal immigration agencies, such as U.S. Immigration and Customs Enforcement or U.S. Customs and Border Protection, do not and cannot determine whether a particular person may remain in the United States, or whether a particular person has been charged with or convicted in another state with one or more "aggravated felonies" as defined by immigration law, without going through the complex procedures set forth in the INA.  Federal agencies similarly do not and cannot determine definitively, in response to a demand from a state or local official, whether an individual is "unlawfully present" or has "authorization to remain in the United States" as those phrases are used in HB 497.  The federal databases that are searched when performing an immigration status query are not set up to make final determinations of whether an individual has federally authorized immigration status.  The federal immigration agencies can only determine whether they believe a non-citizen may be <u>charged</u> with deportability.  A determination of whether an individual has federal immigration authorization is a complex administrative process that may take years, and where the federal government often exercises its prosecutorial discretion.  In addition, not all

inquiries into the federal government's verification system as established under 8 U.S.C. §1373(c) yield a definitive response.  Plaintiffs' Motion for Preliminary Injunction, Exh. 3, *U.S. v. Arizona*, No. 10-1413 (D. Ariz., July 7, 2010).  In fact, as of June 2010,  inquiries into this system took under the best case scenario an average of 81 minutes to process and in some cases took two days or more when a review on an individual's file was required.  *Id.*

61.    Furthermore, determining whether a person is a citizen of the United States can be a complex and counterintuitive process.  U.S. citizens are not required to carry documentary proof of their citizenship.  There is no national database that contains information about every U.S. citizen.  Some people are actually unaware of their U.S. citizenship because they may have acquired U.S. citizenship at birth by operation of law due to their parents' citizenship, despite not being born in the United States.  *See, e.g.*, 8 U.S.C. § 1433.  Others automatically obtained citizenship when their parents became naturalized U.S. citizens.  *See, e.g.*, 8 U.S.C. § 1431.

62.    HB 497's creation of a state immigration verification system fundamentally conflicts with the INA's statutory scheme, impermissibly encroaches on the federal government's exclusive power to regulate immigration, and will lead to erroneous determinations and unlawful detention by state and local officials.

63.    Mere presence inside the United States without federal immigration status is not a criminal offense.  Rather, it is a civil violation under federal immigration law.

64.    Moreover, HB 497 conflicts with and is preempted by provisions of the INA that set forth comprehensive federal schemes addressing the participation

of state and local law enforcement in immigration enforcement and the ability to make warrantless arrests for civil immigration violations.

65.    State and local law enforcement officers have no general authority to enforce federal civil immigration law.  Federal law specifically authorizes state officers to assist in immigration enforcement only in narrowly defined circumstances, and otherwise reserves immigration enforcement authority to the federal government.

66.    Section 1357(g) of Title 8 of the U.S. Code allows the federal government to "enter into a written agreement with a State, or any political subdivision" to carry out "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States."  8 U.S.C. § 1357(g).  These agreements are commonly referred to as "287(g) agreements" after the section of the INA in which they are codified.  Such agreements, however, may be entered into only if the federal government determines the state officers are "qualified to perform a function of an immigration officer," *id.*, and the federal government must train and supervise each officer who is authorized under such an agreement.  Currently, only two agencies in Utah have agreements pursuant to this statutory provision—the Washington County Sheriff's Office and the Weber County Sheriff's Office.  *See* U.S. Immigration and Customs Enforcement, Fact Sheet: Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act.

67.    HB 497 violates the Constitution by granting state and local law enforcement officers authority to make immigration determinations, civil arrests, and investigations without and outside of the authority provided by a 287(g) agreement.  In addition, even with respect to the two counties in Utah with current

287(g) agreements, these local officers are limited to making immigration status inquiries of individuals who are already in local criminal custody.  HB 497's provisions mandating or allowing immigration status verification by law enforcement officials in the field conflicts with the limited manner in which the federal government has allowed Utah law enforcement agencies to engage in the enforcement of federal immigration law.

68.    The other provisions in federal law authorizing state or local participation in immigration enforcement are also carefully constrained.  Federal immigration statutes expressly authorize state and local police to make arrests for exactly two immigration <u>crimes</u>—smuggling, transporting, or harboring <u>criminal</u> aliens, and illegal entry by a previously deported felon.  8 U.S.C. §§ 1103(a)(10), 1252c.  Another provision, 8 U.S.C. § 1103(a)(10), allows the U.S. Attorney General to authorize "any State or local law enforcement officer" to enforce immigration laws upon certification of "an actual or imminent mass influx of aliens," but no such certification has ever occurred.

69.    Congress's intent that state and local officers are generally prohibited from enforcing <u>civil</u> immigration laws is clear both from the statutory scheme and from the statements of its members.

