Linton Joaquin*
Karen C. Tumlin*
Shiu-Ming Cheer*
Melissa S. Keaney*
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
Telephone: (213) 639-3900
Facsimile: (213) 639-3911
*joaquin@nilc.org*
*tumlin@nilc.org*
*cheer@nilc.org*
*keaney@nilc.org*

Omar C. Jadwat*
Andre I. Segura*
Elora Mukherjee*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2660
Facsimile: (212) 549-2654
*ojadwat@aclu.org*
*asegura@aclu.org*
*emukherjee@aclu.org*

Attorneys for Plaintiffs

*   Pro hac vice motion pending
+   Counsel for all plaintiffs except SEIU and
    Workers' United

Cecillia D. Wang*
Katherine Desormeau*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950
*cwang@aclu.org*
*kdesormeau@aclu.org*

Darcy M. Goddard (USB No. 13426)
Esperanza Granados (USB No. 11894)
AMERICAN CIVIL LIBERTIES
UNION OF UTAH FOUNDATION, INC.
355 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 521-9862
Facsimile: (801) 532-2850
*dgoddard@acluutah.org*
*egranados@acluutah.org*

Bradley S. Phillips*+
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702
*brad.phillips@mto.com*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| Utah Coalition of La Raza, *et al.,* | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | Case No. 2:11-cv-00401-BCW |
| Gary R. Herbert, *et al.,* | |
| Defendants. | Judge:  Hon. Brooke C. Wells |

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

    Sections 3 and 4:  Immigration Investigation and Detention by
    State and Local Officers ................................................................................ 3

    Section 6:  Prohibiting Limits on State and Local Authority to
    Enforce Immigration Laws ........................................................................... 5

    Section 10:  Criminalizing Harboring of Unauthorized Immigrants .................................. 6

    Section 11:  Authorizing Warrantless Arrests for Suspected
    Immigration Violations ................................................................................. 6

    Effect of HB 497's Comprehensive Immigration Enforcement
    Provisions ...................................................................................................... 6

ARGUMENT ...................................................................................................................... 8

  I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........................................ 9

    A. Plaintiffs Are Likely To Succeed in Their Claim that HB 497
      Violates the Supremacy Clause ......................................................................... 9

      1.    HB 497 Constitutes Impermissible State "Regulation of
            Immigration" ...................................................................................... 9

      2.  HB 497 Conflicts With Federal Immigration Law .................................................. 14

          a.    HB 497 Grants State and Local Officers Greater
              Authority to Make Arrests for Immigration Violations
              Than Federal Officers Have Under Federal Law ............................................ 14

          b.    HB 497 Conflicts with Federal Laws Limiting State and
              Local Officers' Authority To Enforce Civil
              Immigration Laws ............................................................................ 17

          c.    HB 497 Undermines Federal Policies and Priorities for
              Immigration Enforcement ................................................................. 21

          d.    HB 497 Is Preempted Because It Imposes a *De Facto*
              Alien Registration Requirement ....................................................... 24

          e.    HB 497 Creates State Criminal Immigration Offenses
              that Are Preempted by Federal Laws ............................................... 25

B.  Plaintiffs Are Likely To Succeed in Their Claim that HB 497
Violates the Fourth Amendment ...................................................................... 26

1.  Sections 3 and 4 Violate the Fourth Amendment By
Allowing for Prolonged Detention of Individuals Without
Reasonable Suspicion of Illegal Activity ................................................ 27

2.  Section 11 of HB 497 Violates The Fourth Amendment By
Allowing Warrantless Arrests Without Any Criminal
Predicate .................................................................................................. 31

C.  Plaintiffs Are Likely To Prevail in Their Claim that HB 497
Violates the Constitutional Right To Travel .................................................. 32

II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF HB
497 IS ALLOWED TO GO INTO EFFECT ...................................................... 35

III.  THE BALANCE OF THE EQUITIES TIPS SHARPLY IN
FAVOR OF GRANTING A PRELIMINARY INJUNCTION ....................................... 38

IV.  PRELIMINARILY ENJOINING HB 497 WILL NOT BE
ADVERSE TO THE PUBLIC INTEREST ..................................................... 39

CONCLUSION ............................................................................................................. 40

CERTIFICATE OF SERVICE ..................................................................................... 41

# TABLE OF AUTHORITIES

## CASES

*Adams v. Baker*, 919 F. Supp. 1496 (D. Kan. 1996)......................................................39

*Almendarez-Torres v. U.S.*, 523 U.S. 224 (1998)..........................................................35

*Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396 (2003)......................................................13

*American Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999)..............................................................................................................................39

*Arizona v. Johnson*, 129 S. Ct. 781 (2009)...................................................................30

*Atty. Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898 (1986)................................................33

*Austin v. New Hampshire*, 420 U.S. 656 (1975)............................................................34

*Bank One v. Guttau*, 190 F.3d 844 (8th Cir.1999)........................................................39

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).....................................23

*Carrasca v. Pomeroy,* 313 F.3d 828 (3d Cir. 2002) .....................................................20

*Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) ................14, 39

*Chy Lung v. Freeman*, 92 U.S. 275 (1875)...................................................................13

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007)...................................................31

*Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363 (2000) .........................14, 23, 26

*Davida v. United States,* 422 F.2d 528 (10th Cir. 1970) ..............................................20

*DeCanas v. Bica*, 424 U.S. 351 (1976).............................................9, 10, 12, 13, 25

*Devenpeck v. Alford*, 543 U.S. 146 (2004) ..................................................................32

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ....................................................................33

*Edelman v. Jordan*, 415 U.S. 651 (1974) ....................................................................33

*Fid. Fed. Sav. & Loan Ass'n. v. de la Cuesta*, 458 U.S. 141 (1982) ............................14

*Florida v. Royer*, 460 U.S. 491 (1983) ......................................................................28

*Garrett v. City of Escondido*, 465 F. Supp. 2d 1043 (S.D. Cal. 2006) .........................25

*Gonzales v. City of Peoria,* 722 F.2d 468 (9th Cir. 1983) .....................................19, 20

*Goodlett v. Louisiana & Nashville R.R.*, 122 U.S. 391 (1887).....................................35

*Henderson v. Mayor of the City of New York,* 92 U.S. 259 (1875) ...............................13

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .........................5, 9, 13, 24, 25, 40

*Hodgers-Durgin v. De la Vina,* 199 F.3d 1037 (9th Cir. 1999).....................................19

*Keirnan v. Utah Transit Authority*, 339 F.3d 1217 (10th Cir. 2003).............................38

*Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001).....................................................35

*League of United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755 (C.D. Cal. 1995)...............................................................................................................12

*Leavitt v. Utah Licensed Beverage Ass'n*, 256 F.3d 1061 (10th Cir. 2001) ............36, 39

*Leocal v. Ashcroft,* 543 U.S. 1 (2004)........................................................................16

*Manzanares v. Higdon*, 575 F.3d 1135 (10th Cir. 2009).............................................28

*Martinez-Medina v. Holder*, __ F.3d __, 2011 WL 855791 (9th Cir. Mar.
11, 2011) ..........................................................................................................19, 20

*Mohammed v. Davis County*, 2011 WL 65728 (D. Utah Jan. 10, 2011) ......................28

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992)...............................................35

*Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480 (10th Cir.
1998) ...................................................................................................................9

*Muehler v. Mena*, 544 U.S. 93 (2005) ..................................................................30, 31

*Nat'l Ctr. For Immigrants' Rights, Inc. v. INS*, 743 F.2d 1365 (9th Cir.
1984) ..................................................................................................................39

*Newton v. Buckley*, No. 96-4202, 1997 WL 642085 (10th Cir. Oct. 17,
1997) ...................................................................................................................5

*Padilla v. Kentucky,* 130 S.Ct. 1473 (2010) .............................................................16

*Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y.*, 799 F. Supp.
1417 (W.D.N.Y. 1992) .......................................................................................37

*Romero v. Fay*, 45 F.3d 1472 (10th Cir. 1995).........................................................31

*Saenz v. Roe*, 526 U.S. 489 (1999) .........................................................................33

*Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357 (1997) .............................37

*Shapiro v. Thompson*, 394 U.S. 618 (1969).........................................................32, 33

*State v. Harmon*, 910 P.2d 1196, 1199-1200 (Utah 1995) ..........................................5

*Takahashi v. Fish & Game Comm'n,* 334 U.S. 410 (1948)........................................10

*Terry v. Ohio*, 392 U.S. 1 (1968).............................................................................27

*Toll v. Moreno,* 458 U.S. 1 (1982)...........................................................................10

*United States v. Arizona*, __ F.3d __, 2011 WL 1346945
(9th Cir. Apr. 11, 2011) .............................13, 18, 19, 20, 21, 23, 25, 26, 35, 40

*United States v. Arizona*, 703 F. Supp. 2d 980 (D. Ariz. 2010)...........................5, 16, 35

*United States v. Botero-Ospina,* 71 F.3d 783 (10th Cir. 1995) ................................28

*United States v. Choudhury*, 461 F.3d 1097 (9th Cir. 2006) ...................................31

*United States v. Gonzalez-Lerma,* 14 F.3d 1479 (10th Cir. 1994).......................27, 28

*United States v. Guerrero-Espinoza*, 462 F.3d 1302 (10th Cir. 2006) .....................30

*United States v. Guzman,* 864 F.2d 1512 (10th Cir. 1988) ......................................27

*United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001) ...........................................28

*United States v. Janik,* 723 F.2d 537 (7th Cir. 1983)...............................................20

*United States v. Lee*, 73 F.3d 1034 (10th Cir. 1996) ..............................................28

*United States v. McRae*, 81 F.3d 1528 (10th Cir. 1996)......................................28, 31

*United States v. Patten*, 183 F.3d 1190 (10th Cir. 1999)........................................28

*United States v. Salinas-Calderon*, 728 F.2d 1298 (10th Cir. 1984) ............................................. 20

*United States v. Santana-Garcia,* 264 F.3d 1188 (10th Cir. 2001) ............................................. 21

*United States v. Santillanes*, 848 F.2d 1103 (10th Cir. 1988) ............................................. 31

*United States v. Sokolow*, 490 U.S. 1 (1989) ............................................. 27

*United States v. Swarovski,* 557 F.2d 40 (2d Cir. 1977) ............................................. 20

*United States v. Urrieta,* 520 F.3d 569 (6th Cir. 2008) ............................................. 19, 28

*United States v. Vasquez-Alvarez*, 176 F.3d 129 (10th Cir. 1999) ............................................. 20

*US Airways, Inc. v. O'Donnell*, 627 F.3d 1318 (10th Cir. 2010) ............................................. 9

*Utah Licensed Beverage Assn. v. Leavitt*, 256 F.3d 1061 (10th Cir. 2001) ............................................. 9

*Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835 (N.D. Tex. 2010) ............................................. 25, 39

*Virginia v. Moore*, 553 U.S. 164 (2008) ............................................. 31

