Linton Joaquin*
Karen C. Tumlin*
Shiu-Ming Cheer*
Melissa S. Keaney*
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
Telephone: (213) 639-3900
Facsimile: (213) 639-3911
*joaquin@nilc.org*
*tumlin@nilc.org*
*cheer@nilc.org*
*keaney@nilc.org*

Omar C. Jadwat*
Andre I. Segura*
Elora Mukherjee*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2660
Facsimile: (212) 549-2654
*ojadwat@aclu.org*
*asegura@aclu.org*
*emukherjee@aclu.org*

Attorneys for Plaintiffs

*     *Pro hac vice*
+     Counsel for all plaintiffs except SEIU and
      Workers' United

Cecillia D. Wang*
Katherine Desormeau*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950
*cwang@aclu.org*
*kdesormeau@aclu.org*

Esperanza Granados (USB No. 11894)
AMERICAN CIVIL LIBERTIES
UNION OF UTAH FOUNDATION, INC.
355 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 521-9862
Facsimile: (801) 532-2850
*egranados@acluutah.org*

Bradley S. Phillips*+
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702
brad.phillips@mto.com

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| Utah Coalition of La Raza, *et al.*,<br><br>                              Plaintiffs,<br>        v.<br><br>Gary R. Herbert, *et al.*,<br>                              Defendants. | **PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:11-cv-00401-BCW<br><br>Judge:  Hon. Clark Waddoups |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 1

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................................1

     A. HB 497 Is Preempted ................................................................................. 1

        1.  HB 497 Is an Impermissible State Regulation of Immigration................................. 1

        2.  HB 497 Is Also Invalid Under Field and Conflict Preemption................................ 3

           a.  HB 497's Immigration Verification Provisions are Preempted (Sections 3 and 4)............................................................................... 5

           b.  HB 497's Warrantless Arrest Provisions are Preempted (Section 11) ................. 8

           c.  HB 497 Imposes an Impermissible De Facto Alien Registration Requirement (Sections 3 and 4)............................................................. 9

           d.  HB 497 Inappropriately Directs State and Local Officers to Enforce Federal Alien Registration Provisions (Section 6)............................................ 11

           e.  HB 497's New State Immigration Crimes are Preempted (Section 10) ............... 11

     B. HB 497 Violates the Fourth Amendment................................................................... 13

        1.  HB 497 Authorizes and, in Certain Cases, Mandates Unlawfully Prolonged Detentions ................................................................................... 13

        2.  Section 11 Violates The Fourth Amendment By Allowing Warrantless Arrests Without Probable Cause to Believe A Crime Has Been Committed ...................... 15

     C. HB 497 Violates the Constitutional Right to Travel .................................................... 17

II.     PLAINTIFFS HAVE ESTABLISHED IRREPARABLE HARM ....................................17

     A.  Plaintiffs Have Established Immediate and Irreparable Harm to Their Fourth Amendment Rights and Their Right to Travel ........................................................... 18

B.  Organizational Plaintiffs Have Shown Direct Standing to Challenge HB 497 ............ 19

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGHT IN FAVOR
        OF PRELIMINARY INJUNCTION ……………………………………………... 20

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Abel v. United States*,
   362 U.S. 217 (1960) ................................................................ 16

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ............................................................ 1, 12

*Atty. Gen. of N.Y. v. Soto-Lopez*,
   476 U.S. 898 (1986) ................................................................ 17

*Babbitt v. United Farm Workers Nat. Union*,
   442 U.S. 289 (1979) ................................................................ 19

*Buquer v. Indianapolis*,
   11-CV-708, 2011 WL 2532935 (S.D. Ind. June 24, 2011) ............................... *Passim*

*Chamber of Commerce v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ........................................... 19, 20

*Chamber of Commerce v. Whiting*,
   131 S.Ct. 1968 (2011) ........................................................ *Passim*

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ............................................................ 18, 19

*Cortez v. McCauley*,
   478 F.3d 1108 (10th Cir. 2007) ........................................... 16

*Crawford Fitting Co., v. J.T. Gibbons, Inc*,
   482 U.S. 437 (1987) ................................................................ 15

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ............................................................ 1, 4

*DeCanas v. Bica*,
   424 U.S. 351(1976) .......................................................... *Passim*

*Fla. State Conference of NAACP v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) ........................................... 20

*GA Latino Alliance For Human Rights v. Deal*,
11-CV-1804, 2011WL 2520752 (N.D. Ga. June 27, 2011) ............................................*Passim*

*Greater Yellowstone Coal v. Flowers*,
321 F.3d 1250 (10th Cir. 2003) ............................................ 18

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ............................................ 20

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ............................................*Passim*

*League of United Latin Am. Citizens v. Wilson*,
908 F.Supp 755 (C.D. Cal. 1995) ............................................ 1

*Morales v. Trans World Airlines*,
504 U.S. 374 (1992) ............................................ 18

*New Mexicans for Bill Richardson v. Gonzales*,
64 F.3d 1495 (10th Cir. 1995) ............................................ 19

*Newton v. Buckley*,
1997 WL 642085 (10th Cir. 1997) ............................................ 13

*Ojeda-Vinales v. INS*,
523 F.2d 286 (2d Cir. 1975) ............................................ 16

*Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ............................................ 3

*Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y*,
799 F.Supp. 1417 (W.D.N.Y. 1992) ............................................ 19

*Romero v. Fay*,
45 F.3d 1472 (10th Cir. 1995) ............................................ 16

*Saenz v. Roe*,
526 U.S. 489 (1999) ............................................ 17

*Schenck v. Pro-Choice Network of W.N.Y.*,
519 U.S. 357 (1997) ............................................ 19

*Shapiro v. Thompson*,
394 U.S. 618 (1969) ............................................ 17

*State v. Harmon,*
   910 P.2d 1196 (Utah 1995) ................................................................ 13

*United States v. Alabama,*
   No. 11-CV-02746 (N.D. Ala. filed Aug. 1, 2011) ........................*Passim*

*United States v. Arizona,*
   641 F.3d 339 (9th Cir. 2011) .......................................................*Passim*

*United States v. Arizona,*
   703 F.Supp.2d 980 (D. Ariz. 2010) ................................................... 12

*United States v. Arizona,*
   10-CV-1413 (D. Ariz. filed July 7, 2010) ......................................... 10

