Linton Joaquin*
Karen C. Tumlin*
Shiu-Ming Cheer*
Melissa S. Keaney*
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
Telephone: (213) 639-3900
Facsimile: (213) 639-3911
*joaquin@nilc.org*
*tumlin@nilc.org*
*cheer@nilc.org*
*keaney@nilc.org*

Omar C. Jadwat*
Andre I. Segura*
Elora Mukherjee*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2660
Facsimile: (212) 549-2654
*ojadwat@aclu.org*
*asegura@aclu.org*
*emukherjee@aclu.org*

Attorneys for Plaintiffs

*    Admitted *Pro hac vice*
+    Counsel for all plaintiffs except SEIU and
     Workers' United

Cecillia D. Wang*
Jennifer Chang Newell*
Katherine Desormeau*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950
*cwang@aclu.org*
*jnewell@aclu.org*
*kdesormeau@aclu.org*

Esperanza Granados (USB No. 11894)
AMERICAN CIVIL LIBERTIES
UNION OF UTAH FOUNDATION, INC.
355 North 300 West
Salt Lake City, Utah 84103
Telephone: (801) 521-9862
Facsimile: (801) 532-2850
*egranados@acluutah.org*

Bradley S. Phillips*+
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
*brad.phillips@mto.com*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| Utah Coalition of La Raza, *et al.,*<br>                    Plaintiffs,<br>    v.<br><br>Governor Gary R. Herbert, *et al.*,<br>                    Defendants. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST § 5 OF HB 497**<br><br>Case No. 2:11-cv-00401-BCW;<br>Case No. 2:11-cv-1072-CW<br>Judge:  Honorable Clark Waddoups |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ............................................................................................................... 3

    I.    Plaintiffs Are Likely to Succeed on the Merits in their Claims Against § 5 ................ 3

        A.    Plaintiffs Are Likely to Prevail on Their Claim that § 5 is Preempted by Federal Immigration Law ........................................................................... 3

            1.    Conflict Preemption ........................................................................... 4

                a.    Section 5 Conflicts with the Provisions of the INA Granting Only Limited State and Local Authority to Enforce Immigration Law ................................... 4

                b.    Section 5 Conflicts with Congress's Decision to Grant to *Federal* Authorities Discretion to Make Immigration Detention Decisions ......................................... 7

            2.    States are Field Preempted from Enacting a Unilateral State Scheme Authorizing Detention Pending Transfer ........................................ 11

        B.    Plaintiffs are Likely to Prevail on Their Claim that § 5 Unlawfully Prolongs Detention in Violation of the Fourth Amendment ................................. 11

    II.    Plaintiffs Will be Irreparably Harmed if § 5 is Not Enjoined .................................. 15

    III.    The Balance of Equities Tips in Favor of Granting a Preliminary Injunction ....... 17

    IV.    The Public Interest Weighs in Favor of Enjoining § 5 ............................................ 18

CONCLUSION ........................................................................................................... 19

CERTIFICATE OF SERVICE .................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Adams v. Baker*, 919 F. Supp. 1496 (D. Kan. 1996) ..................................................... 18

*Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) ........................18

*Arizona v. Johnson*, 555 U.S. 323 (2009) ..................................................................... 14

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ................................................. passim

*Arline v. City of Jacksonville*, 359 F. Supp. 2d 1300 (M.D. Fla. 2005) ........................ 14

*Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1988) ................................................. 14

*Bank One v. Guttau*, 190 F.3d 844 (8th Cir.1999) ......................................................... 18

*Barnes v. District of Columbia*, 242 F.R.D. 113 (D.D.C. March 26, 2007) .......... 13, 14

*Berry v. Baca*, 379 F.3d 764 (9th Cir. 2004) ................................................................ 13

*Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) ................ 17, 18

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) ................................................... 13

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) ................................................. 13

*Florida v. Royer*, 460 U.S. 491 (1983) ......................................................................... 12

*Gaylor v. Does*, 105 F.3d 572 (10th Cir. 1997) ............................................................ 13

*Heckler v. Chaney*, 470 U.S. 821 (1985) ........................................................................ 8

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ................................................................... 4, 18

*Illinois v. Caballes*, 543 U.S. 405 (2005) ..................................................................... 14

*Jones v. Cochran*, No. 92-6913, 1994 U.S. Dist. LEXIS 20625 (S.D. Fla. Aug. 8, 1994) ........... 13

*Keirnan v. Utah Transit Authority*, 339 F.3d 1217 (10th Cir. 2003) ............................ 17

*Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001) ..................................................... 16

*Leavitt v. Utah Licensed Beverage Ass'n*, 256 F.3d 1061 (10th Cir. 2001) .......... 16, 17, 18

*Lewis v. Grady*, 853 F.2d 1366 (7th Cir. 1988) ........................................................... 13

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992) ................................................ 16

*Nat'l Ctr. for Immigrants' Rights, Inc. v. INS*, 743 F.2d 1365 (9th Cir. 1984) ............ 18

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ............ 8

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ................................................. 11

*Ringuette v. City of Fall River*, 906 F. Supp. 55 (D. Mass. 1995) ............................... 14

*Sanders v. English*, 950 F.2d 1152 (5th Cir. 1992) ...................................................... 13