70.    Even as to federal immigration officers, the INA and associated regulations impose significant restrictions on the circumstances in which warrantless arrests may be made and the procedures that are required following such arrests.  8 U.S.C. §§ 1357(a), (d); 8 C.F.R. §§ 287.1-287.3, 287.5, 287.8, 287.10.  HB 497, in contrast, authorizes state and local officers to make warrantless arrests even in circumstances where federal immigration agents would not have such authority.

**HB 497 Interferes with the Federal Government's Interests in a
Uniform Immigration System and Adversely Impacts Foreign Relations**

71.   HB 497 interferes with the core federal interests in setting a uniform federal immigration scheme, as well as in conducting foreign relations with other nations.

72.   As recently as April 27, 2011, President Barack Obama criticized state efforts to regulate immigration: "It is a mistake for states to try to do this piecemeal.  We can't have 50 different immigration laws around the country. Arizona tried this and a federal court already struck them down."  *See* Matthew Bigg, "*Obama criticizes new Georgia immigration law,*" REUTERS, Apr. 26, 2011.

73.   Utah's immigration status verification scheme would invariably undermine federal immigration enforcement priorities by subjecting countless individuals in Utah to detention and referral to federal immigration officials without regard for whether they would fit within federal immigration enforcement priorities.

74.   In addition, because immigration policy is inextricably intertwined with foreign relations.  Utah's attempt to regulate immigration through HB 497 will adversely impact the United States' ability to conduct foreign relations.  HB 497 will undermine the ability of the U.S. government to speak with a single voice about immigration, including communicating to foreign nations what their nationals can expect when they come to visit or reside in the United States.  State attempts to interfere with these inherently federal issues can have severe impacts on foreign relations.

1

2          **HB 497 Promotes Racial Profiling and Endangers Minority**

3                                  **Communities**

4          75.   HB 497 promotes an environment of rampant racial profiling by state

5   and local law enforcement officials.  The law mandates immigration status

6   verification in certain circumstances and allows it in other instances.  As a result,

7   law enforcement officers are likely to make decisions about whether to verify a

8   person's immigration status, and whether to credit their affirmation of citizenship

9   or the reliability of their identity documents, based on the way they look or speak.

10  Law enforcement officers are most likely to verify the immigration status of

11  individuals they believe look or sound foreign.

12         76.   Law enforcement officials across the country and in Utah have cited

13  concerns that HB 497 cannot be implemented in a race-neutral fashion and will

14  inevitably lead law enforcement officers to rely inappropriately on race and

15  ethnicity in making decisions about whom to subject to additional scrutiny with

16  questions regarding their immigration status.  In addition, implementation of HB

17  497 will have a significant negative impact on the ability of local police to protect

18  immigrant communities.  Because immigrants will avoid the police out of fear that

19  any interaction could lead to immigration status inquiries, Utah law enforcement

20  officers will not get the assistance they need to prosecute crimes.  As Salt Lake

21  City Police Chief, Chris Burbank has recognized, "When we take into account race

22  or ethnicity in making decisions in whether or not to take enforcement action, it

23  compromises every single law enforcement agent throughout the state."  Lee

24  Davidson, *Latino group to states: Copy Utah Compact, not its law*, THE SALT

25  LAKE TRIBUNE, Apr. 20, 2011.

26

**CLASS ACTION ALLEGATIONS**

77.    The Individual Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).  The class, as proposed by Plaintiffs, consists of all persons:

(a)    who as a result of their race, national origin, customary language, accent, or lack of certain documents are or will be subject to stops, detention, arrest, or questioning about their immigration or nationality status or required to produce documentation of that status, pursuant to a provision of HB 497; or

(b)    who are or will be deterred from living, associating, worshipping, or traveling with immigrants in Utah because of the provisions of HB 497; or

(c)    who are or will be deterred from traveling into or through the State of Utah because of the provisions of HB 497.

78.    The requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2) are met here, in that the class is so numerous that joinder of all members is impracticable.

79.    There are questions of law and fact common to the proposed class, including: (1) whether HB 497 is preempted by the U.S. Constitution and federal law; (2) whether HB 497 violates the Fourth Amendment of the U.S. Constitution; (3) whether HB 497 infringes on the Right to Travel of members of the proposed class; and (4) whether HB 497 violates the Equal Protection clause of the U.S. constitution and its equivalent under Utah law.  These questions predominate over any questions affecting only the Individual Plaintiffs.