*Whren v. United States*, 517 U.S. 806 (1996) ............................................. 31

## STATUTES

8 C.F.R. § 287.3 ............................................. 17

8 C.F.R. § 287.7(d) ............................................. 15

8 U.S.C. § 1101(a)(43) ............................................. 16

8 U.S.C. § 1101(a)(43)(F) ............................................. 17

8 U.S.C. § 1101(a)(43)(G) ............................................. 17

8 U.S.C. § 1101(a)(43)(J) ............................................. 17

8 U.S.C. § 1101(a)(43)(R) ............................................. 17

8 U.S.C. § 1101(a)(43)(S) ............................................. 17

8 U.S.C. § 1101(a)(43)(Q) ............................................. 17

8 U.S.C. § 1101(a)(43)(T) ............................................. 17

8 U.S.C. § 1103(a)(10) ............................................. 18

8 U.S.C. § 1187 ............................................. 15

8 U.S.C. § 1225(b) ............................................. 15

8 U.S.C. § 1227(a)(2)(A)(iii) ............................................. 16

8 U.S.C. § 1252c ............................................. 19

8 U.S.C. § 1252c(a) ............................................. 19

8 U.S.C. § 1304(a) ............................................. 23

8 U.S.C. § 1304(e) ............................................. 5, 23, 24

8 U.S.C. § 1306(a) ............................................. 5, 24

8 U.S.C. § 1324 ............................................. 6, 25, 26

8 U.S.C. § 1357(a)(2) ............................................. 17

8 U.S.C. § 1357(g) .............................................................................................................. 18, 19

8 U.S.C. § 1357(g)(1) ................................................................................................................ 18

8 U.S.C. § 1357(g)(3) ................................................................................................................ 18

8 U.S.C. § 1357(g)(5) ................................................................................................................ 18

8 U.S.C. § 1357(g)(10) .............................................................................................................. 19

8 U.S.C. § 1373(c) ....................................................................................................................... 4

HB 116 § 10, Utah Code Ann. § 63G-12-202(1) .......................................................................... 2

HB 466 § 6, Utah Code Ann. § 63G-12-202 ................................................................................ 2

HB 466 § 6, Utah Code Ann. § 63G-12-301 ................................................................................ 2

N.M. Code R. § 18.19.5.12(D) ................................................................................................... 34

N.M. Stat. Ann. § 66-5-9(B) (1978) .......................................................................................... 34

U.S. Const., Art. VI, cl. 2 ............................................................................................................ 9

Utah Code Ann § 76-9-1003(3) .................................................................................................... 4

Utah Code Ann. § 53-13-103 ...................................................................................................... 12

Utah Code Ann. § 53-3-202 ........................................................................................................ 29

Utah Code Ann. § 63G-12-101, et seq. ......................................................................................... 2

Utah Code Ann. § 63G-12-201(1)(b) ............................................................................................ 3

Utah Code Ann. § 63G-12-201 ..................................................................................................... 2

Utah Code Ann. § 63G-12-202(3) ................................................................................................. 3

Utah Code Ann. § 76-10-2901 ................................................................................................. 6, 25

Utah Code Ann. § 76-10-2901(2)(a) ........................................................................................... 25

Utah Code Ann. § 76-10-2901(2)(b) ........................................................................................... 25

Utah Code Ann. § 76-10-2901(2)(d) ........................................................................................... 25

Utah Code Ann. § 76-9-1002(6) .............................................................................................. 7, 27

Utah Code Ann. § 76-9-1003 ..................................................................................... 3, 27, 29, 33

Utah Code Ann. § 76-9-1003(1)(a)(i) ........................................................................................... 4

Utah Code Ann. § 76-9-1003(1)(a)(ii) .......................................................................................... 4

Utah Code Ann. § 76-9-1003(2) .................................................................................................... 5

Utah Code Ann. § 76-9-1004 ...................................................................................................... 27

Utah Code Ann. § 76-9-1004(1) ......................................................................................... 3, 8, 33

Utah Code Ann. § 76-9-1004(2) ......................................................................................... 4, 8, 24

Utah Code Ann. § 76-9-1006 ................................................................................................... 5, 23

Utah Code Ann. § 77-7-1 .............................................................................................................. 5

Utah Code Ann. § 77-7-2 ............................................................................................................ 16

Utah Code Ann. § 77-7-2(5) .................................................................................................... 6, 32

Utah Code Ann. § 77-7-2(5)(a) ................................................................................................... 15

Utah Code Ann. § 77-7-2(5)(b) ................................................................................................ 15

Wash. Rev. Code 46.20.035(3)................................................................................................ 34

**OTHER AUTHORITIES**

Consolidated Security, Disaster Assistance, and Continuing
Appropriations Act, 2009, Pub. L. No. 110-329, Title II, 122 Stat. 3574
(2008)......................................................................................................................................21

Department of Homeland Security Appropriations Act, 2010, Pub. L. No.
111-83, Title II, 123 Stat. 2142 (2009) .................................................................................21

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs move for a preliminary injunction barring the enforcement of the Utah Illegal Immigration Enforcement Act ("HB 497"), which establishes a comprehensive state-law system for the regulation of immigration. HB 497 creates new state-law criminal penalties for immigration-related conduct and imposes on state and local police officers a complex web of responsibilities to demand identification documents and to investigate immigration status.

HB 497 violates the U.S. Constitution by: (1) regulating immigration in myriad ways forbidden under the Supremacy Clause, including through direct conflict with federal laws and enforcement priorities as well as with U.S. foreign policy; (2) authorizing and in some cases requiring state and local police officers to violate the Fourth Amendment through discriminatory and unlawful seizures and warrantless arrests; and (3) interfering with the rights of citizens of other states to travel freely in and through Utah.  Plaintiffs are likely to succeed on the merits of their constitutional challenge to HB 497.

Unless the Court grants a preliminary injunction, Plaintiffs will suffer immediate and irreparable injury when HB 497 goes into effect on May 10, 2011, because they will be subject to a constitutionally preempted law, unlawful seizures and arrests at the hands of Utah police officers, and will be unable to travel freely in Utah. The public interest will also be harmed if HB 497 is permitted to take effect, because it will result in systemic violations of constitutional rights throughout the state of Utah.  HB 497 should be preliminarily enjoined to preserve the status quo while the Court adjudicates its constitutionality.

## FACTUAL BACKGROUND

The Utah legislature enacted HB 497 as part of a comprehensive system of immigration regulation that also includes two other laws, HB 116 and HB 469. In a press release issued upon signing these laws, Governor Gary Herbert proclaimed that "combined," the new immigration laws "constitute … 'the Utah solution'" for immigration reform.[1] *See* News Release, *Governor Herbert Signs Immigration Reform Legislation* (Mar. 15, 2011) (copy attached as Exhibit A to Decl. of Lorena Fernandez ("Fernandez Decl.")). This "Utah Solution" puts the state government in charge of fundamental aspects of immigration regulation, including: (1) the admission of non-citizens from outside the United States (HB 469);[2] (2) the granting of work authorization under state law to non-citizens without federal immigration or employment authorization (HB 116);[3] and (3) a complex web of immigration enforcement responsibilities for Utah police officers and prosecutors, including investigation of immigration status, detention and arrest for civil immigration violations, and enforcement of new state-law criminal offenses

---

[1] Governor Herbert's press statement also referred to a fourth law, HB 466, which creates the Utah Commission on Immigration and Migration, and charges it with "develop[ing] a comprehensive, coordinated, and sustainable state plan to address … immigration and the use of migrant workers in the state." HB 466 § 6, Utah Code Ann. § 63G-12-202. HB 466 also authorizes the Governor of Utah to enter into an agreement with the government of the Mexican state of Nuevo León for a "pilot project" to obtain "foreign migrant workers." HB 466 § 6, Utah Code Ann. § 63G-12-301. HB 466 does not have an immediate or direct effect on immigration.

[2] HB 469 purports to establish the "Utah Pilot Sponsored Resident Immigrant Program," under which non-citizens living outside the U.S. can apply for a Utah resident immigrant permit giving them permission to reside and work in Utah. Utah Code Ann. § 63G-12-101, *et seq.*

[3] HB 116 purports to establish a state guest worker program, under which non-citizens without federal employment authorization will be granted a state-issued work permit. Recognizing that the state lacks this authority, the law instructs the Governor to seek a federal "waiver" for the program. HB 116 § 10, Utah Code Ann. § 63G-12-202(1). If federal approval is not given, however, the state is directed to move forward with the program by July 1, 2013. Utah Code Ann. § 63G-12-201.

relating to immigration (HB 497).  HB 116 and HB 469 have no immediate effect[4] and are not at

issue in this lawsuit.  HB 497, however, will take effect on May 10, 2011 unless it is enjoined.

**Sections 3 and 4:  Immigration Investigation and Detention by State and Local Officers**

Sections 3 and 4 of HB 497 impose a complex set of mandates and authorizations on

Utah police officers to demand documentation of immigration status during ordinary stops,

detentions, and arrests and to convert many routine encounters into lengthy and intrusive

immigration status investigations.  Section 3 of HB 497 requires Utah officers to demand that

*any* person who is the subject of a "lawful stop, detention, or arrest" produce one of four types of

documents listed in Section 4:  (1) a valid Utah driver's license issued on or after January 1,

2010; (2) a valid Utah identification card issued on or after January 1, 2010; (3) a valid tribal

enrollment card; or (4) a valid identification document that includes a photograph or biometric

identifier and is issued by a government agency that requires proof of legal presence in the

United States.  Utah Code Ann. §§ 76-9-1003 & 76-9-1004(1).

Section 4 provides that production of one of these four types of identity documents

(hereafter, "qualifying identity document") creates a presumption that the person stopped is

lawfully present in the United States "unless the law enforcement officer has a reasonable

suspicion that the document is false or identifies a person other than the person providing the

document."  Utah Code Ann. § 76-9-1004(1).  In cases where a person does not have a

qualifying identity document, Section 4 provides that a person may make a statement or oral

---

[4] HB 116 provides that the state shall implement the guest worker program 120 days after "the state has the one or more federal waivers, exemptions, or authorizations needed to implement the program," or on July 1, 2013, whichever is sooner.  Utah Code Ann. § 63G-12-202(3).  HB 469 requires the Governor to implement the "pilot sponsored resident immigrant program" no later than July 1, 2013.  Utah Code Ann. § 63G-12-201(1)(b).

affirmation of U.S. citizenship or nationality; however, the officer has the discretion to reject

such an affirmation if he or she has "reasonable suspicion that the statement or affirmation is

false."  Utah Code Ann. § 76-9-1004(2).  Section 4 does not provide for a similar affirmation

option for non-citizens who are lawfully present in the United States.