*United States v. Galindo-Hernandez,*
   674 F.Supp. 979 (E.D.N.Y. 1987) .................................................... 16

*United States v. Locke,*
   529 U.S. 89 (2000) ............................................................................. 2

*United States v. Lopez-Guerrero,*
   2000 WL 33348233 (W.D. Tex. 2000) .............................................. 16

*United States v. Quintana,*
   623 F.3d 1237 (8th Cir. 2010) .......................................................... 16

*United States v. Salerno,*
   481 U.S. 739 (1987 ) .......................................................................... 1

*United States v. Santana-Garcia,*
   264 F.3d 1188 (10th Cir. 2001) .......................................................... 5

*United States v. Urrieta,*
   520 F.3d 569 (6th Cir. 2008) ............................................................ 16

*United States v. Vasquez-Alvarez,*
   176 F.3d 1294 (10th Cir. 1999) ....................................................... 5, 6

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008) ........................................................................... 1

*Winter v. Nat'l Resources Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................ 18

*Wyeth v. Levine*,
   129 S.Ct. 1187 (2009) ...................................................................................... 2

*Zscherning v. Miller*,
   389 U.S. 429 (1968) .......................................................................................... 3

## STATUTES/REGULATIONS

8 U.S.C.
   § 1101(a)(43) ...................................................................................................... 8
   § 1103(a)(10) ...................................................................................................... 6
   § 1252 c .............................................................................................................. 6
   § 1324 .......................................................................................................*Passim*
   § 1324 (c) ..................................................................................................*Passim*
   § 1324a(h)(2) ..................................................................................................... 4
   § 1357(a)(2) ....................................................................................................... 9
   § 1357(g) ............................................................................................................ 6
   § 1357(g)(10) ............................................................................................*Passim*
   § 1357(g)(10)(A) ............................................................................................... 6
   § 1357(g)(10)(B) ......................................................................................... 6, 16

Utah Code Ann.
   § 76-9-1002(6) ................................................................................................. 14
   § 76-9-1003(3) ................................................................................................. 14
   § 76-9-1003(1)(a) ............................................................................................ 14
   § 76-9-1003(1)(b) ............................................................................................ 15
   § 76-9-1003(1)(d) ............................................................................................ 15
   § 76-9-1003(5) ................................................................................................. 15
   § 76-9-1006(2) ................................................................................................. 11
   § 77-7-1 ............................................................................................................ 13
   § 77-7-18 .......................................................................................................... 13
   § 77-7-20 .......................................................................................................... 13

Ind. Code Ann.
   § 35-33-1-1(1)(a)(11)-13) .................................................................................. 8

## OTHER AUTHORITIES

DHS Appropriations Act, 2010 Pub. L. No. 111-83, Title III, 123 Stat. 2142, 2149 (2009); Pub.

L. No. 110-329, Title II, 122 Stat. 3574, 3659 (2008) .................................................. 6

H.R. Rep. 111-157 (2009) ..................................................................................... 6

Immigration Reform and Control Act of 1986 ..................................................................... 4

John Morton , "*Civil Immigration Priorities for the Apprehension, Detention and Removal of Aliens,*" Mar. 2, 2011),) ........................................................................................... 7

John Morton , "*Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and  Removal of Aliens,*" Jun 17, 2011),) ............................................................................ 7

## INTRODUCTION

Plaintiffs have demonstrated that a preliminary injunction against HB 497 is necessary and appropriate to prevent an unconstitutional state law from going into effect and causing harm to the Plaintiffs and that the balance of equities and the public interest will be served by preserving the status quo.  Defendants' opposition fails to rebut Plaintiffs' showing.  For these reasons, and because Plaintiffs are likely to prevail on the merits, the Court should preliminarily enjoin HB 497 until its constitutionality can be fully and finally adjudicated by the Court.

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs have demonstrated that they are substantially likely to succeed in their claim that HB 497 is unconstitutional on its face and that there is "no set of circumstances . . . under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).[1]

### A.  HB 497 Is Preempted

#### 1.  HB 497 Is an Impermissible State Regulation of Immigration

HB 497 is a comprehensive legislative scheme for the identification, detention, criminalization, and ultimately the removal of noncitizens.  Such a scheme is an impermissible state regulation of immigration—an exclusively federal power.  *See* Pls.' Br. at 9-14; *DeCanas v. Bica*, 424 U.S. 351, 353-54 (1976); *League of United Latin Am. Citizens v. Wilson ("LULAC")*,

---

[1] Plaintiffs note that it is not clear that the *Salerno* standard applies in facial challenges based on preemption.  In three cases since *Salerno*, the Supreme Court has addressed the merits of preemption claims without applying the *Salerno* standard.  *See Chamber of Commerce v. Whiting*, __ U.S. __, 131 S.Ct. 1968 (2011); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003); *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373 (2000).  Moreover, in other contexts, the Supreme Court has questioned the applicability of the *Salerno* standard.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008).  In any event, Plaintiffs meet either standard.

908 F. Supp. 755, 768-70 (C.D. Cal. 1995); *Hines v. Davidowitz*, 312 U.S 52, 66 (1941).[2]

Defendants incorrectly contend that a presumption against preemption applies to HB 497. Opp. at 12.  States enjoy a presumption against preemption only for laws regulating areas within the "historic police powers of the States."  *Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009); *United States v. Locke*, 529 U.S. 89, 108 (2000) (presumption does not apply in fields "where there has been a history of significant federal presence").  HB 497 is principally concerned with effectuating the detention and removal of noncitizens, an area reserved for federal regulation. Notably, the Defendants have failed even to identify how HB 497 fits under any of the state's historic police powers.  Courts that have considered similar state laws in Arizona, Georgia, and Indiana have consistently denied those state laws a presumption against preemption.  *See United States v. Arizona ("Arizona")*, 641 F.3d 339, 348, 355, 361 (9th Cir. 2011) (rejecting presumption because "states have not traditionally occupied the field[s] of identifying immigration violations," "punishing unauthorized immigrants for their failure to comply with federal registration laws," or "arresting immigrants for civil violations"); *Georgia Latino Alliance for Human Rights ("GLAHR") v. Deal*, 2011 WL 2520752, *9, *14 (N.D. Ga. 2011) (same); *Buquer v. Indianapolis*, 2011 WL 2532935, at *12, *15 (S. Ind. 2011) (same).