*Terry v. Ohio*, 392 U.S. 1 (1968) .................................................................................. 12

*United States v. Gonzalez-Lerma,* 14 F.3d 1479 (10th Cir. 1994),
  *overruled in part on other grounds by United States v. Botero-Ospina,*
  71 F.3d 783 (10th Cir. 1995) ............................................................................12

*United States v. Guzman,* 864 F.2d 1512 (10th Cir. 1988) ........................................12

*United States v. Arizona*, 641 F.3d 339 (9th Cir. 2011)
  *aff'd in part, rev'd in part and remanded*, 132 S. Ct. 2492 (2012) .......................... 16

*United States v. Sokolow*, 490 U.S. 1 (1989)................................................................ 12

*Utah Licensed Beverage Assn. v. Leavitt*, 256 F.3d 1061 (10th Cir. 2001).................... 3

*Villas at Parkside Partners*, 701 F. Supp. 2d 835 (N.D. Tex. 2010)........................... 18

## Statutes and Regulations

8 U.S.C. § 1101 ................................................................................................... 4

8 U.S.C. § 1103(a)(10) ........................................................................................ 5

8 U.S.C. § 1158 ................................................................................................... 9

8 U.S.C. §§ 1181-89 ........................................................................................... 7

8 U.S.C. §§ 1222-31 ........................................................................................... 7

8 U.S.C. § 1226 ................................................................................................... 8

    § 1226(a) ..................................................................................................... 8

    § 1226(c) ..................................................................................................... 8

8 U.S.C. § 1229a(a)(3) ........................................................................................ 7

8 U.S.C. § 1229b ................................................................................................. 9

8 U.S.C. § 1231 ................................................................................................... 9

    § 1231(b)(3) ................................................................................................ 9

8 U.S.C. § 1252(a)(1).......................................................................................... 7

8 U.S.C. § 1252c ................................................................................................. 5

8 U.S.C. § 1254a ................................................................................................. 9

8 U.S.C. § 1255 ................................................................................................... 9

    § 1255(i) ..................................................................................................... 9

    § 1255(m).................................................................................................... 9

8 U.S.C. § 1324(c) .............................................................................................. 5

8 U.S.C. § 1357 ................................................................................................. 5, 6, 8

    § 1357(g) ................................................................................................... 5

    § 1357(g)(10)(B) ....................................................................................... 6

8 C.F.R. § 208.16-18 ............................................................................................ 9

8 C.F.R. § 287.7(d) ............................................................................................... 9

Utah Code Ann. 76-9-1005 ........................................................................... passim

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs respectfully move for a preliminary injunction barring the enforcement of § 5 of Utah's Illegal Immigration Enforcement Act ("HB 497"). Section 5 authorizes Utah law enforcement officers to detain an unlawfully present alien pending transfer to a federal detention facility within the state, without obtaining federal approval. Utah Code Ann. 76-9-1005. The Supreme Court's recent decision in *Arizona v. United States*, 132 S. Ct. 2492 (2012), makes plain that § 5 suffers from multiple constitutional flaws because it unilaterally authorizes detention by state and local officers solely for immigration purposes, and independent of any federal control.

*Arizona* explained that a state law that "put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision" would "disrupt the federal framework." 132 S. Ct. at 2509. Further, the Court emphasized that a state law authorizing detention of non-citizens "solely" for immigration purposes "would raise constitutional concerns." *Id.* It is therefore clear that § 5 is preempted by federal law and violates the Fourth Amendment by authorizing detention of non-citizens based on immigration status alone, without any independent state law basis , and allows Utah to effectuate its own state immigration policy.

In light of the strong merits of these claims, the immediate and irreparable injury Plaintiffs will suffer if § 5 is allowed to go into effect, and the public interest in preventing the constitutional violations that would otherwise occur, § 5 should be preliminarily enjoined pending this Court's review of its constitutionality.

## BACKGROUND

Plaintiffs brought this action challenging the constitutionality of HB 497, which was part of a comprehensive state scheme to regulate immigration.  *See* Dkt. #2 (Compl.); Dkt. #37 (Pls.' Mot. for Prelim. Inj., at 2-3).  Plaintiffs' complaint asserted Supremacy Clause and Fourth Amendment challenges to HB 497, including § 5, among other claims.  *See* Dkt. #2 (Compl., at ¶¶ 92-96) ("HB 497 is void in its entirety" on preemption grounds); *id.* (Compl., at ¶¶ 97-101) ("Section[] … 5 of HB 497 authorize[s] officers to detain individuals without reasonable suspicion of unlawful activity for [the] purpose[] of … transporting them into federal custody, in violation of the Fourth Amendment.").  In previous briefing, Plaintiffs have explained in detail the overall operation of HB 497 as well as numerous other specific provisions of the law.  *See* Dkt. #37 (Pls.' Mot. for Prelim. Inj., at 2-8).

Section 5 of HB 497 provides:

A state or local law enforcement officer may securely transport an alien who is in the agency's custody and whom the agency has verified is unlawfully present in the United States to a federal detention facility in this state or, with the concurrence of the receiving federal agency, to a federal facility or other point of transfer to federal custody that is outside this state.