80.     The claims of the Individual Plaintiffs are typical of the claims of the proposed class.

81.     All of the Individual Plaintiffs will fairly and adequately represent the interests of all members of the proposed class because they seek relief on behalf of the class as a whole and have no interests antagonistic to other members of the class.  The Individual Plaintiffs are also represented by *pro bono* counsel, including the ACLU of Utah, the ACLU Foundation, and the National Immigration Law Center, who have extensive expertise in class action litigation, including litigation regarding the rights of immigrants.  Finally, Defendants have acted and will act on grounds generally applicable to the class in executing their duties to enforce HB 497, thereby making appropriate final injunctive relief with respect to the class as a whole.

### DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

82.     An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties.  Plaintiffs contend that they face an imminent threat of harm if HB 497 is enforced, and that this law violates the U.S. Constitution, federal law, and state law.  Defendants are obligated to enforce this law unless it is found to be illegal.

83.     In violating Plaintiffs' rights under the U.S. Constitution, federal law, and state law, Defendants have acted and will be acting under color of law.

84.     If allowed to go into effect, HB 497 will cause irreparable injury to Plaintiffs.

85.     Plaintiffs have no plain, speedy, and adequate remedy at law against HB 497 other than the relief requested in this Complaint.

86.    If HB 497 takes effect, the Plaintiffs and other individuals of color in Utah will be subject to unlawful detention, arrest, and harassment including plaintiffs Jane Doe #1, John Doe #1, Milton Ivan Salazar-Gomez, Alicia Cervantes, members of Plaintiffs SEIU and Rocky Mountain Joint Board, and members of the proposed plaintiff class.

87.    If allowed to take effect, HB 497 would also violate the right of Plaintiff Eliana Larios, as well as members of the proposed plaintiff class, to travel into and throughout Utah.

88.    In addition, the laws will thwart the missions of organizational Plaintiffs Centro, UCLR, and CUP by forcing them to continue to spend more time and resources on HB 497 and immigration enforcement matters rather than other pressing organizational priorities, and by deterring their members from participating in membership activities.

89.    In doing the things alleged in this Complaint, Defendants will deny Plaintiffs' rights secured by the U.S. Constitution, federal law, and state law.

90.    Defendants' enforcement of HB 497 will constitute an official policy of the state of Utah.

91.    Plaintiffs are entitled to a declaration that HB 497 is unconstitutional on its face and to an order preliminarily and permanently enjoining its enforcement.

## CAUSES OF ACTION

### COUNT ONE

### SUPREMACY CLAUSE; 42 U.S.C. § 1983

92.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

93.   The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

94.   The Supremacy Clause mandates that federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

95.   HB 497 is void in its entirety because it attempts to bypass federal immigration law and to supplant it with a state policy of immigration enforcement, in violation of the prohibition on state regulation of immigration.

96.   HB 497 conflicts with federal laws and policies, usurps powers constitutionally vested in the federal government exclusively, attempts to legislate in fields occupied by the federal government, imposes burdens and penalties on legal residents not authorized by and contrary to federal law, and unilaterally imposes burdens on the federal government's resources and processes, each in violation of the Supremacy Clause.

## COUNT TWO

### FOURTH AMENDMENT; 42 U.S.C. § 1983

97.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

98.   The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures."  The Fourth Amendment's guarantees are applied to the States through the Fourteenth Amendment.

99.   HB 497 requires that officers unreasonably prolong seizures of individuals without reasonable suspicion of criminal activity, in violation of the Fourth Amendment.

100.  Section 11 of HB 497 provides for warrantless arrests of individuals in the absence of probable cause that they have committed crimes, in violation of the Fourth Amendment.

101.  Sections 3, 4, and 5 of HB 497 authorize officers to detain individuals without reasonable suspicion of unlawful activity for purposes of investigating their immigration status and transporting them into federal custody, in violation of the Fourth Amendment.

**COUNT THREE**

**PRIVILEGES AND IMMUNITIES; RIGHT TO TRAVEL; 42 U.S.C.**

**§ 1983**

102.  The foregoing allegations are repeated and incorporated as though fully set forth herein.

103.  The Privileges and Immunities Clause of the U.S. Constitution, Article IV, Section 2, Clause 1, provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

104.  Similarly, the Privileges and Immunities Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

105.  All residents in the United States enjoy a fundamental right to travel, which has also been held to derive from the Equal Protection Clause of the U.S. Constitution as well as the Commerce Clause.

106.  The constitutional right to travel prevents states from burdening, penalizing, or infringing upon the right to travel, including the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in another state, without a rational or compelling justification.

107.  Sections 76-9-1003 and 76-9-1004 of HB 497 subjects those out-of-state residents who lack certain documents and appear to a law enforcement officer to not to be "citizens or nationals" of the United States to investigation and detention pending a determination of immigration status if they do not present an identification document deemed acceptable by the State of Utah.