      In cases where a person cannot produce a qualifying identity document; or the police

officer has "reasonable suspicion" to believe that the document is false; and either the person

does not make or the officer disbelieves an affirmation of U.S. citizenship or nationality, Section

3 provides for the officer to verify immigration status by contacting the federal government "or

an authorized immigration agent," as follows:  In cases where the person is stopped for a

suspected felony or class A misdemeanor, if "the officer is otherwise unable to verify the identity

of the person"—a phrase that is not defined in HB 497—the officer is required to verify the

person's immigration status.  Utah Code Ann. § 76-9-1003(1)(a)(i) (citing 8 U.S.C. § 1373(c)).

If the person is "arrested and booked" for a class B or C misdemeanor, the officer is also

required to verify immigration status.  Utah Code Ann. § 76-9-1003(1)(a)(ii).  And if the person

is merely stopped or briefly detained for a class B or C misdemeanor—a category that includes

minor traffic violations—the officer has the discretion to verify immigration status.  *Id.*  Even

more broadly, immigration verification is required "as promptly as reasonably possible" in *any*

case where a suspect "is arrested *or* booked into a jail, juvenile detention facility, or correctional

facility."  *Id.* at § 76-9-1003(3) (emphasis added).  Thus, even when a person is cited and

released for a Class B or C misdemeanor (*e.g.*, given a traffic ticket), he or she will be subject to

prolonged detention while an officer attempts to verify immigration status.[5]

_____

[5] Under Utah law, a person who is stopped and issued a citation is deemed to be "arrested."  *See*,

Section 3 also provides that, in the course of a stop if the officer develops reasonable suspicion that any occupant of a vehicle has violated any of three state offenses concerning smuggling, transporting, or encouraging non-citizens to come to Utah without federal immigration status, including new criminal offenses created by Section 10 of HB 497 (*see infra*), the officer is required to detain not just the suspect but *all* of the vehicle's occupants to verify their immigration status.  Utah Code Ann. § 76-9-1003(2).

Notably, HB 497's immigration status verification requirements and warrantless arrest provisions suffer from the same constitutional defects as provisions in Arizona's similar immigration law, SB 1070, which has been preliminarily enjoined by the federal district court in Arizona and the Ninth Circuit.  *United States v. Arizona*, 703 F. Supp. 2d 980, 998, 1006 (D. Ariz. 2010), *aff'd*, __ F.3d __, 2011 WL 1346945, at *4-10, *15-19 (9th Cir. Apr. 11, 2011).

### Section 6:  Prohibiting Limits on State and Local Authority to Enforce Immigration Laws

Section 6 of HB 497 prohibits any state or local government agency from having any policy limiting or restricting authority to investigate or enforce violations of the federal misdemeanor offenses of willful failure to register as an alien, 8 U.S.C. § 1304(e), and willful failure to personally possess an alien registration document, 8 U.S.C. § 1306(a).  Utah Code Ann. § 76-9-1006.  These federal statutory provisions,  however, are not a proper subject for Utah law enforcement; they are part of a federal alien registration scheme that the Supreme Court found to be broadly preemptive of state authority in *Hines v. Davidowitz*, 312 U.S. 52, 73-

---

*e.g.*, *State v. Harmon*, 910 P.2d 1196, 1199-1200 (Utah 1995) (citing Utah Code Ann. § 77-7-1); *Newton v. Buckley*, No. 96-4202, 1997 WL 642085, at *2 (10th Cir. Oct. 17, 1997) (unpublished op.) ("Under Utah law, when a police officer arrests someone on a misdemeanor or infraction charge, the officer can issue the arrestee a citation, directing him to appear in court at a particular time and location, rather than take the arrestee into custody.").

74 (1941).  Moreover, these federal laws have become obsolete because the federal government

no longer prioritizes their enforcement and has let the implementing regulations lapse.  *See* Decl.

of Bo Cooper ("Cooper Decl.") ¶¶ 27-29, filed in *Friendly House v. Whiting*, No. CV 10-1061

(D. Ariz. filed June 21, 2010) (copy attached as Exhibit B to Fernandez Decl.).

**Section 10:  Criminalizing Harboring of Unauthorized Immigrants**

     Section 10 of HB 497 creates new state criminal provisions for transporting unauthorized

immigrants into or within the state of Utah; concealing, harboring or sheltering an unauthorized

immigrant within Utah; "encourag[ing] or induc[ing]" non-citizens to come to, enter, or reside in

Utah where doing so would be in violation of federal law; or engaging in a conspiracy to commit

any of the foregoing offenses.  Utah Code Ann. § 76-10-2901.  The new Utah alien harboring

statute largely overlaps with a federal statute, 8 U.S.C. § 1324.  As noted above, when an officer

believes that any occupant of a vehicle may have committed this state offense, the officer must

detain all of the vehicle's occupants pending verification of immigration status.

**Section 11:  Authorizing Warrantless Arrests for Suspected Immigration Violations**

     Section 11 of HB 497 grants Utah officers broad new authority to make warrantless

arrests in the immigration arena.  Utah Code Ann. § 77-7-2(5).  HB 497 authorizes warrantless

arrests in three new circumstances that do not implicate any criminal conduct.  Section 11 grants

state and local officials in Utah much broader immigration arrest authority than even federal

immigration officers have.   It also requires state and local officers to make arrests based on

complex determinations of federal immigration law in the field without adequate information.

**Effect of HB 497's Comprehensive Immigration Enforcement Provisions**

     HB 497 will work a fundamental change in Utah law enforcement practices, in violation

of U.S. constitutional norms.  Sections 3 and 4 effectively require all persons in Utah to carry a qualifying identity document in order to avoid being detained for a prolonged period of time while an officer attempts to verify their immigration status in the course of a traffic stop or other encounter.  Sections 3 and 4 will impose a *de facto* state-law alien registration requirement that conflicts with federal law, which does not impose such a universal documentation requirement.

Second, Section 3 will result in the systemic prolonging of stops for the purpose of immigration status verification, which violates settled Fourth Amendment norms and also imposes enormous burdens on local law enforcement agencies and, contravening the Supremacy Clause, the federal government.  Section 3 provides that police officers must contact either the federal government or a state or local officer who has been authorized by the federal government to determine immigration status.  Utah Code Ann. § 76-9-1002(6).  In Salt Lake City, police officers annually issue approximately 30,000 citations, which take, on average, less than 10 minutes to issue.  Decl. of Chris Burbank ("Burbank Decl.") ¶ 11.  These traffic citations are considered arrests under Utah law, and thus trigger mandatory immigration verification under section 76-9-1003(3).  *See id.*; *supra* note 5.  Therefore, if HB 497 goes into effect, many ordinary stops will be extended by more than an hour while police officers attempt to verify immigration status through contact with the federal government.  *See* Decl. of David C. Palmatier ("Palmatier Decl.") ¶ 8, filed in *United States v. Arizona*, No. 10-CV-1413 (D. Ariz. filed July 6, 2010) (copy attached as Exhibit C to Fernandez Decl.).  This substantial prolonging of traffic stops for immigration investigations violates the Fourth Amendment, as set forth in Part I(B) below.  The immigration status verification requirement also imposes a substantial burden on federal authorities, who will be required to respond to an enormous increase in the number of

immigration status inquiries because of HB 497.

Section 11 gives Utah police officers broader authority than even federal immigration agents have to make warrantless arrests for immigration purposes, not requiring probable cause to believe a person has committed a crime. This violates the Supremacy Clause and the Fourth Amendment. Moreover, Section 11 requires complex determinations about immigration status that are simply impossible for a police officer to make in the field. *See* Burbank Decl. ¶ 16; Decl. of George Gascón ("Gascón Decl.") ¶¶ 21, 22.

Finally, HB 497 invites Utah police officers to detain people for immigration purposes based on nothing more than racial and ethnic stereotypes, in violation of the Fourth Amendment. Sections 3 and 4 vest officers with authority to accept or reject a person's affirmation of U.S. citizenship, Utah Code Ann. § 76-9-1004(2), and to discredit a proffered qualifying identity document, HB 497 § 4, Utah Code Ann. § 76-9-1004(1). Section 3 also gives officers broad discretion to determine when to conduct immigration status verification during stops for Class B and C misdemeanors. These provisions create a grave risk that officers will rely on racial and ethnic stereotypes, and that these decisions will lead to prolonged detention. Burbank Decl., ¶ 16; Gascón Decl., ¶ 11; Decl. of Eduardo Gonzalez ("Gonzalez Decl.") ¶ 14; Decl. of Arturo Venegas ("Venegas Decl.") ¶ 8.

## ARGUMENT

A preliminary injunction is appropriate if the moving party establishes: "(1) that it has a substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable injury if the injunction is denied; (3) that the threatened injury to the movant outweighs the injury that the opposing party will suffer under the injunction; and (4) that the injunction would not be adverse

to the public interest." *Utah Licensed Beverage Assn. v. Leavitt*, 256 F.3d 1061, 1066 (10th Cir. 2001). All four factors are established here.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.     Plaintiffs Are Likely To Succeed in Their Claim that HB 497 Violates the Supremacy Clause

HB 497 is preempted by federal law in at least two ways. First, it is a state "regulation of immigration," and accordingly trespasses on authority exclusively reserved to the federal government by the Constitution. *See DeCanas v. Bica*, 424 U.S. 351, 353-54 (1976).[6] Second, HB 497 is subject to "'conflict preemption, which occurs … when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *See US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (citing *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998)).

### 1.     HB 497 Constitutes Impermissible State "Regulation of Immigration"

In both operation and express intent, HB 497 is a key component of a comprehensive system for the regulation of immigration by the state of Utah. It therefore violates the Supremacy Clause of the U.S. Constitution, which forbids any state "regulation of immigration." *DeCanas*, 424 U.S. at 353-54; U.S. Const., Art. VI, cl. 2. Any state law regulating immigration is void, regardless of whether Congress has enacted comparable federal statutory provisions. *See Hines,* 312 U.S. at 66. The Supreme Court has emphasized that the constitutional prohibition on

---

[6] As set forth in *DeCanas*, in the field of immigration, constitutional preemption principles apply. In addition, by enacting the Immigration and Nationality Act, Congress has occupied the entire field of immigration enforcement, and thus state immigration laws are subject to statutory "'field preemption, which occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it.'" *See US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010) (citation omitted).

state regulation of immigration is absolute: The "[p]ower to regulate immigration is unquestionably *exclusively* a federal power." *DeCanas*, 424 U.S. at 354 (emphasis added).  Thus, at a minimum, no state may intrude on the "determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."  *Id.* at 355; *see also Toll v. Moreno,* 458 U.S. 1, 11 (1982) (citing *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419 (1948)).  To be valid, a state law that affects immigration must primarily address legitimate *local* concerns and have only a "purely speculative and indirect impact on immigration." *DeCanas,* 424 U.S. at 355.  Under these settled authorities, HB 497 is preempted.