Defendants attempt to argue that HB 497 "carves out a very limited role for state and local authorities" with respect to immigration.  Opp. at 13.  Nothing could be further from the truth – and even if this were true, HB 497 would nonetheless be preempted.  While it is true that a state law that addresses legitimate local concerns and has only a "purely speculative and

---

[2] Moreover, when viewed in combination with its companion bills, HB 116, 466, and 469, there can be no question that Utah's "immigration solution" was intended to regulate in virtually every sphere of federal immigration law.

indirect impact on immigration" is not preempted, *DeCanas*, 424 U.S. at 354-55, HB 497 is not

such a law.  HB 497 is already having a substantial, negative effect on U.S. foreign relations, a

core federal interest that the rule against state regulation of immigration is designed to protect.

*See* Decl. of William J. Burns ¶¶ 8-10, 38, 46-49, 53, *United States v. Alabama*, No. 11-CV-

02746 (N.D. Ala. filed Aug. 1, 2011) (noting cumulative impact of recent state immigration

laws, including HB 497, on foreign affairs and that such laws are "already complicating [U.S.]

efforts to pursue [foreign policy] interests"), attached as Exh. 1.  Defendants argue that a state

law can be preempted on foreign policy grounds only if it conflicts with express federal

government policy statements.  Opp at 15.  This is incorrect.  The question is whether the state

law is likely to have a substantial, non-speculative impact on foreign affairs.  *Zscherning v.

Miller*, 389 U.S. 429, 441 (1968) (holding that Oregon state law preempted despite absence of an

express foreign policy statement by the federal government and noting that such a state law

"must give way if [it] impair[s] with the effective exercise of the Nation's foreign policy").

 Plaintiffs have shown that HB 497 has already had such an effect.

### 2.  HB 497 Is Also Invalid Under Field and Conflict Preemption

Field preemption occurs when a "scheme of federal regulation [is] so pervasive as to

make reasonable the inference that Congress left no room to supplement it"; because "the federal

interest is so dominant that the federal system will be assumed to preclude enforcement of state

laws on the same subject"; or because "the object sought to be obtained by the federal law and

the character of obligations imposed by it may reveal the same purpose."  *Pacific Gas and Elec.

Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 203-04 (1983) (internal

citations omitted).  Conflict preemption exists when a state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67. These concepts are not "rigidly distinct," and "field preemption may be understood as a species of conflict preemption." *Crosby,* 530 U.S. at 373 (internal citations omitted).

HB 497 is preempted on both grounds. Defendants incorrectly claim that HB 497 merely provides for state and local officers to cooperate with federal officials on immigration enforcement. Opp. at 13. But Congress has expressly provided for specific circumstances in which state and local officers may engage in immigration enforcement under the federal government's direction and control. HB 497 does not fit within those federal laws, and creates a state immigration enforcement regime that conflicts with Congress's intent, obstructs federal objectives and attempts to regulate in a field occupied by federal law. *See* Pls.' Br. at 9-20.

Defendants' reliance on the Supreme Court's decision in *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, to justify HB 497's encroachment into an area of exclusive federal control is misplaced. *See* Opp. at 14-15. *Whiting* concerned a narrow statutory preemption question that is not at issue in this case: whether an Arizona law providing for revocation of business licenses as a penalty for employing unauthorized workers fell within a savings clause in an express preemption provision in the Immigration Reform and Control Act of 1986 ("IRCA").[3] The Court found that the Arizona law fell within the express savings clause and thus was not preempted. 131 S. Ct. at 1981. Four Justices further found that the law was not subject to implied preemption, distinguishing cases relied upon by the plaintiffs on the grounds that "[r]egulating in-state businesses through licensing laws has never been considered such an area

---

[3] IRCA expressly preempts state and local laws that impose civil or criminal sanctions on employers of unauthorized workers, but expressly excludes "licensing and similar laws" from this prohibition. 8 U.S.C. § 1324a(h)(2).

of dominant federal concern." *Id.* at 1983.  But in this case there is no comparable Congressional authorization explicitly authorizing HB 497's immigration enforcement scheme, and HB 497's provisions directly conflict with federal immigration law.

### a. HB 497's Immigration Verification Provisions are Preempted (Sections 3 and 4)

Contrary to Defendants' argument, the Tenth Circuit's decision in *United States v. Vasquez-Alvarez,* 176 F.3d 1294 (10th Cir. 1999), does not support the constitutionality of HB 497's sweeping state immigration enforcement scheme.  Neither in *Vasquez-Alvarez,* nor in any other case, has the Tenth Circuit approved of state or local law enforcement arrests for *civil* immigration violations.  *Vasquez-Alvarez* concerned an arrest for the federal crime of illegal reentry following deportation, and the court upheld the validity of a police officer's arrest of a noncitizen, which occurred after a federal immigration agent requested that the officer make the arrest.  *Id.* at 1295-96, 1300.  The court concluded that local police officers have authority "to investigate and make arrests for *criminal* violations of federal immigration laws."  *Id.* at 1299 n.4 (emphasis added).  And the court found that the arrest came within the authority "to cooperate with the Attorney General" provided in 8 U.S.C. § 1357(g)(10).  *Id.* at 1300.  The court never addressed the distinction between civil and criminal immigration provisions, and relied entirely on cases upholding state arrest authority for federal criminal offenses.  *See* Pls.' Br. at 20-21.[4]

*Vasquez-Alvarez* and its progeny at most support local police authority to make arrests for *criminal* immigration violations.  HB 497 authorizes arrests in far broader circumstances.  Moreover, HB 497 is conflict preempted as Congress has enacted four specific statutes outlining

---

[4] In *United States v. Santana-Garcia,* 264 F.3d 1188 (10th Cir. 2001), the court followed *Vasquez-Alvarez,* but also without analysis of the distinction between civil and criminal immigration provisions.

5

the circumstances when state or local officers may cooperate in immigration enforcement.  *See*
Pls.' Br. at 18-19, 25 (describing 8 U.S.C. §§ 1103(a)(10), 1357(g), 1252c).  *See also* 8 U.S.C. §
1324(c) (authorizing all "officers whose duty it is to enforce criminal laws" to make arrests
under 8 U.S.C. § 1324).  HB 497 does not fall within any of these four provisions and therefore
conflicts with Congress's scheme.