Utah Code Ann. 76-9-1005.  Section 5 provides authority for immigration-based detention as long as the non-citizen is initially in "custody," whether the non-citizen is in custody at the side of the road or has been booked into jail, and contains no requirement for a state law basis for continued detention of the non-citizen during the transfer to federal authorities.  Section 5 thus grants state and local law enforcement officers the power to detain a non-citizen, during the duration of transfer to federal custody, based merely on unlawful presence.  Significantly, section 5 expressly requires federal "concurrence" for out-of-state transfers, but does *not* require any federal communication, acquiescence or approval for a transfer to any in-state federal detention

facility.  Thus, for transfers within the State of Utah, state and local officers are authorized to

maintain custody of a non-citizen solely for immigration purposes even if the federal government

does not approve.

In Utah, federal immigration detainees are held at a federal contract detention facility, the

Utah County Jail in Spanish Fork, Utah.  Decl. of Aaron Tarin, ¶¶ 3-4.  The Spanish Fork jail is

the only facility in the state of Utah currently housing immigration detainees.  *Id.*  The Spanish

Fork jail is over 4 hours by car from St. George, and over 1.5 hours by car from Ogden.  *Id.* at ¶

6.  Depending on traffic, driving time from Salt Lake City to Spanish Fork jail can range from 35

minutes to 1.5 hours.  *Id.* at ¶ 5.  Thus, non-citizens transported to Spanish Fork jail for

immigration detention pursuant to § 5 may be detained for as many as 4 or more hours during

transport, depending on their initial location in the state.

## ARGUMENT

A preliminary injunction is appropriate if the moving party establishes: "(1) that it has a

substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable injury if the

injunction is denied; (3) that the threatened injury to the movant outweighs the injury that the

opposing party will suffer under the injunction; and (4) that the injunction would not be adverse

to the public interest."  *Utah Licensed Beverage Assn. v. Leavitt*, 256 F.3d 1061, 1066 (10th Cir.

2001).  All four factors are established here.

## I.   Plaintiffs Are Likely to Succeed on the Merits in their Claims Against § 5

### A.  Plaintiffs Are Likely to Prevail on Their Claim that § 5 is Preempted by Federal Immigration Law

Section 5 is preempted by federal immigration law in multiple respects.  As *Arizona*

explained, "state laws are preempted when they conflict with federal law," which occurs when

"the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  State laws are also preempted when they "regulat[e] conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Id.*  Section 5 is preempted on each of these grounds: it conflicts with federal immigration law, and it impinges on fields Congress has wholly occupied.

### 1.  Conflict Preemption

Section 5 conflicts with federal immigration law in at least two ways.  First, it grants state and local officers authority to detain unlawfully present aliens for immigration purposes, when Congress has granted state officers immigration enforcement authority only in specific, limited circumstances that do not encompass those set forth in § 5.  Second, and relatedly, § 5 conflicts with provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, et seq., that specifically entrust the discretionary decision whether to detain a non-citizen for removal purposes to *federal* officers, not state law enforcement authorities.   By permitting state and local officers to detain non-citizens independent of federal officers' discretion, § 5 permits state and local officers to interfere with important federal objectives, at odds with Congress's scheme.

### a.  Section 5 Conflicts with the Provisions of the INA Granting Only Limited State and Local Authority to Enforce Immigration Law

In *Arizona*, the Supreme Court held that under the federal immigration scheme established by Congress, state and local officers have only the authority expressly granted to them in the INA.  132 S.Ct. at 2506.  The Court did so in the course of considering the validity of a provision of Arizona law that would have granted to state officers the power to make warrantless arrests of (and to detain) non-citizens based on suspicion of removability from the

United States.  *Id.*  The Court struck down Arizona's arrest provision on conflict preemption grounds, emphasizing that "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer."  *Id*.  The Court further explained, "Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances."  *Id.* at 2507.

As Plaintiffs have previously argued, and as the Supreme Court discussed, the INA's complex immigration scheme grants immigration enforcement authority to state officers in only four narrow instances – none of which purports to grant state officers the power to unilaterally detain unlawfully present immigrants as a general matter.  *See Arizona*, 132 S.Ct. at 2506 (citing 8 U.S.C. §§ 1357(g), 1103(a)(10), 1252c, and 1324(c)); Dkt. # 37 (Pls.' Mot. for Prelim. Inj. at 18-19).  First, 8 U.S.C. § 1324(c) authorizes state and local officers to make arrests for the federal immigration crimes of transporting, smuggling, or harboring certain aliens.  *See id.* (authorizing "arrests" for such crimes by "all … officers whose duty it is to enforce criminal laws").  Second, under 8 U.S.C. § 1252c, state officers may arrest and detain a noncitizen for the federal crime of illegal reentry into the United States by a deported felon, but only if the federal government provides "appropriate confirmation" of the suspect's status, and if the detention is only for such time as may be required for the federal government to take the individual into custody.  Third, pursuant to 8 U.S.C. § 1103(a)(10), the Attorney General may authorize "any State or local enforcement officer" to enforce immigration laws upon certification of "an actual or imminent mass influx of aliens," an authorization that has never been made.  Fourth, the detailed provisions of 8 U.S.C. § 1357(g) permit state officers to perform certain functions of immigration officers if the Attorney General enters into a written agreement with the state or local government that satisfies specific conditions.  *See Arizona*, 132 S. Ct. at 2506.  As the

5

Supreme Court concluded, neither these provisions of the INA nor any others authorize state law enforcement officers to take "unilateral state action to detain" non-citizens for immigration purposes. *Id.* at 2507.