108.  HB 497 thus interferes with the rights of such out-of-state citizens to travel freely through the State of Utah without being stopped, interrogated, and detained.

## COUNT FOUR

## EQUAL PROTECTION CLAUSE; 42 U.S.C. § 1983

109.  The foregoing allegations are repeated and incorporated as though fully set forth herein.

110.  The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

111.  HB 497 impermissibly targets individuals who do not possess one of an enumerated set of identity documents for differential treatment by law enforcement officers.  Individuals who do not have one of the favored identity documents will be subject to prolonged detention and arrest by law enforcement officers based solely on their lack of having a preferred document.

112.  There is no valid justification for this differential treatment of state residents or visitors.

113.  As a result, HB 497 denies plaintiffs and other individuals lacking one of the preferred identity documents residing or traveling in Utah of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

## COUNT FIVE

### VIOLATION OF ARTICLE I, SECTION 24 OF THE UTAH CONSTITUTION

114.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

115.  Article I, section 24 of the Utah Constitution provides that "All laws of a general nature shall have uniform operation."

116.  HB 497 violates the Utah Constitution by impermissibly targeting and treating disparately similarly situated individuals who do not possess one of an enumerated set of identity documents.  Individuals who do not have one of the favored identity documents will be subject to prolonged detention and arrest by law enforcement officers based solely on their lack of having a preferred document.

117.  As a result, HB 497 denies Plaintiffs and other individuals lacking one of the preferred identity documents the guarantee of uniform application of the laws within the meaning Article I, Section 24 of the Utah Constitution.

## COUNT SIX

### EQUAL PROTECTION CLAUSE; 42 U.S.C. § 1983

118.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

119.   The Fourteenth Amendment to the U.S. Constitution provides that "No State shall … deny to any person within its jurisdiction the equal protections of the laws."

120.   Section 4 of HB 497 impermissibly discriminates against non-citizen Plaintiffs on the basis of alienage and deprives them of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution. Section 4 affords a presumption of lawful presence to U.S. citizens and nationals who make an oral affirmation or statement to a law enforcement officer as to their status; however, Section 4 does not grant any presumption of lawful presence to lawful permanent residents or other noncitizens who similarly affirm their lawful immigration status.

**COUNT SEVEN**

**VIOLATION OF ARTICLE I, SECTION 24 OF THE UTAH CONSTITUTION**

121.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

122.   Article I, section 24 of the Utah Constitution provides that "All laws of a general nature shall have uniform operation."

123.   Section 4 of HB 497 violates the Utah Constitution by impermissibly targeting and treating disparately similarly situated individuals.  Under Section 4, U.S. citizens and nationals are afforded a presumption of lawful presence when they make an affirmation or statement to a law enforcement officer of their citizenship or national status; however, the provisions of Section 4 do not grant

any presumption of lawful presence to permanent residents or other noncitizens with lawful immigration status who affirm their lawful presence.

124.  As a result, Section 4 of HB 497 denies Plaintiffs the guarantee of uniform application of the laws within the meaning Article I, Section 24 of the Utah Constitution.

## COUNT EIGHT

### SECTION 1981; 42 U.S.C. § 1983

125.  The foregoing allegations are repeated and incorporated as though fully set forth herein.

126.  Section 1981 of Title 42 of the United States Code guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property."  Section 1981 also provides that all persons "shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

127.  Section 1981 prohibits discrimination under color of state law on the basis of alienage, national origin, and race.

128.  HB 497 impermissibly discriminates against persons within the State of Utah on the basis of alienage and national origin and race.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that the Court:

    a.      Assume jurisdiction over this matter;

    b.      Declare that HB 497 is unconstitutional in its entirety;

    c.      Enjoin Defendants from enforcing HB 497;

1

2          d.       Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and

3    other expenses pursuant to 28 U.S.C. § 1988; and

4          e.       Grant such other relief as the Court may deem appropriate.

5

6          Dated:  May 3, 2011              Respectfully submitted,

7                                           /s/ Karen C. Tumlin
                                            NATIONAL IMMIGRATION LAW
8                                           CENTER

9                                           /s/ Cecillia D. Wang
10                                          AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION, IMMIGRANTS'
11                                          RIGHTS PROJECT

12                                          /s/ Darcy M. Goddard
13                                          AMERICAN CIVIL LIBERTIES UNION
                                            OF UTAH FOUNDATION, INC.
14
                                            /s/ Elora Mukherjee
15                                          AMERICAN CIVIL LIBERTIES UNION
                                            FOUNDATION, RACIAL JUSTICE
16                                          PROGRAM

17                                          /s/ Bradley S. Phillips
18                                          MUNGER, TOLLES & OLSON LLP

19

20

21

22

23

24

25

26