First, HB 497 is a central part of a comprehensive state-law system for regulating immigration; indeed, the legislature provided for HB 497 to be the first component of the "Utah solution" to go into effect.  HB 497 was expressly intended to supplant federal immigration enforcement.  During the legislative debate leading up to the passage of HB 497, Governor Gary Herbert stated:  "Absent any meaningful leadership from the federal government on this issue, individual states are being forced to take up the charge."  News Release, *Governor Herbert Issues Statement on Illegal Immigration Reform* (Aug. 13, 2010) (copy attached as Exhibit D to Fernandez Decl.).  Thus, the "Utah solution" does not even purport to address an area of local concern apart from immigration policy.  *DeCanas,* 424 U.S. at 355.  Instead, the package of laws is expressly meant to implement Utah's preferred immigration policy "solution," in disagreement with the federal government's current immigration laws and policies.

Utah legislators also expressed that, in passing HB 497, they intended to wrest control over immigration regulation away from the federal government.  For example, Senator Dayton stated during debate on HB 497:  "What we have in this bill are federal laws put into state

statutes so that we can enforce the federal laws since the federal government is not."  Decl. of Sheila Miller ("Miller Decl."), Exh. A at 2:16-18 (Tr. of Senate Floor debate on HB 497, Day 39).  She explained that HB 497 "empowers law enforcement to enforce, on the state level, federal law."  *Id*. at 3:12-13.   Representative Dougall stated: "This bill also recognizes that historically . . . the states ran immigration for about the first 100 years of our nation before the feds started assuming more and more authority over immigration.  And so this recognizes and speaks to the states' rights issue regarding immigration."  Miller Decl., Exh. B at 1:14-18 (Tr. of House debate on HB 469, Day 38).  Representative Ivory stated during the debate on HB 469 that he "applaud[ed]" the bill's sponsor for "reclaiming a right that was never delegated [to the federal government] and exercising power over immigration in the state of Utah."  Miller Decl., Exh. B at 3:10-12 (Tr. of House debate on HB 469, Day 38).

The legislators recognized that the intent and effect of HB 469 is counter to settled constitutional precedent.  HB 469's sponsor, Representative Dougall, stated in response to a question about the bill's constitutionality by the Legislative Research and General Counsel: "[I]f that means that we need to push back against the federal government and the tradition [of federal control over immigration] that built up in the courts, I would suggest that we push back."  Miller Decl., Exh. B at 7:5-8 (Tr. of House debate on HB 469, Day 38).  He also stated, "I would suggest that there is a lot of wrongness, if that is a word, with what the Supreme Court has said in regards to immigration.  I believe that states who deal with the frontline benefits and issues, [and] challenges regarding immigration stand in the best position to deal with it."  *Id*, ln. 10-14.

In their actual operation, HB 497 and its companion laws implement this stated intent to regulate immigration and to supplant federal law, by establishing:  conditions under which non-

citizens residing outside the United States may be admitted to Utah (HB 469); conditions under which immigrants may remain in the country (HB 497 and 469); conditions under which non-citizens who lack federal employment authorization may be granted state work authorization (HB 116); procedures for verifying the immigration status of individuals encountered by state and local law enforcement officers and providing for the arrest of those deemed to be unlawfully present (HB 497); and requirements that state and local officers detain and turn persons they deem to be unlawfully present over to federal authorities for further detention and removal (HB 497). These are precisely the sorts of functions that regulate immigration and therefore are reserved exclusively to the federal government. *DeCanas,* 424 U.S. at 356; *League of United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755, 768-70 (C.D. Cal. 1995).

HB 497 must be struck down as a state law regulating immigration. HB 497 imposes requirements on Utah police officers to verify immigration status and to detain persons they deem to be unauthorized immigrants strictly for the purpose of enforcing immigration violations, and not for the purpose of enforcing any separate state-law criminal violations. Thus, HB 497 represents a fundamental departure from the "primary and principal duties" of Utah police officers in addressing truly local concerns, which are "the prevention and detection of crime and the enforcement of criminal statutes or ordinances of [Utah] or any of its political subdivisions." Utah Code Ann. § 53-13-103. HB 497 diverts police officers *away* from local concerns and focuses them instead on the regulation of immigration. *See* Burbank Decl. ¶ 10 ("HB 497 inappropriately imposes civil enforcement priorities ahead of criminal activity.").

HB 497 has far more than an incidental or "speculative" connection to the regulation of immigration; it is therefore preempted. *DeCanas,* 424 U.S. at 355-56. HB 497's very purpose is

to subject non-citizens in Utah to a new set of state-created immigration rules, legal interpretations, and procedures that do not exist or apply in other states. It will bring about exactly what the Supreme Court struck down in *Hines*—the subjection of non-citizens to "indiscriminate and repeated interception and interrogation by public officials" and "the possibility of inquisitorial practices and police surveillance" in the name of a state effort to enforce immigration law. 312 U.S. at 66, 74. By subjecting non-citizens to detention and arrest for immigration purposes, and state officials' determinations about who is subject to removal, HB 497 impermissibly sets the conditions under which non-citizens may remain in the country and thus intrudes on the core of the federal immigration power. *DeCanas,* 424 U.S. at 355.

Indeed, HB 497 has a direct effect on the national interests at the core of preemption in the immigration context. Federal supremacy in immigration has, since its earliest days, been aimed at preventing states from interfering with the foreign relations of the United States through separate regulation of foreign nationals. *See Chy Lung v. Freeman,* 92 U.S. 275, 279 (1875); *Henderson v. Mayor of the City of New York,* 92 U.S. 259, 273 (1875). "Experience has shown that international controversies of the gravest moment… may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." *Hines*, 312 U.S. at 64; *see also id.* at 63-64 & n.9-12. And indeed, "even . . . the *likelihood* that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law." *Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396, 420 (2003) (emphasis added); *see also United States v. Arizona*, __ F.3d __, 2011 WL 1346945, at *22-23 (Noonan, J., concurring).

More than a "likelihood" of foreign policy implications is at stake here. Abraham F.

13

Lowenthal, an international relations expert who specializes in U.S.-Latin American relations, has declared that "this law, if allowed to stand, would significantly impair the relations of Mexico with the United States, the attitudes and opinions of Mexicans, officials and the general public, toward the United States, and the capacity of US Government officials to conduct constructive relations with Mexico in the national interest of the United States and its citizens." Decl. of Abraham F. Lowenthal ¶ 11.  Indeed, the government of Mexico has made a formal statement that HB 497 is detrimental to U.S.-Mexico relations.  Fernandez Decl., Exh. E (Statement by the Embassy of Mexico on Lawsuit Filed Against HB 497 in Utah (May 3, 2011)).

For all of these reasons, HB 497 is an impermissible, direct regulation of immigration.

### 2. HB 497 Conflicts With Federal Immigration Law

HB 497 is also preempted on the separate ground that it conflicts with federal law.  The Supremacy Clause "prohibits states from enacting laws that make compliance with both federal and state law a physical impossibility or that 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 766 (10th Cir. 2010) (quoting *Fid. Fed. Sav. & Loan Ass'n. v. de la Cuesta*, 458 U.S. 141, 152-53 (1982)).  Even when a state law and the federal law "share the same goals," "[t]he fact of a common end hardly neutralizes conflicting means."  *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 379 (2000).  Sections 3, 4, 6, 10, and 11 of HB 497 conflict with Congress's comprehensive federal immigration enforcement scheme.

### a. HB 497 Grants State and Local Officers Greater Authority to Make Arrests for Immigration Violations Than Federal Officers Have Under Federal Law

Section 11 of HB 497 creates three new categories of warrantless arrest authority for Utah officers.  Each new provision authorizes arrest of non-citizens who are not subject to arrest

by immigration officers under federal law, and for this reason conflicts with Congress's

considered judgment about what circumstances justify arrest under federal immigration law.

First, Section 11 authorizes warrantless arrests of non-citizens who are "subject to a civil

removal order issued by an immigration judge."  Utah Code Ann. § 77-7-2(5)(a).  It is

impossible for an officer in the field to determine whether a removal order was issued by "an

immigration judge after a hearing," as the statute requires.[7]  Moreover, Section 11 authorizes

arrests of non-citizens with removal orders regardless of whether they have been released from

federal custody and thus are not subject to arrest by federal immigration authorities.  For

example, under Section 11, Utah police officers may arrest individuals whom the federal

government has released on bond or under supervision while their removal cases are pending.

Second, Section 11 authorizes warrantless arrests for non-citizens "regarding whom a

civil detainer warrant has been issued by the federal Department of Homeland Security."  Utah

Code Ann. § 77-7-2(5)(b).  This subsection is based upon a misunderstanding of federal law,

since an immigration detainer is not a warrant of any sort.  Unlike an arrest warrant, which issues

only upon a showing of probable cause by a neutral judicial officer, an ICE detainer is merely a

notice from ICE to another law enforcement agency, indicating that ICE has an interest in a

person in that law enforcement agency's custody and requesting that the agency temporarily

*maintain* custody of the person for up to 48 hours.  8 C.F.R. § 287.7(d).  An immigration detainer

does not authorize either federal immigration agents or state or local officials to make an arrest,

as formal federal guidance explicitly confirms.  *See* Fernandez Decl., Exh. F (U.S. Immigration

---

[7]Among other things, many removal orders are issued not by an immigration judge but by a
federal agent.  *See* 8 U.S.C. § 1225(b) (expedited removal orders); 8 U.S.C. § 1187 (removal
orders under Visa Waiver Program).

and Customs Enforcement, *Interim Policy Number 10074.1: Detainers* (Aug. 2, 2010)).  HB 497

assigns a meaning to ICE detainers that is plainly inconsistent with federal law and requires

police officers to act upon ICE detainers in conflict with federal law.

Third, Section 11 authorizes a warrantless arrest if the officer believes a non-citizen "has

been charged or convicted in another state with one or more aggravated felonies as defined by 8

U.S.C. Sec. 1101(a)(43)."  Utah Code Ann. § 77-7-2.  This provision requires local officers to

make extremely complicated determinations regarding whether charges brought in other states,

under those states' penal codes, may constitute an "aggravated felony" for purposes of federal

immigration law.  Utah police officers implementing this provision inevitably will make

erroneous determinations that lead to arrests.  *See United States v. Arizona*, 703 F. Supp. 2d 980,

1005-06; Gascón Decl. ¶ 22.  The determination of what crimes constitute "aggravated felonies"

under federal immigration law is enormously complex.[8]  There is no way a state or local law

enforcement officer in the field can make that determination.

More fundamentally, the warrantless arrest provision conflicts with federal law by

authorizing arrest when federal law would not even deem the individual deportable.  Under

federal law, being *charged* with an aggravated felony does not make a non-citizen removable;

only *conviction* for an aggravated felony is a ground of removal.  8 U.S.C. § 1227(a)(2)(A)(iii).