The court in *Vasquez-Alvarez* noted that the criminal arrest in that case fell within the
bounds of 8 U.S.C. § 1357(g)(10).  176 F.3d at 1300.  Section 1357(g) generally permits state
and local officers to perform civil immigration enforcement functions only when the Attorney
General has approved each officer to perform the authorized function, the Attorney General
retains control over the officer's conduct pursuant to written agreements (called "287(g)
agreements"), and other conditions are met.  Section 1357(g)(10) preserves authority for state
and local officers to engage in immigration enforcement outside of 287(g) agreements, but only
in two specific areas: "communicat[ion]" with federal authorities regarding immigration status, 8
U.S.C. § 1357(g)(10)(A), and direct "cooperat[ion]" with federal authorities, § 1357(g)(10)(B).
While the court in *Vasquez-Alvarez* found that the arrest in that case came within the authority
"to cooperate with the Attorney General" under § 1357(g)(10), 176 F.3d at 1300, the
immigration enforcement regime established by HB 497 decidedly does not.

The sweeping enforcement actions mandated by HB 497 are not tailored to the judgment
and enforcement priorities of Congress and federal immigration authorities,[5] and thus do not
come within the meaning of "cooperation" under § 1357(g)(10).[6]  In many circumstances, HB

---

[5] DHS Appropriations Act, 2010 Pub. L. No. 111-83, Title III, 123 Stat. 2142, 2149 (2009); Pub.
L. No. 110-329, Title II, 122 Stat. 3574, 3659 (2008).  *See also* H.R. Rep. 111-157, at 8 (2009).
[6] The term "cooperation" in § 1357(g)(10) means acting *in concert with* and *under the*

6

497 requires immigration status verification for anyone who lacks an identity document under

Section 4 or who otherwise is not identified to the officer's satisfaction, with the object of

identifying noncitizens who may not be lawfully present.[7] This approach contrasts sharply with

the federal government's carefully balanced priorities for immigration enforcement.[8] Moreover,

under HB 497, individuals whom the federal government in the exercise of discretion has

decided not to place in removal proceedings will be subject to repeated investigation and

interrogation by local officers.  In addition, the increased demand for immigration status

verification caused by HB 497 will burden and create an obstacle for the federal government's

ability to properly allocate its resources in accord with Congress's overall immigration

---

supervision of federal authorities. *Arizona*, 641 F.3d at 348-52.  It would make no sense for
Congress to require strong federal supervision of enforcement under 287(g) agreements and then
permit states to engage in the same enforcement activities without federal supervision or
coordination. *Id.*

[7] Defendants emphasize that in some limited circumstances HB 497 allows officers discretion
not to verify immigration status (Opp. at 3-5), but that fact in no way shields it from
unconstitutionality.  Notably, a U.S. district court in Georgia recently enjoined a state
immigration enforcement scheme similar to HB 497 that broadly authorized, but in *no*
circumstance required, state and local law enforcement officers to verify the immigration status
of people whom they stop for investigation of other offenses. *GLAHR*, 2011 WL 2520752 at *9-
11.

[8] The federal government has repeatedly emphasized the importance of setting immigration
enforcement priorities at the federal level. *See* Pls.' Br. at 21-22. *See also* Doc. 37-19 at pp. 61-
65 (ICE Director John Morton, "Civil Immigration Priorities for the Apprehension, Detention
and Removal of Aliens," Mar. 2, 2011); Doc. 37-20 at p. 27 (2007 Memorandum of former ICE
Assist. Secretary Julie Myers); *id.* at 33-41 (2005 Memorandum of former ICE Principal Legal
Advisor William Howard), and *id.* at 43-56 (2000 Memorandum of former INS Commissioner
Doris Meissner).  Recently, ICE issued updated guidance on enforcement priorities. *See* ICE
Director John Morton, "Exercising Prosecutorial Discretion Consistent with the Civil
Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and
Removal of Aliens," June 17, 2011, attached as Exh. 3.  Citing Director Morton's guidance,
DHS Secretary Janet Napolitano recently emphasized that "DHS enforcement resources must
continue to be focused on our highest priorities," and that "doing otherwise hinders our public
safety mission – clogging immigration court dockets and diverting DHS enforcement resources
away from individuals who pose a threat to public safety."  Ltr. from Secretary Napolitano to
Senator Dick Durbin, Aug. 18, 2011, attached as Exh. 4.

enforcement priorities.  *See* Pls.' Br. at 21-24; Ragsdale Decl. ¶¶ 32, 36, 38, filed in *United States v. Alabama*, No. 11-CV-02746 (N.D. Ala. filed Aug. 1, 2011), attached as Exh. 2.  For these reasons, Sections 3 and 4 of HB 497 exceed state authority to "communicate" and "cooperate with" federal immigration authorities, 8 U.S.C. § 1357(g)(10), and "circumvent[] Congress'[s] intention to allow the Attorney General to authorize and designate local law enforcement officers to enforce civil immigration law."  *GLAHR*, 2011 WL 2520752 at *11.

### b.  HB 497's Warrantless Arrest Provisions are Preempted (Section 11)

Defendants fail to address Plaintiffs' arguments that Section 11's warrantless arrest provisions are preempted, *see* Pls.' Br. at 14-17, instead resting on their mistaken belief that local officers have inherent authority to make warrantless arrests for *civil* immigration violations.[9] Opp. at 21-23.  As discussed above, local law enforcement officers in Utah do not enjoy the ability to make warrantless arrests solely based on suspicion of civil immigration violations.

Section 11 is nearly identical to a provision in an Indiana law that was recently enjoined based on federal preemption and other grounds.[10] *Buquer*, 2011 WL 2532935, at * 11-13 (holding the provision likely preempted because it grants state and local officers arrest powers

---

[9] The state asserts that the United States has acknowledged that "state officers are not preempted from making arrests for suspected civil immigration violations."  Opp. at 22.  Yet, in the passage it cites for the so-called admission at the oral argument in *United States v. Arizona*, the United States stated only that Arizona's warrantless arrest provision would be constitutional if it contained language requiring state officers to first confirm with ICE that a crime made a noncitizen removable.  *Id.*  Section 11 of HB 497 contains no such requirement. Defendants also cite a 2002 legal opinion by the Department of Justice, but fail to mention that the Ninth Circuit rejected this memorandum because it incorrectly interpreted federal immigration law and is not binding on federal courts.  *See* Opp. at 22; *Arizona*, 641 F.3d at 365 n.24.