In particular, *Arizona* rejected the state's contention that 8 U.S.C. § 1357(g)(10)(B) provided state officers with authority to arrest or detain for immigration purposes. *Arizona*, 132 S.Ct. at 2507. That statute provides that no agreement with the Attorney General is necessary for state officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B). But as the Court held, "no coherent understanding of the term ['cooperate'] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 132 S.Ct. at 2507. Because "the unilateral state action to detain authorized by [the Arizona law] goes far beyond these measures," the state law "creates an obstacle to the full purposes and objectives of Congress." *Id.*

Section 5 directly contravenes this holding in *Arizona*. It attempts to put into the hands of state officers the power to detain non-citizens based solely on unlawful presence. Utah Code Ann. 76-9-1005. Under § 5, detention of a non-citizen during the pendency of a transfer is authorized as long as the non-citizen is initially in "custody," and there is no requirement that a separate state law basis for custody exist during the duration of the transfer. *Id.* Further, and also like the preempted Arizona provision, the power to detain a non-citizen pending transfer is granted unilaterally, with no requirement to obtain federal approval as long as the transfer occurs within the state. *Id.* Because § 5, in granting state officers unilateral power to detain non-citizens pending transfer, goes far beyond the limited authorizations enacted by Congress, it too

"creates an obstacle to the full purposes and objectives of Congress."  *Arizona* 132 S. Ct. at

2507.  It therefore is preempted.

### b.  Section 5 Conflicts with Congress's Decision to Grant to *Federal* Authorities Discretion to Make Immigration Detention Decisions

Section 5 is preempted for the additional but related reason that it conflicts with

Congress's delegation to *federal* authorities of the power over decisions concerning detention

and removal of non-citizens, and therefore empowers state and local officers to make custody

decisions that interfere with Congress's statutory scheme – one that accounts for numerous and

sometimes conflicting national interests.  Under the immigration system established by

Congress, it is the Executive's prerogative to decide whether and when to detain an unlawfully

present non-citizen – and when to forbear from doing so.  *See, e.g.*, *Arizona*, 132 S.Ct. at 2499,

2506.  Section 5's attempt to place in state hands the unilateral power to detain a non-citizen

pending transfer to a federal detention facility usurps the federal government's authority and

conflicts with federal law.

Congress's complex immigration scheme includes regulation of the conditions under

which noncitizens can be admitted, the status and presence of noncitizens, when they can be

detained, and when they can be removed.  *See* 8 U.S.C. §§ 1181-89 (admission), 1222-31 (entry,

inspection, apprehension, detention, removal).  *See also Arizona*, 132 S. Ct. at 2499 (explaining

that "[f]ederal governance of immigration and alien status is extensive and complex," and that

"Congress has specified which aliens may be removed … and the procedures for doing so").

Federal law also provides the exclusive mechanism for adjudicating whether a noncitizen will be

permitted to remain in the country, through an administrative process subject to judicial review.

*See* 8 U.S.C. §§ 1229a(a)(3), 1252(a)(1).

Federal law also provides the Attorney General with discretion to determine whether to detain individuals who are placed in removal proceedings.  *See* 8 U.S.C. § 1226(a) (allowing for, on a warrant issued by the Attorney General, the arrest and detention, or release, of a noncitizen pending a decision on whether the noncitizen is to be removed from the United States), 1357 (establishing criteria for warrantless arrest by federal immigration officers).  Indeed, detention is not the default rule, but instead is categorically required only for certain limited categories of non-citizens enumerated by statute.  *See, e.g.*, § 1226(c).  The INA reflects Congress's intent that the Executive Branch has ultimate discretion to decide when, how, and whether to take particular enforcement actions in individual cases, including the power to decide whether to initiate removal proceedings and detain a non-citizen for removal purposes.  As *Arizona* explained, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," including the fact that "[f]ederal officials … must decide whether it makes sense to pursue removal at all."  132 S. Ct. at 2499.  *Accord Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999) (explaining that in "the initiation or prosecution of various stages in the deportation process . . . [a]t each stage the Executive has discretion to abandon the endeavor"); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  *See also Arizona*, 132 S.Ct. at 2499 (recognizing that foreign relations considerations "require[] the Executive branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy").