---

[8] The federal statutory definition encompasses 21 subsections, most of which in turn encompass numerous crimes.  8 U.S.C. § 1101(a)(43).  "Defense counsel who consults a guidebook on whether a particular crime is an 'aggravated felony' will often find that the answer is not 'easily ascertained.'"  *Padilla v. Kentucky,* 130 S.Ct. 1473, 1489 (2010) (Alito, J., concurring).  Because of this complexity, it is not uncommon that different federal appellate courts reach different conclusions as to whether an offense constitutes an "aggravated felony" for immigration purposes.  *See, e.g., Leocal v. Ashcroft,* 543 U.S. 1 (2004) (resolving conflict among circuits by holding that Florida felony of driving under the influence and causing serious bodily injury conviction was not "aggravated felony").

Under many subsections of the federal statute defining "aggravated felony," whether the offense meets the definition ultimately depends upon facts that cannot be determined until a person is convicted and sentenced.[9] And while the initial charges may be for a crime that potentially constitutes an aggravated felony, the ultimate disposition may not be.

Finally, Section 11 grants to state and local law enforcement officers broader warrantless arrest authority than Congress has authorized for immigration violations.  Even *federal* immigration officers are authorized to make warrantless arrests only where the officer has reason to believe the arrestee is in the United States in violation of immigration law *and* "is likely to escape before a warrant can be obtained for his arrest."  8 U.S.C. § 1357(a)(2).[10]  Section 77-7-2 does not include this limitation.  Thus, HB 497 impermissibly subjects non-citizens in Utah to arrest for federal immigration violations in circumstances where federal law requires a warrant.

### b.   HB 497 Conflicts with Federal Laws Limiting State and Local Officers' Authority To Enforce Civil Immigration Laws

By requiring Utah police officers to act as immigration enforcers, HB 497 directly conflicts with federal laws setting out specific requirements for state and local law enforcement officers' involvement in immigration enforcement functions.  As the Ninth Circuit recently explained in reviewing Arizona's SB 1070, the federal laws "foreclose[] any argument that state or local officers can enforce federal immigration law as directed by a mandatory state law."

---

[9] For example, under some subsections, whether a conviction is for an aggravated felony depends on the length of sentence imposed, a fact that cannot be determined prior to a conviction.  *See, e.g.*, 8 U.S.C. §§ 1101(a)(43)(F), (G), (J), (R), (S), (Q), (T).

[10] In addition, federal law requires that specific procedures be followed when non-citizens are arrested by immigration officers without a warrant, and HB 497 contains no such provisions. For example, when federal immigration agents make a warrantless arrest for an immigration violation, the individual arrested must be provided with specific notices of their rights in immigration proceedings.  *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.3.

*United States v. Arizona*, 2011 WL 1346945, at *11.

Federal immigration law contains specific provisions specifying when state and local officers may participate in enforcement of civil immigration laws.  First, 8 U.S.C. § 1103(a)(10) provides that the U.S. Attorney General may authorize state or local law enforcement officers to perform immigration enforcement duties in the event the Attorney General "determines that an actual or imminent mass influx of aliens… presents urgent circumstances requiring an immediate Federal response."  This provision has never been invoked by the Attorney General.

Second, certain state and local officers may be authorized under 8 U.S.C. § 1357(g) to perform immigration enforcement functions under the control and supervision of the Attorney General.  Under Section 1357(g), the Attorney General may enter into a written agreement with a state or local agency, allowing a limited number of officers "who [are] determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States… may carry out such function[s]."  8 U.S.C. § 1357(g)(1).  State or local officers who perform such immigration enforcement functions "shall be subject to the direction and supervision of the Attorney General."  *Id*. § 1357(g)(3).  The written agreement authorizing officers to perform immigration enforcement functions must specify "the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual."  *Id*. § 1357(g)(5).  Thus, section 1357(g) demonstrates Congress's intent to allow state and local officers to perform civil immigration enforcement functions only where each officer has been approved by the Attorney General to perform the specifically authorized

function, and where the Attorney General retains control over the officer's conduct.[11]

Finally, 8 U.S.C. § 1252c permits state and local law enforcement officers, "to the extent permitted by relevant State and local law," to arrest and detain non-citizens who are illegally present in the United States, where they have previously been convicted of a felony in the United States and either were deported or left the country following the conviction, "but only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual."  8 U.S.C. § 1252c(a).  HB 497 goes far beyond this limited grant of authority to arrest for criminal reentry.

The complex and comprehensive nature of federal immigration law has led two federal appeals courts – the Ninth and the Sixth Circuits – to hold that federal law preempts the authority of state and local officers to make arrests for civil violations of federal immigration law except as expressly provided by federal law.  *United States v. Arizona*, 2011 WL 1346945, at *17; *Martinez-Medina v. Holder*, __ F.3d __, 2011 WL 855791, at *6 (9th Cir. Mar. 11, 2011); *Gonzales v. City of Peoria,* 722 F.2d 468, 474 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. De la Vina,* 199 F.3d 1037 (9th Cir. 1999); *United States v. Urrieta,* 520 F.3d

---

[11] 8 U.S.C. § 1357(g) concludes with a provision that "[n]othing in this subsection [*i.e.*, section 1357(g)] shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State … (A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention or removal of aliens not lawfully present in the United States."  8 U.S.C. § 1357(g)(10).  Subsection 1357(g)(10) is not a broad grant of authority to states; indeed, if it were read as such, the rest of section 1357(g) would be nugatory.  *United States v. Arizona*, 2011 WL 1346945, at *5.  As the Ninth Circuit held in *United States v. Arizona*, "Congress intended for state officers to aid in federal immigration enforcement only under particular conditions, including the Attorney General's supervision."  *Id.*  HB 497 does not provide for such supervised cooperation; to the contrary, Utah clearly intended the law to supplant federal authority, as set forth above at 10-11.

569, 574 (6th Cir. 2008).  Both the Ninth and Sixth Circuits have emphasized the distinction

between civil and criminal immigration laws in reaching this conclusion.  *United States v.*

*Arizona*, 2011 WL 1346945, at *17 (citing *Gonzales*, 722 F.2d at 475); *Martinez-Medina*, 2011

WL 855791, at *6.  *See also Carrasca v. Pomeroy,* 313 F.3d 828, 836-37 (3d Cir. 2002) (noting

distinction between civil and criminal immigration laws and expressing "uncertainty… with

respect to state rangers' authority to detain immigrants").

 While the Tenth Circuit has stated that state and local officers have the authority to make

arrests for immigration violations, it has only done so in cases involving violations of the federal

*criminal* laws.  In *United States v. Vasquez-Alvarez,* the Tenth Circuit upheld a police officer's

arrest of a non-citizen with a history of prior criminal convictions and deportations suspected of

participating in a drug transaction.  176 F.3d 1294*,* 1295-96 (10th Cir. 1999).  The court

concluded that the arrest did not meet the requirements of 8 U.S.C. § 1252c, but that the arrest

came within state "general authority to investigate and make arrests for violations of federal

immigration laws" and so was permissible.  *Id.* at 1296.  But critically, in reaching this

conclusion the court relied exclusively on cases upholding state arrest authority for federal

*criminal* violations. *Vasquez-Alvarez, Id.* (citing *Davida v. United States,* 422 F.2d 528, 530

(10th Cir. 1970) (federal felony offense); *United States v. Janik,* 723 F.2d 537, 548 (7th Cir.

1983) (same); *United States v. Swarovski,* 557 F.2d 40, 43-49 (2d Cir. 1977) (same); *United*

*States v. Salinas-Calderon*, 728 F.2d 1298, 1301-02 & n.3 (10th Cir. 1984) (same); *Gonzales*,

722 F.2d at 477 (expressly distinguishing civil and criminal immigration laws)).  In particular,

the *Vasquez-Alvarez* court's reliance on the Ninth Circuit's *Gonzales* decision demonstrates that

its analysis was based on criminal immigration enforcement authority.[12]  The Tenth Circuit has never approved of arrests for civil immigration violations by state or local police officers.

### c.   HB 497 Undermines Federal Policies and Priorities for Immigration Enforcement

In addition to conflicting with federal statutes, HB 497 also conflicts and interferes with the federal government's authority to implement its priorities and strategies for immigration law enforcement.[13]  Congress repeatedly has directed the Department of Homeland Security to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime."  Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, Title II, 123 Stat. 2142, 2149 (2009); Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, Title II, 122 Stat. 3574, 3659 (2008) (same language).  U.S. Immigration and Customs Enforcement has identified specific enforcement priorities, with individuals who pose recognized risks to national security or public safety as the highest priority for enforcement.  *See* Fernandez Decl., Exh. G (John Morton, Director of U.S. Immigration and Customs Enforcement, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011)); Decl. of Daniel H. Ragsdale ¶

---

[12] In *United States v. Santana-Garcia,* 264 F.3d 1188 (10th Cir. 2001), the Tenth Circuit upheld the validity of a state arrest that was based in part on probable cause to believe that the defendants violated federal immigration law.  The court followed *Vasquez-Alvarez* but did not consider the distinction between civil and criminal violations.

[13] Preventing such conflicts is at the heart of preemption in the immigration field, as the Constitution specifically provides for uniformity in treatment of non-citizens with respect to their immigration status in the United States.  *See* Decl. of Doris Meissner ("Meissner Decl.") ¶ 11, filed in *Friendly House v. Whiting*, No. 10-CV-1061 (D. Ariz. filed June 21, 2010) (copy attached as Exh. I to Fernandez Decl.) ("it is critical to have a single, coordinated federal system"); *see also United States v. Arizona*, 2011 WL 1346945, at *4828 ("[T]he threat of 50 states layering their own immigration enforcement rules on top of the INA also weighs in favor of preemption").

17, filed in *United States v. Arizona,* No. 10-CV-1413 (D. Ariz. filed July 7, 2010) (copy

attached as Exh. H to Fernandez Decl.). The Utah law's mandates for immigration enforcement

reflect no such tailoring and in fact clash directly with these federal priorities.

      Sections 3 and 4 of HB 497 directly undermine federal immigration enforcement

priorities, because they will result in a vast increase in immigration status verification queries

from Utah law enforcement officers to the federal agency, which will impose burdens on the

federal government and directly "compete with" and "adversely affect" the federal government's

ability to respond to queries about "aliens arrested for particularly serious crimes." Decl. of

David C. Palmatier ¶ 7, filed in *United States v. Arizona*, No. 2:10-cv-01413-SRB (D. Ariz., filed

July 7, 2010) (copy attached as Exhibit C to Fernandez Decl.). The federal Law Enforcement

Support Center ("LESC"), which is responsible for responding to immigration status queries

from law enforcement agencies, has experienced "continuous and dramatic increases" in

immigration status determination queries over the past four years. Palmatier Decl., ¶ 9. As of

June 2010, the average immigration status query waited for approximately 70 minutes at the

LESC before it could be handled by a Law Enforcement Specialist, who would then take, on

average, an additional 11 minutes per query to research Department of Homeland Security

(DHS) data systems and make an immigration status determination. *Id.* at ¶ 8. In some cases,

where a review of the individual's physical file is required, the review may take two days or

more. *Id.* at ¶ 11. In addition, the LESC is unable to verify the status of most U.S. citizens,

since their records are not contained in the LESC databases. *Id.* at ¶ 19.