[10] The Indiana statute authorized warrantless arrests when the officer has "(1) a removal order issued for the person by an immigration court; (2) a detainer or notice of action for the person issued by the United States Department of Homeland Security; or (3) probable cause to believe that the person has been indicted for or convicted of one (1) or more aggravated felonies (as defined in 8 U.S.C. 1101(a)(43))."  Ind. Code § 35-33-1-1(1)(a)(11)-(13).

beyond what is federally authorized).  *See also Arizona*, 641 F.3d at 365 (holding that provision allowing state and local officers to make warrantless arrests based on probable cause of civil removability is likely preempted).  Like the enjoined Indiana and Arizona provisions, Section 11 conflicts with federal immigration law by authorizing warrantless arrests for individuals:  (1) whom the federal government has elected to allow to remain free pending appeal of their removal cases; (2) whom the federal government has elected not to place in removal proceedings; or (3) who would not be removable at all because they were charged, but never convicted, of a crime that constitutes an aggravated felony under federal immigration law.  *See* Pls.' Br. at 15-17.  *See also Buquer*, 2011 WL 2532935, at *13 (preliminarily enjoining similar provision that "interferes with federal discretion relating to priorities for immigration enforcement and the best methods for carrying out those enforcement responsibilities").[11]

Finally, Defendants do not dispute that Section 11 grants to state and local officers significantly more warrantless arrest authority than Congress saw fit to give to federal immigration officers.  *See* 8 U.S.C. § 1357(a)(2) (limiting warrantless arrest to instances where the noncitizen "is likely to escape before a warrant can be obtained").  HB 497 is thus clearly contrary to Congress's intent.  *See also Buquer*, 2011 WL 2532935, at *11.

### c.  HB 497 Imposes an Impermissible De Facto Alien Registration Requirement (Sections 3 and 4)

Defendants argue that Sections 3 and 4 do not amount to a *de facto* state alien registration scheme because U.S. citizens and nationals may be exempted from Section 4's document-

---

[11] The Indiana court found that "where the federal government has exercised its discretion to release an individual... who has had a removal order issued, the subsequent arrest of that person by Indiana law enforcement officers directly conflicts with the federal decision, obviously and seriously interfering with the federal government's authority in the field of immigration enforcement."  *Buquer*, 2011 WL 2532935  at *12.  Section 11(5)(a) poses the same conflict.

9

carrying requirements by attesting to being U.S. citizens.  Opp. at 23-24.  This ignores the lack of

an attestation provision for lawful immigrants, who will be treated as suspected undocumented

immigrants and will be at risk of prolonged detention if they do not carry one of the identity

documents preferred by Utah.  In *Hines*, the Supreme Court invalidated a similar state alien

registration act that required, among other things, that every alien 18 years or over carry a state

alien identification card at all times.  312 U.S. at 56.  The Court held:

> Having the constitutional authority so to do, [Congress] has provided a
> standard for alien registration in a single integrated and all-embracing system
> in order to obtain the information deemed desirable in connection with aliens.
> When it made this addition to its uniform naturalization and immigration laws,
> it plainly manifested a purpose to do so in such a way as to protect the
> personal liberties of law-abiding aliens through one uniform national
> registration system, and to leave them free from the possibility of inquisitorial
> practices and police surveillance….

*Id.* at 74.

HB 497's *de facto* documentation requirement is particularly problematic because many

foreign nationals who reside in the United States with the permission of the federal government

do not have readily available documentation that is acceptable under HB 497.  These categories

of noncitizens include those with deferred action, travelers visiting from countries participating

in the Visa Waiver Program, individuals with Temporary Protected Status, or those who have

applied for visas as victims of crimes.  Decl. of Michael Aytes ¶¶ 17, 19, 21, filed in *United

States v. Arizona*, No. 10-CV-1413 (D. Ariz. filed July 7, 2010).[12]   Such increased police

---

[12] The number of individuals in these situations is significant.  In fiscal year 2010, more than 16 million aliens were admitted under the Visa Waiver Program, Decl. of David V. Aguilar ¶ 10, filed in *United States v. Alabama*, No. 11-CV-02746 (N.D. Ala. filed Aug. 1, 2011), attached as Exh. 5, and as of the end of calendar year 2010 approximately 400,000 individuals had Temporary Protected Status, Decl. of Lori Scialabba ¶ 27, filed in *United States v. Alabama*, No. 11-CV-02746 (N.D. Ala. filed Aug. 1, 2011), attached as Exh. 6.

intrusion into the lives of these lawfully present aliens, among others, is impermissible.  *See DeCanas*, 424 U.S. at 358 n.6 ("Of course, state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.").

### d.  HB 497 Inappropriately Directs State and Local Officers to Enforce Federal Alien Registration Provisions (Section 6)

Defendants argue that Section 6 is not preempted by claiming that it "does not compel local authorities to do anything," but simply prevents them "from interfering with federal law." Opp. at 24.  Defendants completely ignore the provision of Section 6 that prohibits state and local agencies from limiting or restricting enforcement of the federal misdemeanor offenses of willful failure to register or to carry a registration document.  *See* Utah Code Ann. §76-9-1006(2).  This mandatory state and local enforcement provision conflicts with federal law.  *See* Pls.' Br. at 23-24.  As previously discussed (Pls.' Br. at 18-19), Congress has carefully limited the situations in which local officers may cooperate in the enforcement of federal immigration law, and a state law requiring local police to investigate and enforce the federal alien registration crimes is outside of these limits.  Finally, state and local officers' efforts to investigate suspected violations of the federal alien registration statutes without federal direction will inevitably result in improper detention and interrogation based on mistaken judgments of whether a given individual is subject to a federal penalty for violation of the federal registration provisions.