The federal government's discretion over whether to detain a non-citizen is fundamentally important, because under the federal system, numerous categories of individuals who are unlawfully present in the United States may be permitted to remain, either implicitly or explicitly, and are therefore not wanted for detention or removal by the federal government.  For

example, federal immigration statutes and U.S. treaty obligations affirmatively prohibit the removal of certain persons from the United States, even if they are unlawfully present. *See*, *e.g.*, 8 U.S.C. § 1231(b)(3) (mandatory withholding of removal for persons facing persecution); 8 U.S.C. § 1231 note (Foreign Affairs Reform and Restructuring Act of 1998, implementing Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment ("CAT")); 8 C.F.R. §§ 208.16-18 (deferral of removal under CAT). In addition, many persons who currently lack immigration status, including those who have already been found by an immigration judge to be removable, may be permitted by the Executive, exercising statutory authority, to remain in the United States, even indefinitely. *See*, *e.g.*, 8 U.S.C. §§ 1158 (political asylum), 1229b (cancellation of removal), 1254a (temporary protected status), 1255(i) (adjustment of status for certain unlawful entrants), 1255(m) (adjustment of status pursuant to Violence Against Women Act ). Plaintiffs Jane Doe and David Morales are among those non-citizens whose unlawful presence is known to federal authorities, but whom the federal government has not opted to remove. *See* Dkt. # 171 (Decl. of Jane Doe, ¶ 8); Updated Decl. of David Morales, ¶¶ 2, 10.[1]

Section 5 disrupts Congress's statutory framework by usurping the federal government's discretion over whether to detain a particular non-citizen for immigration purposes. It authorizes state officers to detain an unlawfully present non-citizen for the period of time it takes to transfer

---

[1] Notably, the federal government's discretion not to detain applies even to non-citizens for whom an ICE detainer has issued, and the mere issuance of a detainer does not indicate that federal authorities ultimately will decide to assume custody of the non-citizen. *See* Dkt. # 37-19 (Fernandez Decl., Exh. F) (U.S. Immigration and Customs Enforcement, *Interim Policy Number 10074.1: Detainers* (Aug. 2, 2010)) ("at any time after a detainer is issued," the immigration agency may "determine[] it will not assume custody of the alien"); Decl. of Aaron Tarin, ¶ 8; *see also* Dkt. #37 (Pls.' Mot. for Prelim. Inj. at 15-16) (explaining that an ICE detainer is merely a notice from ICE to another law enforcement agency, indicating that ICE has an interest in a person in that law enforcement agency's custody and requesting that the agency maintain custody of the person for up to 48 hours) (citing 8 C.F.R. § 287.7(d)).

him to a federal detention facility within the state, without seeking any federal input.  *See* Utah

Code Ann. 76-9-1005 (requiring federal "concurrence" only for transfers to out-of-state

detention facilities, with no such requirement for in-state transfers).  Notably, the *Arizona* Court

specifically pointed to a similar lack of federal input in the Arizona arrest provision as a fatal

flaw.  The Court explained, "[t]his state authority could be exercised without any input from the

Federal Government about whether an arrest is warranted in a particular case.  This would allow

the State to achieve its own immigration policy."  132 S. Ct. at 2506.

Further, § 5 interferes with the federal system by authorizing detention pending transfer

based on unlawful presence alone, Utah Code Ann. 76-9-1005, even though under the federal

system, numerous unlawfully present aliens are not detained.  For example, § 5 permits detention

pending transfer of non-citizens whose unlawful presence is known to the federal government

but whom the federal government has exercised discretion not to detain or remove, such as

Plaintiffs Jane Doe and David Morales.  *See* Dkt. # 171 (Decl. of Jane Doe, ¶ 8); Updated Decl.

of David Morales, ¶¶ 2, 10.  Section 5 also allows detention pending transfer of non-citizens who

are already in removal proceedings even when they have been ordered released by ICE or a

federal immigration judge.  Accordingly, non-citizens whom the federal authorities do not wish

to detain will be unlawfully detained by Utah authorities during the pendency of the transfer.

This would result in "unnecessary harassment of some aliens (for instance, a veteran, college

student, or someone assisting with a criminal investigation) whom federal officials determine

should not be removed."  *Arizona*, 132 S. Ct. at 2506.  As was the case with the Arizona law,

"[b]y authorizing state officers to decide whether an alien should be detained for being

removable," § 5 "violates the principle that the removal process is entrusted to the discretion of

the Federal Government."  *See id.*

In sum, § 5 attempts to grant Utah officers authority to unilaterally detain unlawfully present non-citizens pending transfer to a federal detention facility.  It therefore intrudes on federal authority over such decisions and disrupts and conflicts with the federal scheme.

### 2.   States are Field Preempted from Enacting a Unilateral State Scheme Authorizing Detention Pending Transfer

Section 5 is also invalid based on field preemption principles.  Congressional

> intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'

*Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

As discussed above, Congress has enacted a comprehensive and exclusive system to govern the entry, presence, status, detention, and removal of immigrants in the United States.  The federal scheme specifically sets forth the circumstances under which non-citizens may be detained for immigration purposes, and entrusts federal officials with discretion to determine whether a particular noncitizen should be detained.  *See supra* at 8-11.   That scheme confines state immigration enforcement authority to narrow, carefully circumscribed limits, and does not permit "unilateral state action to detain" non-citizens for immigration purposes.  *See Arizona*, 132 S.Ct. at 2507.  The federal scheme simply leaves no room for a state to enact a law authorizing unilateral detention of non-citizens pending transfer.