      Thus, like the now-enjoined provisions of Arizona's SB 1070, HB 497 "is inconsistent

with the discretion Congress vested in the Attorney General to supervise and direct State officers

in their immigration work according to federally-determined priorities."  *United States v. Arizona*, 2011 WL 1346945, at *8.   "By imposing mandatory obligations on state and local officers, [the state] interferes with the federal government's authority to implement its priorities and strategies in law enforcement, turning [state] officers into state-directed DHS agents."  *Id.* at *4824.  That interference violates the Supremacy Clause.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374, 377 (striking down state law as preempted where "Congress clearly intended the federal Act to provide the President with flexible and effective authority," and the state law's "unyielding application undermines the President's intended statutory authority"); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 (2001).

Section 6 of HB 497, like Sections 3 and 4, compels local officers to engage in immigration enforcement actions in circumstances where the federal government has de-emphasized enforcement in favor of other priorities.  Utah Code Ann. § 76-9-1006.  Section 6 prohibits any state or local governmental agency from having any policy limiting or restricting the authority of any law enforcement agency to investigate or enforce violations of the federal misdemeanor offenses of willful failure to register as an alien or willful failure to personally possess an alien registration document, under 8 U.S.C. §§ 1304(e) and 1304(a).  This provision prohibits state and local law enforcement agencies from limiting their enforcement of the federal immigration registration requirement "that has long been obsolete and widely regarded by the federal authorities, at the very highest levels, to be practically impossible to enforce and of extremely limited value as an immigration enforcement tool."  Cooper Decl. ¶ 25 (copy attached

as Exh. B to Fernandez Decl.).[14]  Currently, numerous categories of non-citizens who have

pending applications with immigration authorities, including many who have been granted a

lawful status in the United States, are not issued a document or other form designating

compliance with the registration requirement.  Decl. of Michael Aytes ("Aytes Decl.") ¶ 2, filed

in *United States  v. Arizona*, 10-CV-1413 (D. Ariz. filed July 7, 2010) (copy attached as Exh. K

to Fernandez Decl.).  By prohibiting law enforcement agencies from limiting their enforcement

of these obsolete provisions, Section 6 will inevitably lead to erroneous enforcement efforts

against non-citizens for technical violations of federal statutory provisions the federal

government itself recognizes are obsolete.

### d.   HB 497 Is Preempted Because It Imposes a *De Facto* Alien Registration Requirement

Section 4 enumerates the four types of qualifying identity documents that create a

presumption of lawful presence.  Section 4 also provides that a person who makes a "statement

or affirmation" to a law enforcement officer that he or she is a U.S. citizen or national is

presumed to be such "unless the officer has a reasonable suspicion that the statement or

affirmation is false."  Utah Code Ann. § 76-9-1004(2).  Yet HB 497 does not provide a similar

opportunity for non-citizens with lawful immigration status to make an affirmation of status.

Section 4 thus operates as a *de facto* alien registration law, requiring non-citizens to carry a state-

approved qualifying identity document in order to avoid extended police questioning each time

they encounter law enforcement.  The Supreme Court has expressly declared such state schemes

preempted by federal law.  *Hines*, 312 U.S. at 68-69, 74.  Even laws that "complement the

---

[14] Indeed, Bureau of Justice Services statistics show only 30 prosecutions for the misdemeanor offenses of 8 U.S.C. §§ 1304(e) and 1306(a) in the past 16 years. Fernandez Decl., Exh. J (statistics obtained from Federal Justice Statistics Resource Center website).

federal [alien registration] law [and] enforce additional or auxiliary regulations" are preempted. *Id.* at 66-67; *accord United States v. Arizona*, 2011 WL 1346945, at *11.

<h3>e. <u>HB 497 Creates State Criminal Immigration Offenses that Are Preempted by Federal Laws</u></h3>

Section 10 of HB 497 creates new state criminal provisions for transporting unauthorized immigrants into or within the state of Utah; concealing, harboring or sheltering an unauthorized immigrant within Utah; "encourag[ing] or induc[ing]" non-citizens to come to, enter, or reside in Utah where doing so would be in violation of federal law; or engaging in a conspiracy to commit any of the foregoing offenses. Utah Code Ann. § 76-10-2901. The new Utah alien harboring statute largely overlaps with a federal statute, 8 U.S.C. § 1324.[15] Courts have held that 8 U.S.C. § 1324 has broad preemptive effect. *Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835, 856-59 (N.D. Tex. 2010) (holding that 8 U.S.C. § 1324 preempts city ordinance forbidding rental of housing to unauthorized immigrants); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043 (S.D. Cal. 2006). More generally, as discussed above, conditions and penalties for non-citizens' entry into the United States are constitutionally committed to the exclusive authority of the federal government and Congress has occupied the field by enacting a comprehensive Immigration and Nationality Act. *DeCanas*, 424 U.S. at 359.

The fact that Section 10 of HB 497 appears to be modeled after the federal statute, 8 U.S.C. § 1324, does not save it. Even if the Utah statute were identical, it places prosecutorial discretion in the hands of Utah state officials, so that decisions about when to charge a person for encouraging or inducing a non-citizen to enter the United States, and the total penalty to be

---

[15] Unlike the federal alien harboring statute, 8 U.S.C. § 1324, all of the Utah statute's section except the "encouraging or inducing" subsection require an element of committing the offense for commercial gain. Utah Code Ann. § 76-10-2901(2)(a), (b), (d).

imposed for that conduct, are no longer under the full control of the federal government.   If

allowed to take effect, Section 10 would pose numerous conflicts with federal law.  For example,

Utah may elect to charge an individual whom the federal government has exercised the

discretion not to prosecute.  Or Utah prosecutors may pile additional penalties on top of a federal

sentence under 8 U.S.C. § 1324, effectively increasing the penalty calibrated by Congress and

the federal justice system.  Even if a state law shares the same goals as the federal law, "[t]he

fact of a common end hardly neutralizes conflicting means."  *Crosby,* 530 U.S. at 377; *see also*

*United States v. Arizona*, 2011 WL 1346945, at *10.  Section 10 impermissibly "undermines the

congressional calibration of force," *Crosby*, 530 U.S. at 380, and is preempted.

On each and every one of the grounds above, HB 497 conflicts with federal law and is

therefore preempted.

### B.  Plaintiffs Are Likely To Succeed in Their Claim that HB 497 Violates the Fourth Amendment

Sections 3 and 4 of HB 497 authorize, and in some cases require, state and local law

enforcement officers to extend a traffic stop or other seizure for the purpose of verifying an

individual's immigration status, based only on the individual's failure to produce a qualifying

identity document and without any suspicion of unlawful conduct.  Section 11 of HB 497 allows

for the warrantless arrest of individuals whom the police believe to be subject to a civil removal

order or an immigration detainer, or charged or convicted in another state with an aggravated

felony.  As explained below, these provisions violate the Fourth Amendment by authorizing the

prolonged detention and warrantless arrest of individuals without suspicion of any wrongdoing,

much less criminal activity.

1.      **Sections 3 and 4 Violate the Fourth Amendment By Allowing for Prolonged Detention of Individuals Without Reasonable Suspicion of Illegal Activity**

As set forth above at pages 2-3, Section 3 of HB 497 authorizes police officers to "verify the immigration status" of a person stopped or detained for an alleged class B or C misdemeanor if the person is unable to provide the officer with a qualifying identity document and the officer is "otherwise unable to verify the identity of the person."  Utah Ann. Code §§ 76-9-1003, 76-9-1004.  Section 3 therefore authorizes officers to prolong traffic stops and other seizures for as long as necessary for the officer to verify immigration status with ICE.  *See* Utah Code § 76-9-1002(6).  Persons stopped for even a class C misdemeanor, which includes minor traffic violations, littering, or jaywalking, will be held by a police officer until immigration status can be verified if the person happens not to be carrying a qualifying identity document.  Gascón Decl. ¶ 13; Burbank Decl. ¶ 10.

HB 497's requirement that stops be prolonged violates basic Fourth Amendment law permitting a brief investigatory stop only if an officer has "a reasonable suspicion supported by articulable facts that criminal activity may be afoot."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  In the context of a vehicle stop, the parameters of permissible activity during the encounter are well established:

> An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

*United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994) (quoting *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988), *overruled in part on other grounds by, United*

*States v. Botero-Ospina,* 71 F.3d 783 (10th Cir. 1995)).  In other words, the "investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'"  *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)); *see also United States v. Lee*, 73 F.3d 1034, 1038-39 (10th Cir. 1996), *overruled on other grounds by United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001).

Once the purpose of the stop has been effectuated, however, "[d]etention beyond that time period is only justified if the officer 'has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring . . . [or] the initial detention has become a consensual encounter.'"  *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996) (quoting *Gonzalez-Lerma*, 14 F.3d at 1483).  "An investigative detention evolves into an arrest when the scope of police conduct is no longer reasonably related to the circumstances initially justifying the seizure."[16]  *Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir. 2009); *United States v. Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008) ("Under the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity.").

HB 497 requires police officers to violate this basic Fourth Amendment principle.  An officer is authorized to verify immigration status—and therefore necessarily must prolong a stop—based on nothing more than the person's failure to produce a qualifying identity document.  But critically, lack of a qualifying identity document does not give rise to any suspicion of unlawful activity.  While it is unlawful to drive without a valid driver's license,

---

[16] For example, in *Mohammed v. Davis County*, the court found that once an officer had issued and delivered a citation for speeding, the purpose for the stop was complete, and therefore, it was not reasonable to prolong the person's detention by insisting that he sign the citation or arrest the person for refusing to sign when the person was not required to do so.  2011 WL 65728, *7 (D. Utah Jan. 10, 2011).

Utah Code Ann. § 53-3-202, HB 497 does not limit prolonged investigation to such circumstances.  For example, an officer may stop a person, such as a pedestrian or passenger in a vehicle, who is not required to carry any identification document at all and would have no expectation that he or she should.  A person driving in Utah with a valid New Mexico or Washington driver's license (which are issued pursuant to those states' laws without an immigration status check), including U.S. citizens like Plaintiff Larios, would be unable to produce a qualifying identity document upon being stopped.  Burbank Decl. ¶ 14.  Thus, HB 497 subjects even U.S. citizens and lawful immigrants to prolonged detention pending an immigration status verification.  Gascón Decl. ¶ 13; Burbank Decl. ¶¶ 10, 14.