### e.  HB 497's New State Immigration Crimes are Preempted (Section 10)

Contrary to Defendants' assertions, *see* Opp. at 25-26, Section 10 is not coterminous with the federal harboring statute, 8 U.S.C. § 1324.  Section 10(c) punishes encouraging or inducing undocumented individuals to come to, enter, or reside in the state of Utah, while the federal

statute does not criminalize actions with respect to entering Utah from another state.  *See GLAHR*, 2011 WL 2520752, at *13 (noting a similar Georgia provision to be "not identical" to federal law because the state law prohibited "knowingly inducing, enticing, or assisting illegal aliens to enter Georgia" whereas "[o]nce in the United States, it is not a federal crime to induce an illegal alien to enter Georgia from another state").[13]

Even if Section 10 were identical to the federal harboring law, it would still be preempted.  Utah's provision would be enforced by state police and prosecutors and interpreted by state judges, not by their federal counterparts, and decisions about when to charge a person or what penalty to seek would no longer be under federal control.[14]  In fact, Section 10 would even permit the state to prosecute and to impose additional penalties on individuals who have already been federally charged.  Thus, Section 10 would authorizes state officers to "use an iron fist where the President has consistently chosen kid gloves."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427 (2003).  Like Georgia's enjoined counterpart, Section 10 is preempted because although it is "superficially similar to [the relevant federal statute, 8 U.S.C.] § 1324, state prosecutorial discretion and judicial interpretation will undermine federal authority to 'establish immigration enforcement priorities and strategies.'"  *GLAHR*, 2011 WL 2520752, at * 13

---

[13] Defendants' reliance on the district court's decision in *United States v. Arizona*, 703 F. Supp. 2d 980 (D. Ariz. 2010), to argue that Section 10 is narrower than federal law is misplaced.  The *Arizona* court concluded that the challenged Arizona provision was "narrower than its federal counterpart because it requires that the person already be in violation of a criminal offense."  *Id.* at 1002 n. 18.  Section 10 has no such requirement.

[14] The text of the federal statute demonstrates that Congress intended states to have a far more limited role.  Under 8 U.S.C. § 1324(c), state and local officers have authority to arrest individuals for violations of that federal statute.  HB 497 goes well beyond that narrow boundary and creates an independent state crime, administered through a state system, out of apparent dissatisfaction with federal law.  The Supremacy Clause does not permit states to make that decision.  Moreover, "the threat of 50 states layering their own enforcement rules on top of the INA also weighs in favor of preemption."  *Arizona*, 641 F.3d at 354.

(quoting *Arizona*, 641 F.3d at 352).

    **B.   HB 497 Violates the Fourth Amendment**

          **1.   HB 497 Authorizes and, In Certain Cases, Mandates Unlawfully Prolonged Detentions**

Defendants concede that a prolonged detention or arrest without proper suspicion of criminal activity violates the Fourth Amendment.  Opp. at 27.  Bedrock Fourth Amendment principles provide that, while an officer may ask questions unrelated to the original purpose of a stop, such questioning must not unreasonably prolong the stop.  Pls.' Br. at 30.  Defendants also concede that Section 3 requires immigration verification upon any arrest.  *See* Opp. at 29-30. Defendants nevertheless attempt to salvage Section 3 by advancing two meritless arguments.

First, Defendants argue that Section 3 mandates immigration verification only upon a *full custodial* arrest.  This ignores Utah law, which holds that a person who is given a citation but not taken into custody is considered to have been placed under arrest.  *See State v. Harmon*, 910 P.2d 1196, 1199-1200 (Utah 1995); *Newton v. Buckley*, 1997 WL 642085, *2 (10th Cir. 1997) (unpublished) ("Under Utah law, when a police officer arrests someone on a misdemeanor or infraction charge, the officer can issue the arrestee a citation . . . .") (citing Utah Code Ann. §§ 77-7-18, 77-7-20); Decl. of Chris Burbank ¶ 11 (Doc. No. 37.14).

Defendants agree that the definition of an "arrest" under Utah Code Ann. § 77-7-1 encompasses a traffic stop resulting in a citation, but argue that the term "arrest" in Section 3 should be read differently from the word "arrest" as generally defined in Utah law.  Opp. at 29. However, "arrest" is not defined independently in HB 497, and Defendants cannot create a new and entirely different definition.[15]  Thus, under HB 497, in situations when an individual would

---

[15] The only rationale offered by Defendants for this different definition of the term "arrest" is

normally be cited and released, officers would be required to prolong the detention to verify the "arrested" person's immigration status. *See* Utah Code Ann. § 76-9-1003(1)(a), (3).

Second, Defendants ignore the reality of "immigration verification" as used in HB 497, which necessarily will extend a routine stop or detention. Even when a person is only stopped or detained (but not cited or booked into a jail) and an officer opts to verify the person's immigration status, Section 3 demands that the detention be unlawfully prolonged solely for this purpose. Defendants do not contest that the process of investigating and verifying immigration status under Section 3 is necessarily time-intensive.[16] Under HB 497, verifying immigration status requires that the verification be performed by a law enforcement officer who is authorized by a federal agency to do so, or by a federal agency. Utah Code Ann. § 76-9-1002(6). And Defendants do not contest that on average it would take the federal government over 80 minutes to respond to an immigration query from peace officers and, in some cases, it could take more than two days. Decl. of David C. Palmatier ¶¶ 8, 11 (Doc. No. 37.19).[17] Since currently an average stop and citation takes only 10 minutes to complete, *see* Burbank Decl. ¶ 11, the decision to verify immigration status will necessarily prolong the stop beyond its lawful purpose.

Ultimately, the only relevant verification limitations under Section 3 are that: (1) an officer can forgo verification if it could hinder or obstruct a criminal investigation or if the officer is in a jurisdiction with only one law enforcement officer on duty and back-up support is

---

their mistaken belief that otherwise the term "stop" would have no meaning in the provision. Opp. at 30. Defendants ignore the fact that individuals may lawfully be stopped without being either cited or placed under custodial arrest, as in a *Terry* stop where an officer's reasonable suspicion is satisfactorily resolved as a result of the stop.

[16] See also Gentile Decl. ¶¶ 7-11 filed in *United States v. Alabama*, No. 11-CV-02746 (N.D. Ala. filed Aug. 1, 2011), attached as Exh. 7.