### B.   Plaintiffs are Likely to Prevail on Their Claim that § 5 Unlawfully Prolongs Detention in Violation of the Fourth Amendment

Section 5 also violates the Fourth Amendment because it authorizes detention of a non-citizen *after* any lawful basis for custody has expired, for the purpose of transporting him to a federal detention facility.  By its plain language, Section 5 empowers Utah officers to extend

custody of a non-citizen to effectuate a transfer simply based on the non-citizen's "unlawful[]

presen[ce] in the United States."  Utah Code Ann. § 76-9-1005.  This grant of authority applies

whenever a non-citizen is "in the agency's custody."  *Id.*  Thus, whether a non-citizen is "in ...

custody" in the sense that he is detained at the side of the road or because he has been arrested

and taken to jail, § 5 permits an officer to continue state custody past the point he should

otherwise be released.  But as the Supreme Court explained in *Arizona*, and as discussed above,

the state has no power to arrest or detain a non-citizen on immigration grounds, except in the

limited circumstances established in the INA and not generally applicable here.  *See* 132 S.Ct. at

2506-07; *supra* at 12.  As a result, individuals who are entitled to be released from "custody" –

because, for example, there is no basis for a charge or charges have been dismissed– will be

illegally detained pending a transfer to a federal detention facility.

It is well-established that a law enforcement officer may stop and briefly detain an

individual for questioning only when the officer has "a reasonable suspicion supported by

articulable facts that criminal activity 'may be afoot.'"  *United States v. Sokolow*, 490 U.S. 1, 7

(1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *see also Florida v. Royer*, 460 U.S. 491,

500 (1983) ("an investigative detention must be temporary and last no longer than is necessary to

effectuate the purpose of the stop"); *United States v. Gonzalez-Lerma,* 14 F.3d 1479, 1483 (10th

Cir. 1994) ("When the driver has produced a valid license and proof that he is entitled to operate

the car, he must be allowed to proceed on his way, without being subject to further delay by

police for additional questioning.") (quoting *United States v. Guzman,* 864 F.2d 1512, 1519 (10th

Cir. 1988)), *overruled in part on other grounds by United States v. Botero-Ospina,* 71 F.3d 783

(10th Cir. 1995).  Similarly well-established is the principle that an officer may not make a

warrantless arrest without "probable cause to believe that a person committed a crime."  *Cortez*

*v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007).   And, it is equally basic that once the legal

basis for custody has ended, the individual is entitled to be released.[2]   Thus, federal courts have

routinely concluded that the Fourth Amendment is violated when persons initially held on a

lawful basis are held after they are entitled to release, or after any lawful basis for detention has

ended.  *See*, *e.g.*, *Barnes v. District of Columbia*, 242 F.R.D. 113, 118 (D.D.C. March 26, 2007)

(holding that plaintiffs pled valid Fourth Amendment claim by alleging that, despite being

entitled to release after a court appearance, they were taken back into custody and transported to

jail); *Jones v. Cochran*, No. 92-6913, 1994 U.S. Dist. LEXIS 20625, at *16-17 (S.D. Fla. Aug. 8,

1994) (holding that detention of plaintiffs after acquittal, for purpose of determining whether

there was an alternative justification for holding them, was an unreasonable seizure in violation

of Fourth Amendment);  *see also Berry v. Baca*, 379 F.3d 764, 766-67 (9th Cir. 2004) (reversing

grant of summary judgment to county sheriff on Fourth Amendment claims where plaintiffs

alleged they were detained for extended periods after the court authorized their release); *Sanders*

*v. English*, 950 F.2d 1152, 1159, 1162 (5th Cir. 1992) (explaining that claims of illegal detention

or false imprisonment implicate the Fourth and Fourteenth Amendments, and concluding that a

jury could find for plaintiff where he alleged that an officer failed to release him even after he

should have known that they had arrested the wrong person); *Lewis v. Grady*, 853 F.2d 1366,

1370 (7th Cir. 1988) (reversing directed verdict, holding that a reasonable fact-finder could find

that the 11-hour delay in releasing plaintiff violated the Fourth Amendment).   Courts have held

---

[2] Under Tenth Circuit precedent, claims such as this one involving pretrial detention prior to a determination of probable cause are analyzed under the Fourth Amendment. *See Gaylor v. Does*, 105 F.3d 572, 574-75 (10th Cir. 1997).  Confinement after the initial probable cause hearing is analyzed under substantive due process.  *See id.*; *see also Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010).  Here, no probable cause determination could justify immigration-based detention by the state, so the Fourth Amendment supplies the proper framework.

that persons subjected to such continued custody are arrested or seized for Fourth Amendment purposes.  *See*, *e.g.*, *Ringuette v. City of Fall River*, 906 F. Supp. 55, 57 (D. Mass. 1995) (holding that plaintiff's continued custody, after being entitled to release, was a seizure because the continuation of detention "was a physical show of authority which restrained [plaintiff's] liberty"); *Barnes*, 242 F.R.D. at 118.

Section 5 violates the Fourth Amendment by granting authority to state officers to continue to detain unlawfully present immigrants when there is no longer a lawful basis for custody.  Instead of being released from state custody, a non-citizen otherwise entitled to release will be illegally detained during the time it takes to complete a transfer to a federal detention facility.  *Cf. Armstrong v. Squadrito*, 152 F.3d 564, 578 (7th Cir. 1988) ("[H]ow much more basic could it get – jails cannot confine people without the authority to do so.").  Given the location of the federal detention facility in Utah and the size of the state, such detentions pending transfer could last for four or more hours.  *See* Decl. of Aaron Tarin, ¶ 3-6.  *See*, *e.g.*, *Arline v. City of Jacksonville*, 359 F. Supp. 2d 1300, 1310 (M.D. Fla. 2005) (holding that a fact-finder could find that plaintiff's 2.5-hour detention following acquittal was unreasonable in violation of the Fourth Amendment).