Many foreign nationals legally in the United States do not possess or have readily available documentation required by § 76-9-1003 or any documentation that would demonstrate their status.  This includes tourists eligible to enter the United States through the Visa Waiver Program and non-citizens who have been granted temporary protected status or who have immigration applications pending with the federal government.  Aytes Decl. ¶ 5 (copy attached as Exh. K to Fernandez Decl.); Decl. of David V. Aguilar ¶ 24, filed in *United States v. Arizona*, No. 10-CV-1413 (D. Ariz. filed July 6, 2010) (copy attached as Exh. L to Fernandez Decl.).  The number of individuals in these situations is significant.  In fiscal year 2009, more than 14 million aliens were admitted under the Visa Waiver Program, Aguilar Decl. ¶ 24, and DHS estimates that up to 200,000 individuals were eligible for temporary protected status based solely on the designation of Haiti due to last year's earthquake, Decl. of James B. Steinberg ¶ 19, filed in *United States v. Arizona*, No. 10-CV-1413 (D. Ariz. filed July 6, 2010) (copy attached as Exh. M to Fernandez Decl.).  All of these people are subject to prolonged detention under HB 497, even

though they are not subject to removal proceedings under federal law and there is no evidence of criminal activity justifying additional investigation.

Verifying immigration status under Section 3 will necessarily require traffic stops and other seizures to be prolonged beyond the bounds of the Fourth Amendment. The Supreme Court has held that a police officer may ask questions unrelated to the original purpose of a stop, provided that such questioning does not unreasonably prolong the stop. *Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009); *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005); *see also United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 n.6 (10th Cir. 2006) (finding that a trooper's further questioning of a lawfully stopped individual unlawfully prolonged the detention, since there was no dispute that the traffic stop had ended prior to the additional inquiry).  But under HB 497 immigration status verification will drastically extend an ordinary traffic stop.  An average traffic stop and citation takes less than 10 minutes.  Burbank Decl. ¶ 11.  HB 497 requires officers to call ICE for immigration status verification.  When ICE is able to make such a determination telephonically, it will take on average more than 80 minutes before a police officer will receive a response from ICE.  Palmatier Decl. ¶ 8.  But in many cases, it will take two days or more because ICE cannot make a determination without a file review.  *Id.* ¶ 11.  Moreover, such inquiries to ICE do not necessarily yield accurate or definite results.  For example, in Arizona almost 10,000 of the 80,000 requests for immigration-status verification received during 2009 produced an indeterminate answer, which would require DHS to search additional databases and even paper files in an effort to resolve the inquiry.[17]  *See* Palmatier Decl. ¶¶ 12, 19.

---

[17] Moreover, the ICE database verification method entails a critical opportunity for grave errors as the fact that a person does not appear in ICE databases may mean either that the person is a U.S. citizen or is a non-citizen who has entered without inspection, depending on whether the

More fundamentally, it is well-established that police may not extend a stop for purposes other than investigating criminal activity.[18]  *McRae*, 81 F.3d at 1534; *Mena*, 544 U.S. at 101. Thus, the continued detention of an individual solely on the basis of a suspected civil immigration violation, such as unlawful presence, is not permitted under the Fourth Amendment. For example, in *United States v. Santillanes*, the Tenth Circuit held that the initial stop and questioning of an individual for a non-criminal reason—in that case, violation of a condition of pretrial release—violated the Fourth Amendment.  848 F.2d 1103, 1107-10 (10th Cir. 1988).

Because Section 76-9-1003 allows for the prolonged detention and arrest of individuals in situations involving either no unlawful conduct or merely civil violations, it violates the Fourth Amendment and should be enjoined.

> ### 2.     Section 11 of HB 497 Violates The Fourth Amendment By Allowing Warrantless Arrests Without Any Criminal Predicate.

Section 11 of HB 497 violates the Fourth Amendment by allowing warrantless arrests of individuals who have not committed any violation, civil or criminal.  Courts have long recognized that "[a] warrantless arrest is permissible when an officer 'has probable cause to believe that a person committed a *crime*.'"  *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (emphasis added) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)); *see also Virginia v. Moore*, 553 U.S. 164, 171 (2008) ("[W]hen an officer has probable cause to believe a person committed even a minor crime . . . . [t]he arrest is constitutionally reasonable.");

---

person was born in the United States.  Palmatier Decl. ¶ 12.

[18] The only exception to the requirement that the suspicion be of criminal activity is for civil traffic code violations.  The Supreme Court has "carve[d] out an exception in the context of traffic stops, i.e., a stop is 'reasonable' where an officer suspects an individual has committed a traffic violation." *United States v. Choudhury*, 461 F.3d 1097, 1102 (9th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).  No similar exception has been created for other civil violations, such as unlawful presence in the United States.

*Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  Yet HB 497 contemplates warrantless arrests for civil immigration purposes—that is, to apprehend unauthorized immigrants and to turn them over to ICE for removal.

Moreover, HB 497 subjects individuals to arrest for civil immigration violations even when they are not subject to removal at all or have been released pending completion of their removal proceedings.  Section 11 authorizes a warrantless arrest when a police officer has "reasonable cause" to believe a person "has been charged or convicted in another state with one or more aggravated felonies," Utah Code Ann. § 77-7-2(5), "even though such individuals may not be deportable.   Similarly, Section 11 authorizes warrantless arrests of individuals who have final removal orders, while many such individuals are routinely released on bond or conditions pending judicial review of those administrative orders.  In addition, as explained above in Part I(A)(2)(a), being *charged* with an aggravated felony is not a ground for removal.  In any event, a Utah police officer simply cannot make such determinations in the field.  *See* Gonzalez Decl. ¶ 15; Burbank Decl. ¶ 16; Gascón Decl. ¶¶ 21, 22.  In summary, Section 11 circumvents the Fourth Amendment by not requiring any criminal predicate for a warrantless arrest.

## C.  Plaintiffs Are Likely To Prevail in Their Claim that HB 497 Violates the Constitutional Right To Travel

By subjecting persons traveling in Utah to prolonged stops if they do not have a qualifying identity document, even if they have valid driver's licenses, HB 497 violates the fundamental right to travel.  The Supreme Court has long "recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement."  *Shapiro v. Thompson*, 394

U.S. 618, 629 (1969), *overruled on other grounds*, *Edelman v. Jordan*, 415 U.S. 651 (1974).

The Supreme Court has repeatedly held that the right is fundamental. *Atty. Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (plurality op.).[19]  A state law infringes on the right to travel if it

uses "'any classification which serves to penalize the exercise of that right'" even in an "indirect

manner," *Soto-Lopez*, 476 U.S. at 903 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 340 (1972)), or

treats residents of other states as "unfriendly alien[s]" rather than "welcome visitor[s]," *Saenz v.

Roe*, 526 U.S. 489, 500 (1999).  If either condition is met, the law must be analyzed under strict

scrutiny and invalidated unless the state can satisfy the "heavy burden of proving that it has

selected a means of pursuing a compelling state interest which does not impinge unnecessarily

on constitutionally protected interests."  *Soto-Lopez*, 476 U.S. at 911; *id.* at 906; *Saenz*, 526 U.S.

at 499; *Shapiro*, 394 U.S. at 634.

HB 497, on its face, burdens and penalizes certain out-of-state drivers' exercise of the

right to travel.  As described above, the law requires a law enforcement officer to verify an

individual's immigration status in certain circumstances and grants wide discretion to verify

immigration status in other instances.  Utah Code Ann. § 76-9-1003.  HB 497 affords a

presumption of "lawful presence in the United States" if an individual presents "a valid Utah

driver's license," or a valid out-of-state driver's license if the issuing state "requires proof or

verification of legal presence in the United States as a condition of issuance of the document."

Utah Code Ann. § 76-9-1004(1).  Some states—currently New Mexico and Washington—issue

---

[19] The right to travel has been derived from: the Privileges and Immunities Clause of Article IV, § 2; the Equal Protection Clause; the Commerce Clause; and the Privileges and Immunities Clause of the Fourteenth Amendment.  *See Soto-Lopez*, 476 U.S. at 902.

driver's licenses without requiring proof of federal immigration status.[20]   Thus, although Utahans

can use their driver's licenses to create a presumption that they are "lawfully present," out-of-

state drivers, including New Mexico and Washington drivers such as Plaintiff Larios, cannot use

their valid state driver's licenses for the same purpose.   Instead, those out-of-state drivers will be

subjected to additional scrutiny by Utah law enforcement officers and will be effectively

required to obtain and carry additional documentation that is acceptable under HB 497 while

driving or traveling in Utah.   *See* Burbank Decl. ¶ 14 ("… my officers will require additional

proof of lawful presence for individuals presenting these forms of identification.").   This is a

significant burden, particularly because other states do not have such a requirement.

HB 497 further violates the right to travel because it pressures other states to legislate in

response so that their citizens do not face discriminatory treatment in Utah.   *See Austin v. New*

*Hampshire*, 420 U.S. 656, 666-67 (1975) (explaining that such pressure on other states

"compounds" the constitutional violation).   By creating a discriminatory classification for drivers

from certain states, HB 497 interferes with those states' sovereign power to regulate issuance of

their own driver's licenses.[21]   This interference will be particularly pronounced in neighboring

states such as New Mexico, whose residents often travel to Utah.[22]

---

[20] N.M. Stat. Ann. § 66-5-9(B) (1978); N.M. Code R. § 18.19.5.12(D) (allowing foreign national to obtain driver's license with federal tax identification number and valid foreign passport or Matrícula Consular card); Wash. Rev. Code 46.20.035(3) (allowing use of "other available documentation," on a discretionary basis, for issuance of driver's license); Fernandez Decl., Exh. N (Washington State Dep't of Licensing rules allowing issuance of driver's license if resident provides valid foreign passport or other identification document).

[21] HB 497 burdens the ability of every state except Utah to enact driver documentation policies akin to those in New Mexico and Washington. *See Austin*, 420 U.S. at 666 (holding a New Hampshire statute unconstitutional and finding it especially burdensome because of the risk that it would affect other states' lawmaking).

[22] In fact, Senator Jeff Bingaman of New Mexico wrote to Attorney General Holder expressing

HB 497's differential treatment of licensed drivers based on the issuing states' driver's license policies cannot withstand strict scrutiny because it is not narrowly tailored to the purpose of the law—immigration regulation and enforcement—even if such a purpose could be deemed a compelling state interest (which it is not).[23]  HB 497 penalizes all licensed drivers from certain states, including U.S. citizens and other lawfully present immigrants, and subjects them to investigation and prolonged detention to which licensed drivers from Utah and other states are not subject. This discrimination violates the constitutional right to travel.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF HB 497 IS ALLOWED TO GO INTO EFFECT

Plaintiffs will suffer irreparable harm if HB 497 is not enjoined.  Courts have repeatedly recognized that being subjected to the enforcement of an unconstitutional law constitutes irreparable injury.  This principle applies not only to laws that violate the Supremacy Clause, *see, e.g,, Morales v. Trans World Airlines*, 504 U.S. 374, 381 (1992); *United States v. Arizona*, 2011 WL 1346945, at *19, but also to laws that violate individuals' constitutional rights.  *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("'When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'")

---

concerns that his constituents would be unduly burdened by the implementation of a similar provision under Arizona's SB 1070.  Letter from U.S. Senator Jeff Bingaman of New Mexico to U.S. Attorney General Eric Holder (Apr. 29, 2010), filed in *United States v. Arizona*, No. 10-CV-1061 (D. Ariz. filed June 21, 2010) (copy attached as Exh. O to Fernandez Decl.).  This provision in Arizona has since been enjoined.  U.S. v. Arizona, 703 F. Supp. 2d 980, 997-98 (D. Ariz. 2010); *aff'd* 2011 WL 1346945, *8-10 (9th Cir. 2011).