[17] See also Griffin Decl. ¶ 18 filed in *United States v. Alabama*, No. 11-CV-02746 (N.D. Ala. filed Aug. 1, 2011), attached as Exh. 8.

unavailable, and (2) the officer may not consider "race, color, or national origin" in implementing Section 3.  Utah Code Ann. § 76-9-1003(1)(b), (1)(d), (5).  The statute does not restrict an officer from prolonging the stop beyond the time it takes to complete the original stop.  On the contrary, such an extension of routine stops and detentions is required in order to effectuate the plain meaning of the statute.  To reach a contrary result, the provision would need to be read to require verification only when the person is taken into custody and booked, and even to require release even of persons who are booked if the charges are dropped before verification has been completed.  No such limitations appear in the statute.  *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442 (1987) ("We cannot accept an interpretation . . . that would render any of these specific statutory provisions entirely without meaning.").  Moreover, the verification exception for jurisdictions with only one law enforcement officer makes clear that the intent of Section 3 was for the officer to detain the individual until verification was completed.  Section 3 is susceptible to only one interpretation:  It authorizes and often requires local officers to conduct verifications that will unlawfully prolong detentions.

### 2. Section 11 Violates The Fourth Amendment By Allowing Warrantless Arrests Without Probable Cause To Believe A Crime Has Been Committed

Defendants concede that Section 11 of HB 497 authorizes Utah officers to execute warrantless arrests for non-criminal conduct, but argue that such conduct is "appropriate," relying solely on case law upholding arrests by *federal* immigration agents based on certain immigration violations.  Opp. at 30-31.  But federal agents have unique civil arrest authority under federal law, which state and local officers do not enjoy.  Such arrests by local officers would violate well-established Fourth Amendment law requiring probable cause to believe a crime has been committed in order to effectuate a warrantless arrest.

15

"A warrantless arrest is permissible when an officer 'has probable cause to believe that a person committed a *crime*.'" *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (emphasis added) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). A federal district court in Indiana recently enjoined a nearly identical provision on Fourth Amendment grounds, finding the provision allowed arrests "for conduct that all parties stipulate and agree is not criminal" and did not "include a requirement that the arrest powers granted to law enforcement officers . . . be used only in circumstances in which the officer has a separate, lawful reason for the arrest." *Buquer*, 2011 WL 2532935, *10. Defendants also ignore recent decisions by Arizona and Georgia district courts addressing analogous provisions and holding that "local law enforcement officers cannot enforce completed violations of civil immigration law (i.e., illegal presence) unless specifically authorized to do so by the Attorney General under special conditions." *GLAHR*, 2011 WL 2520752 at *9 (quoting *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008)). *See also Arizona*, 641 F.3d at 362–64. Similarly Section 11 impermissibly subjects individuals to warrantless arrests on suspicion of civil immigration violations, including when individuals are not subject to removal or are lawfully out of custody pending the completion of their proceedings. Pls.' Br. at 32.

All of the cases cited by Defendants are inapposite, involving the authority of federal, not state, agents to conduct arrests for certain immigration violations.[18] None of these cases purport

---

[18] *See Abel v. United States*, 362 U.S. 217, 223 (1960) (arrest by INS agents pursuant to an administrative deportation warrant); *United States v. Quintana*, 623 F.3d 1237, 1242 (8th Cir. 2010) (holding that an ICE agent had probable cause to arrest for an immigration violation and state officer was authorized to directly cooperate with ICE under 8 U.S.C. § 1357(g)(10)(B)); *United States v. Lopez-Guerrero*, 2000 WL 33348233, at *1 (W.D. Tex. 2000) (arrest by a U.S. Border Patrol agent); *United States v. Galindo-Hernandez*, 674 F. Supp. 979, 980-81 (E.D.N.Y. 1987) (arrest by INS agents at the airport); *Ojeda-Vinales v. INS*, 523 F.2d 286, 287 (2d Cir.

to allow warrantless arrests for purely civil immigration violations outside of the specific contexts permitted under federal law.  *See* Pls.' Br. at 18-19.

### C.   HB 497 Violates the Constitutional Right to Travel

Defendants incorrectly assert that Plaintiffs may prevail on their right to travel claim only if they show that "some provision of HB 497 discriminates against non-residents."  Opp. at 33. But the Supreme Court has held that a state law infringes on the constitutional right to travel if it uses "any classification which serves to penalize the exercise of that right" even in an "indirect manner," *Atty. Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986), or if it treats residents of another state as "unfriendly alien[s]" rather than "welcome visitors," *Saenz v. Roe*, 526 U.S. 489, 500 (1999).  HB 497 does both, and therefore the law must be analyzed under strict scrutiny. *Soto-Lopez*, 476 U.S. at 906, 911; *Saenz*, 526 U.S. at 499; *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969).  Defendants have failed to establish that they meet this high burden.

Contrary to Defendants' contention, HB 497 does not treat all motorists alike.  It creates exactly the kind of penalizing classification that concerned the *Soto-Lopez* Court.  476 U.S. at 903.  Because HB 497 affords a presumption of lawful status only to drivers licensed in states that require proof of legal status to obtain a driver's license, it will require out-of-state motorists like Plaintiff Larios to carry proof of citizenship to avoid lengthy detentions while Utah law enforcement officers inquire about their status.  *See* Burbank Decl. ¶ 14.[19]

## II.   PLAINTIFFS HAVE ESTABLISHED IRREPARABLE HARM

If HB 497 is not enjoined, Plaintiffs will suffer immediate and irreparable injury.  The

---

1975) (arrest by INS agents).

[19] Defendants claim that these checks will occur only if the officer is "otherwise unable to verify the identity of the person." Opp. at 34.  This does not save HB 497 still discriminates in that motorists from states with favored identity documents (unlike Plaintiff Larios) will not be subjected to similar scrutiny to establish their identity.

Plaintiffs will be:  subjected to the enforcement of a preempted state law;[20] at imminent risk of unlawful arrest and prolonged detention by Utah law enforcement officials; and unable to travel freely in and through Utah.  Additionally, the organizational Plaintiffs will suffer direct harm in the form of resource diversion and the frustration of their core mission activities.