Indeed, in *Arizona* the Supreme Court's warning that detaining individuals solely for immigration purposes "would raise constitutional concerns" was explicitly grounded in Fourth Amendment precedent.  *See* 132 S. Ct. at 2509 (citing two Fourth Amendment cases, *Arizona v. Johnson,* 555 U.S. 323, 333 (2009) and *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)); *see also id.* at 2505 ("If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent").

In sum, § 5's authorization for detention solely for immigration purposes is unreasonable in violation of the Fourth Amendment.

## II.     Plaintiffs Will be Irreparably Harmed if § 5 is Not Enjoined

Plaintiffs will suffer irreparable harm if § 5 is not enjoined.  Plaintiffs are individuals and organizations representing individuals at heightened risk of being stopped, detained, and arrested because of HB 497, including racial minorities, national origin minorities, individuals who speak foreign languages or speak English with an accent, and individuals who lack the identity documents enumerated in HB 497.  Individual Plaintiffs and Plaintiff organizations' members are worried that if any part of HB 497 goes into effect they will be subjected to repeated stops, questioning, detention, and possibly arrest.  *See, e.g.*, Updated Decl. of  David Morales, ¶¶ 6, 11-12 (describing concerns about unlawful stops because of lack of acceptable documentation); Dkt. 121-1 (Decl. of David Morales, ¶¶ 8-10) (describing fears of unlawful stops and prolonged detention); Suppl. Decl. of John Doe #2, ¶ 6 (describing fear of being unlawfully stopped and arrested); Dkt. # 37-10 (Decl. of Alicia Cervantes, ¶¶ 7, 10-11) (describing past racial profiling incident and concern that she will be unlawfully stopped and arrested because of lack of acceptable identification); *see also* Dkt. # 37-4 (Decl. of Robert Archuleta ¶¶ 11, 13-14) (describing community concerns about being stopped by police, and discussing incidents and patterns of racial profiling and pretextual arrests in several Utah counties); Dkt. # 37-7 (Decl. of Frank Cordova, ¶¶ 10-12) (describing pretextual stops and arrests); Dkt. # 37-6 (Decl. of Katie Gerken, ¶¶ 6-7) (explaining that union members "are likely to be unlawfully stopped, detained, arrested, and questioned by state and local police after HB 497 goes into effect"); Dkt. # 37-8 (Decl. of Michael Picardi, ¶¶ 18-20) (describing concerns about unlawful stops and arrests as a result of HB 497); Dkt. # 37-16 (Decl. of Daniel Argueta, ¶¶ 5, 10-11) (describing concerns

about racial profiling and unlawful stops).  Because of the high likelihood that individual

Plaintiffs and members of Plaintiff organizations will be held in custody by Utah law

enforcement officers, whether detained at the side of the road or taken to jail, they are likewise at

risk of being illegally detained without lawful authority and transferred to a federal facility

pursuant to § 5.  Section 5 thus poses an acute and immediate danger to Plaintiffs.

      Courts have repeatedly recognized that being subjected to the enforcement of an

unconstitutional law constitutes irreparable injury.  This principle applies not only to laws that

violate the Supremacy Clause, *see*, *e.g*, *Morales v. Trans World Airlines*, 504 U.S. 374, 381

(1992); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) *aff'd in part, rev'd in part

and remanded*, 132 S. Ct. 2492 (2012), but also to laws that violate individuals' constitutional

rights.  *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) ("'When an alleged

constitutional right  is involved, most courts hold that no further showing of irreparable injury is

necessary.'") (citation omitted); *see also Leavitt v. Utah Licensed Beverage Ass'n*, 256 F.3d

1061, 1076 (10th Cir. 2001) ("[I]t is proper for us to assume irreparable injury due to the

deprivation of ULBA's commercial speech rights.").

      Finally, the organizational Plaintiffs will suffer irreparable harm because they will need

to divert organizational resources away from core mission activities to address their members'

concerns about HB 497 and repercussions from its enforcement.  *See* Dkt. # 37-9 (Decl. of Juan

M. Ruiz, ¶¶ 10-11, 15-20); Dkt. # 37-5 (Decl. of Eliseo Medina, ¶ 12); Dkt. # 37-7 (Decl. of

Frank Cordova, ¶¶ 13-15); Dkt. # 37-6 (Decl. of Katie Gerken, ¶ 9); Dkt. # 37-16 (Decl. of

Daniel Argueta, ¶¶ 6-7); *see also* Dkt. # 37-4 (Decl. of Robert Archuleta, ¶ 8).  The missions of

the organizational Plaintiffs have been and will continue to be frustrated as their members will be

afraid to gather in public places, attend marches and meetings, and engage in other advocacy and

organizing activities that might bring them into contact with law enforcement and therefore subject them to illegal detention.  Dkt. # 37-9 (Decl. of Juan M. Ruiz, ¶¶ 7-8); Dkt. # 37-5 (Decl. of Eliseo Medina, ¶ 13); Dkt. # 37-6 (Decl. of Katie Gerken, ¶¶ 8-9); Dkt. # 37-8 (Decl. of Michael Picardi, ¶ 12); Dkt. # 37-7 (Decl. of Frank Cordova, ¶¶ 9-10).