[23] HB 497 does not contain an express statement of legislative intent; however, the plain language of the statute as well as its title, "The Illegal Immigration Enforcement Act," make clear the legislature's intent to enforce federal immigration law violations by identifying and detaining individuals who have violated federal immigration law.  *See Almendarez-Torres v. U.S.*, 523 U.S. 224 (1998) (noting that title of statute is legitimate guide for legislative interpretation); *Goodlett v. Louisiana & Nashville R.R.*, 122 U.S. 391, 408 (1887) (allowing consideration of statute's title in determining legislative intent).

(citation omitted); *see also Leavitt v. Utah Licensed Beverage Ass'n*, 256 F.3d 1061, 1076 (10th Cir. 2001).

As set forth above, HB 497 subjects certain persons in Utah to unconstitutional detention while police officers investigate immigration status. Thus, HB 497 poses an acute and immediate danger to Plaintiffs. Plaintiffs are a diverse group of individuals and organizations who represent racial minorities, national origin minorities, individuals who speak foreign languages or who have accents when speaking English, and individuals who lack the qualified identity documents enumerated in HB 497. If HB 497 takes effect, Plaintiffs will be at risk of discriminatory treatment, unwarranted police scrutiny, prolonged detentions, and arrest every time they come into contact with Utah law enforcement. Several of the individual Plaintiffs have experienced racial profiling in the past, and all of them are worried that if HB 497 goes into effect they will be subjected to repeated stops, questioning, detention, and possibly arrest. *See* Decl. of Milton Salazar ¶¶ 4-5, 7-9; Decl. of John Doe #1 ¶¶ 8-9; Decl. of Alicia Cervantes ¶¶7, 11. *See also* Decl. of Robert Archuleta ¶¶ 13-14 (discussing incidents and patterns of racial profiling and pretextual arrests in several Utah counties); Decl. of Frank Cordova ¶ 10; Decl. of Katie Gerken ¶ 6; Decl. of Michael Picardi ¶¶ 19-20; Decl. of Daniel Argueta, ¶ 5, 10-11.

Because of the threat of unreasonable searches and seizures and racial profiling, Plaintiffs will fear having any contact with law enforcement if HB 497 goes into effect. Decl. of Jane Doe ¶ 11-13; Decl. of Alicia Cervantes, ¶¶ 6, 9; Decl. of Eliana Larios ¶8; Decl. of John Doe #2 ¶¶7-8. This fear will deter them and countless others in Utah from reporting crimes to the police or acting as witnesses, thus making them particularly vulnerable targets for criminals and undermining public safety in their communities. *See* Burbank Decl. ¶ 8 (citing a recent Utah-

based study showing that people "are significantly less likely to report crimes if they feel officers are engaged in immigration enforcement," as well as "numerous anecdotal reports of individuals who have fallen victim to a crime and have failed to report it because of the rhetoric surrounding proposed immigration laws."); Picardi Decl. ¶ 11 ("[A]fter HB 497 is implemented immigrants will no longer trust law enforcement.  Immigrants will stop coming forward to report crimes and crimes will skyrocket."); Gascón Decl. ¶ 16-19; Gonzalez Decl. ¶¶ 10, 11; Venegas Decl. ¶ 5.

Moreover, all Plaintiffs will be harmed as local law enforcement resources are diverted away from criminal law enforcement to effectuate HB 497's status-verification and immigration enforcement provisions.  *See* Burbank Decl. ¶¶ 11-12; Gascón Decl. ¶ 20.  This is not a case with a limited, technical violation of the Supremacy Clause, rather it is an attempt by a state to take over an area of exclusive federal authority—the regulation of immigration.

HB 497's severe burdening of Plaintiffs' constitutional right to travel threatens further irreparable harm.  Several Plaintiffs regularly drive themselves and loved ones to work, school, church, and charitable activities, using out-of-state licenses or Utah driving privilege cards as their identification.  *See* Decl. of Eliana Larios at ¶ 9; Decl. of Jane Doe  ¶¶ 14-15; Decl. of John Doe #1  ¶¶ 10-13.  Because they lack the privileged forms of identification that would protect them from additional inquiry by police officers, they will be afraid to travel to Utah or to drive within the state once HB 497 goes into effect, and will suffer irreparable harm due to the limitation on their freedom of movement.  *See Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y.*, 799 F. Supp. 1417, 1428, 1430 (W.D.N.Y. 1992) (holding alleged violation of right to travel constitutes irreparable injury), *aff'd in part, rev'd in part on other grounds sub nom. Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357 (1997).  *See, e.g.,* Larios Decl. ¶¶ 5-9

(describing how she will curtail her visits to Utah to see her father, recently diagnosed with cancer, for fear that her Washington driver license and physical appearance will subject her to prolonged detention while officers attempt to verify her citizenship).

Finally, the organizational Plaintiffs will suffer irreparable harm because they will need to divert organizational resources away from core mission activities to address their members' concerns about the law and repercussions from its enforcement. *See* Decl. of Juan M. Ruiz ¶¶ 10-11, 15-20; Decl. of Eliseo Medina ¶ 12; Decl. of Frank Cordova ¶¶ 13-15; Decl. of Katie Gerken ¶ 9; Decl. of Daniel Argueta ¶¶ 6-7; *see also* Decl. of Robert Archuleta ¶ 8. The missions of the organizational Plaintiffs have been and will continue to be frustrated as their members will be afraid to gather in public places, attend marches and meetings, and engage in other advocacy and organizing activities that might bring them into contact with law enforcement. Decl. of Juan M. Ruiz ¶¶ 7-8; Decl. of Eliseo Medina ¶ 13; Decl. of Katie Gerken ¶¶ 8-9; Decl. of Michael Picardi ¶ 12; Decl. of Frank Cordova ¶¶ 9-10.

## III.   THE BALANCE OF THE EQUITIES TIPS SHARPLY IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION

A preliminary injunction will impose only minimal harm on the state of Utah, because Plaintiffs ask merely for the status quo to be maintained while serious questions about the law's constitutionality are adjudicated. This is precisely the purpose of a preliminary injunction: "to preserve the status quo pending a final determination of the case on the merits." *Keirnan v. Utah Transit Authority*, 339 F.3d 1217, 1220 (10th Cir. 2003). Any harm to the State in adhering to the status quo is dramatically outweighed by the immediate and irreparable harms Plaintiffs will face, outlined above, if HB 497 is allowed to go into effect.

The requested preliminary injunction would prevent the implementation of a new law that

would upset the longstanding allocation of authority between state and federal government,

intrude on the federal government's ability to regulate immigration and conduct foreign affairs,

and impose irreparable harms on Plaintiffs and the public.  Therefore, the equities tip sharply in

favor of granting a preliminary injunction while the constitutionality of HB 497 is decided.  *See*

*Chamber of Commerce v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (affirming district

court's preliminary injunction because "Oklahoma does not have an interest in enforcing a law

that is likely constitutionally infirm."); *Leavitt*, 256 F.3d at 1076 (balance of equities favors

preliminarily enjoining state statute likely to be held unconstitutional); *Nat'l Ctr. For*

*Immigrants' Rights, Inc. v. INS*, 743 F.2d 1365, 1368, 1370-71 (9th Cir. 1984) (affirming district

court decision that irreparable harm to plaintiffs outweighed harm to government from delayed

implementation of regulation).

## IV.   PRELIMINARILY ENJOINING HB 497 WILL NOT BE ADVERSE TO THE PUBLIC INTEREST

Preliminarily enjoining HB 497 will not be adverse to the public interest.  In fact, the

interests of Plaintiffs and the general public are aligned in favor of a preliminary injunction in

this case.  The public interest is not served by allowing an unconstitutional law to take effect.

*See Leavitt*, 256 F.3d at 1076; *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163

(10th Cir. 1999).  Where civil rights are at stake, "the public interest … favors granting [an]

injunction as the public as a whole has an interest in protecting constitutional rights."  *Adams v.*

*Baker*, 919 F. Supp. 1496, 1505 (D. Kan. 1996).  And courts have specifically held that enjoining

a state statute that is preempted by federal law will serve the public interest.  *See Edmondson*,

594 F.3d at 771 (quoting *Bank One v. Guttau*, 190 F.3d 844, 848 (8th Cir.1999)); *Villas at*

*Parkside Partners*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010) ("[T]he public interest favor[s]

preserving the uniform application of federal immigration standards.").  This is particularly true in the field of immigration, in light of the risk of encroachment on the federal government's relations with foreign countries.  *See Hines*, 312 U.S. at 64; *United States v. Arizona*, 2011 WL 1346945, at *21-23.  Without an injunction, Utah residents and visitors will face enforcement of a statutory scheme that not only violates the Constitution in several respects, but also presents a grave risk of other harms to the public interest, such as the undermining of public safety as a result of diversion of law enforcement resources away from criminal investigations.

## CONCLUSION

Plaintiffs have met all four factors for the issuance of a preliminary injunction. Therefore, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction barring the enforcement of HB 497.

Dated:  May 6, 2011                           Respectfully submitted,

/s/ Cecillia D. Wang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT

/s/ Linton Joaquin
NATIONAL IMMIGRATION LAW CENTER

/s/ Darcy M. Goddard
AMERICAN CIVIL LIBERTIES UNION
OF UTAH FOUNDATION, INC.

/s/ Elora Mukherjee
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
RACIAL JUSTICE PROGRAM

/s/ Bradley S. Phillips
MUNGER, TOLLES & OLSON LLP

## CERTIFICATE OF SERVICE

I, Darcy M. Goddard, hereby certify that on this 6th day of May 2011, I

electronically filed the foregoing MEMORANDUM IN SUPPORT OF PLAINTIFFS'

MOTION FOR PRELIMINARY INJUNCTION and its supporting attachments with the

Clerk of the Court using the CM/ECF system, which sent notification to the following:


Jerrold S. Jensen
UTAH ATTORNEY GENERAL'S
OFFICE (160-140857)
160 E 300 S
PO BOX 140857
SALT LAKE CITY, UT 84114-0857
(801)366-0350
Email: jerroldjensen@utah.gov

Thomas D. Roberts
UTAH ATTORNEY GENERAL'S
OFFICE (160-140857)
160 E 300 S
PO BOX 140857
SALT LAKE CITY, UT 84114-0857
(801)366-0353
Email: ThomRoberts@utah.gov


Dated: May 6, 2011          Signed:  /s/ Darcy M. Goddard
                                     Darcy M. Goddard