### A.  Plaintiffs Have Established Immediate and Irreparable Harm to Their Fourth Amendment Rights and Their Right to Travel

Defendants assert that HB 497's harms to Plaintiffs' Fourth Amendment rights and their right to travel are "either speculative or nonexistent (because [they are] based on an improper reading of the statute) or both."  Opp. at 35.  Defendants are wrong on both counts.  First, these harms are not speculative.  Once HB 497 goes into effect, Plaintiffs will be at imminent and significant risk of unlawful and prolonged seizures by law enforcement officers.  Unlike the unwritten custom of chokeholds at issue in *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), HB 497 institutionalizes immigration status inquiries as part of virtually all law enforcement interactions.  Moreover, Plaintiffs need not show with certainty that they will be stopped or arrested under HB 497 to satisfy the standard for irreparable harm.

> [A]n injury is not speculative simply because it is not certain to occur.  An irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact. . . .

*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (quotation and citation omitted; emphasis in original).[21]

---

[20] Defendants do not dispute that being subjected to a preempted state law qualifies as irreparable harm.  Courts have repeatedly recognized that the enforcement of a preempted law may constitute irreparable harm, particularly where (as here) more than monetary interests are at stake.  *See, e.g., Arizona*, 641 F.3d at 366; *GLAHR*, 2011 WL 2520752 at *18; *see also Morales v. Trans World Airlines*, 504 U.S. 374, 381 (1992).

[21] *Accord Winter v. Nat'l Resources Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an

The likelihood that Plaintiffs will be targeted for scrutiny and status verification is especially acute because they belong to racial or national origin minority groups, speak foreign languages or have accents in English, and/or lack HB 497's qualifying identity documents—characteristics they cannot easily change.  In preliminarily enjoining Georgia's similar law, the district court found irreparable harm where the law would "convert many routine encounters with law enforcement into lengthy and intrusive immigration status investigations."  *GLAHR*, 2011 WL 2520752, at *4 (distinguishing *Lyons*, 461 U.S. 95 (1983)).[22]

Plaintiffs have also shown that HB 497 will force them to curtail their activities and travel in order to avoid encounters with law enforcement—another cognizable harm.  Several Plaintiffs regularly drive themselves and loved ones to work, school, church, and charitable activities.  If HB 497 goes into effect, they will be forced to curtail their travel to Utah or within the state because they lack the privileged forms of identification that would protect them from additional inquiry by police officers.[23]  This limitation on their freedom of movement constitutes irreparable harm.  *See Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y.*, 799 F. Supp. 1417, 1428, 1430 (W.D.N.Y. 1992), *aff'd in part, rev'd in part on other grounds sub nom. Schenck  v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357 (1997).

### B.  Organizational Plaintiffs Have Shown Direct Standing to Challenge HB 497

HB 497's implementation will divert resources away from the organizational Plaintiffs'

---

injunction.") (emphasis in the original); *Chamber of Commerce v. Edmondson,* 594 F.3d 742, 771 (10th Cir. 2010).

[22] *Cf. Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1502 (10th Cir. 1995).

[23] *See* Decl. of Jane Doe ¶ 11-16; Decl. of John Doe #1 ¶¶ 10-13; Decl. of John Doe #2 ¶¶ 7-11; Decl. of Alicia Cervantes, ¶¶ 6, 9-11; Decl. of Eliana Larios ¶¶ 7-9; *see also* Decl. of Frank Cordova ¶¶ 7-10; Decl. of Juan Manuel Ruiz ¶¶ 8-9, 13, 16.

core activities, frustrate their goals, and hinder their ability to retain and recruit members. *See* Pls.' Br. at 38; Compl. ¶¶ 17-23. Courts have repeatedly found that frustration of an organization's mission or diversion of its resources constitutes irreparable harm. *See GLAHR*, 2011 WL 2520752, at *4-5, *18; *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1164-66 (11th Cir. 2008). *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION

Defendants argue that the equities tip against granting a preliminary injunction here because the State deserves "wide[] latitude in the dispatch of its own internal affairs." Opp. at 37 (quotation and citation omitted). But regulating immigration is not a matter of the state's "own internal affairs" as a matter of settled law of preemption. Defendants only claim one alleged harm to the State from delaying HB 497's implementation: "Enjoining HB 497 would … harm the State in its effort to communicate and cooperate with the federal government respond [sic] to the issue of illegal immigration." Opp. at 38-39. But as discussed above, HB 497 is not an attempt to "cooperate with the federal government," but to supplant the federal government.

Defendants' argument that a preliminary injunction would harm the public interest is also meritless. The public interest is not served by allowing an unconstitutional law to take effect. *See Edmonson*, 594 F.3d at 771; *GLAHR*, 2011 WL 2520752, at *18; *Arizona*, 641 F.3d at 366.

## CONCLUSION

For the foregoing reasons and the reasons discussed in Plaintiffs' opening brief, the court should preliminarily enjoin HB 497 pending a full and complete constitutional review.

Dated:  September 2, 2011                         Respectfully submitted,

/s/ Linton Joaquin
NATIONAL IMMIGRATION LAW CENTER
20

/s/ Andre Segura
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT


/s/ Esperanza Granados
AMERICAN CIVIL LIBERTIES UNION
OF UTAH FOUNDATION, INC.


/s/ Elora Mukherjee
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
RACIAL JUSTICE PROJECT


/s/ Bradley S. Phillips
MUNGER, TOLLES & OLSON LLP

## CERTIFICATE OF SERVICE

This is to certify that copies of the foregoing **PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** were served by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

BARRY G. LAWRENCE
PHILIP S. LOTT
TIMOTHY EVANS
blawrence@utah.gov
phillott@utah.gov
tevans@utah.gov

OMAR C. JADWAT
ANDRE SEGURA
ELORA MUKHERJEE
ojadwat@aclu.org
asegura@aclu.org
emukherjee@aclu.org

CECILLIA D. WANG
KATHERINE DESORMEAU
cwang@aclu.org
kdesormeau@aclu.org

ESPERANZA GRANADOS
egranados@acluutah.org

LINTON JOAQUIN
KAREN C. TUMLIN
SHIU-MING CHEER
MELISSA S. KEANEY
joaquin@nilc.org
tumlin@nilc.org
cheer@nilc.org
keaney@nilc.org

BRADLEY S. PHILLIPS
brad.phillips@mto.com

Dated:  September 2, 2011

/s/ Linton Joaquin
NATIONAL IMMIGRATION LAW CENTER

22