### III.     The Balance of Equities Tips in Favor of Granting a Preliminary Injunction

A preliminary injunction will impose only minimal harm on the state of Utah, because Plaintiffs ask merely for the status quo to be maintained while serious questions about § 5's constitutionality are adjudicated.  This is precisely the purpose of a preliminary injunction: "to preserve the status quo pending a final determination of the case on the merits."  *Keirnan v. Utah Transit Authority*, 339 F.3d 1217, 1220 (10th Cir. 2003).  Any harm to the State in adhering to the status quo is dramatically outweighed by the immediate and irreparable harms Plaintiffs will face, outlined above, if § 5 is allowed to go into effect.

The requested preliminary injunction would prevent the implementation of a new provision that, in concert with the rest of HB 497, would upset the longstanding allocation of authority between state and federal government, intrude on the federal government's ability to regulate immigration and conduct foreign affairs, and impose irreparable harms on Plaintiffs and the public.  Therefore, the equities tip sharply in favor of granting a preliminary injunction while the constitutionality of § 5 is decided.  *See Chamber of Commerce v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (affirming district court's preliminary injunction because "Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm."); *Leavitt*, 256 F.3d at 1076 (balance of equities favors preliminarily enjoining state statute likely to be held unconstitutional); *Nat'l Ctr. for Immigrants' Rights, Inc. v. INS*, 743 F.2d 1365, 1368-69 (9th

Cir. 1984) (affirming district court decision that irreparable harm to plaintiffs outweighed harm to government from delayed implementation of regulation).

## IV.  The Public Interest Weighs in Favor of Enjoining § 5

Preliminarily enjoining § 5 will not be adverse to the public interest.  In fact, the interests of Plaintiffs and the general public are aligned in favor of a preliminary injunction in this case. The public interest is not served by allowing an unconstitutional law to take effect.  *See Leavitt*, 256 F.3d at 1076; *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999). Where civil rights are at stake, "the public interest … favors granting [an] injunction as the public as a whole has an interest in protecting constitutional rights."  *Adams v. Baker*, 919 F. Supp. 1496, 1505 (D. Kan. 1996).  And courts have specifically held that enjoining a state statute that is preempted by federal law will serve the public interest.  *See Edmondson*, 594 F.3d at 771 (citing *Bank One v. Guttau*, 190 F.3d 844, 848 (8th Cir.1999)); *Villas at Parkside Partners*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010) ("[T]he public interest favor[s] preserving the uniform application of federal immigration standards.").  This is particularly true in the field of immigration, in light of the risk of encroachment on the federal government's relations with foreign countries.  *See Arizona v. United States*, 132 S. Ct. 2492, 2498-99, 2506-07 (2012); *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941).  Without an injunction, Utah residents and visitors will face enforcement of a statutory provision that violates the Constitution in several respects and therefore threatens the constitutional rights of members of the public.

## CONCLUSION

Plaintiffs have met all four factors for the issuance of a preliminary injunction. Therefore, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction Against § 5.

Dated:  August 17, 2012                          Respectfully submitted,

/s/ Jennifer Chang Newell
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
IMMIGRANTS' RIGHTS PROJECT

/s/ Karen C. Tumlin
NATIONAL IMMIGRATION LAW CENTER

/s/ Esperanza Granados
AMERICAN CIVIL LIBERTIES UNION
  OF UTAH FOUNDATION, INC.

/s/ Elora Mukherjee
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
RACIAL JUSTICE PROGRAM

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that copies of the foregoing **MEMORANDUM IN SUPPORT OF**

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AGAINST § 5 OF HB 497**

and its supporting attachments were served by electronically filing the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the

following:

BARRY G. LAWRENCE
blawrence@utah.gov

PHILIP S. LOTT
phillott@utah.gov

TIMOTHY EVANS
tevans@utah.gov

OMAR C. JADWAT
ojadwat@aclu.org

ANDRE SEGURA
asegura@aclu.org

ELORA MUKHERJEE
emukherjee@aclu.org

CECILLIA D. WANG
cwang@aclu.org

KATHERINE DESORMEAU
kdesormeau@aclu.org

ESPERANZA GRANADOS
egranados@acluutah.org

LINTON JOAQUIN
joaquin@nilc.org

KAREN C. TUMLIN
tumlin@nilc.org

SHIU-MING CHEER
cheer@nilc.org

MELISSA S. KEANEY
keaney@nilc.org

BRADLEY S. PHILLIPS
brad.phillips@mto.com

STUART F. DELERY
DAVID B. BARLOW
DANIEL D. PRICE
ARTHUR R. GOLDBERG
W. SCOTT SIMPSON
scott.simpson@usdoj.gov

Dated:  August 17, 2012

/s/ Jennifer Chang Newell
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
IMMIGRANTS' RIGHTS PROJECT