| | |
|---|---|
| UTAH COALITION OF LA RAZA et al., <br><br> Plaintiffs, <br><br> v. <br><br> GARY R. HERBERT et al., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:11-cv-401 CW <br><br> *Related Case* 2:11-cv-1072 <br><br> Judge Clark Waddoups |

## INTRODUCTION AND BACKGROUND

During its 2011 legislative session, the Utah State Legislature enacted the Utah Illegal Immigration Enforcement Act (hereinafter "H.B. 497" or the "Act"), in conjunction with three other bills, as part of a comprehensive "Utah solution" on immigration reform.[1] H.B. 497 was signed into law by Governor Gary Herbert on March 15, 2011, and was scheduled to take effect on May 10, 2011.

On May 3, 2011, Plaintiff Utah Coalition of La Raza and others[2] (collectively "La Raza") filed a Complaint seeking declaratory and injunctive relief. La Raza seeks to have the entire Act declared unconstitutional based on alleged violations of both the United States and Utah's

---

[1]  *See* News Release, *Governor Herbert Signs Immigration Reform Legislation* (Mar. 15, 2011). Of the four bills named by the Governor's office as part of this "solution," only H.B. 497 is challenged here. The other three bills may be roughly summarized as follows: H.B. 116 modified the Utah Workforce Services Code to establish a guest worker program that provides for the issuance of work permits to undocumented individuals. H.B. 469 required the Governor to create the Utah Pilot Sponsored Resident Immigrant Program. H.B. 466 called for the creation of a commission to study the possibility of an agreement and/or program between Utah and Mexico to promote and increase the issuance of federal non-immigrant visas.

[2]  The additional named Plaintiffs are:  Service Employees International Union; Workers United Rocky Mountain Joint Board; Centro Civico Mexicano; Coalition of Utah Progressives; Latin American Chamber of Commerce; Salt Lake City Brown Berets; Milton Ivan Salazar-Gomez; Eliana Larios; Alicia Cervantes; Jane Doe #1; John Doe #1; and John Doe #2.

constitutions.  On May 6, 2011, La Raza filed a Motion for Preliminary Injunction, seeking to enjoin state enforcement of H.B. 497.  A hearing was held on May 10, 2011, and this court granted a Temporary Restraining Order, staying H.B. 497 pending further order.  *See* Order (Dkt. No. 45).

The United States filed a parallel action on November 22, 2011and immediately moved to consolidate that case with the present one.  After the court granted that motion, the United States then filed its own motion for preliminary injunction.  In its motion, however, the United States only seeks to enjoin enforcement of three sections of H.B. 497 – Sections 3, 10, and 11.

On February 17, 2012, the court held a hearing on both motions for preliminary injunction and took the matter under advisement.  Four days later, the court issued a written order stating that, given the significant constitutional issues raised by this case, and the likelihood that the Supreme Court would address some of the issues in a forthcoming ruling, it would not be prudent to rule until it had received such guidance.[3]  *See* Order (Dkt. No. 183).

On June 25, 2012, the Supreme Court announced its holding in *Arizona v. United States*, 567 U.S. ____, 132 S. Ct. 2492 (2012). In the wake of this ruling, the parties submitted additional briefing on the motions.  La Raza also filed an additional motion for preliminary injunction, seeking to enjoin section 5 of H.B. 497.  The court then held another hearing on February 15, 2013 to address all three motions.  The court took the motions under advisement and stated that the court's previous injunction would remain in effect pending its decision. The court now rules on the three outstanding motions.

For the reasons stated below, La Raza's Motion for Preliminary Injunction (Dkt. No. 36) is GRANTED IN PART and DENIED IN PART, the United States' Motion for Preliminary

---

[3]  At the hearing and in the order, the court also stated that the temporary "injunction shall continue in place until the court rules on the pending motions for preliminary injunction."  Order, at 2 (Dkt. No. 183).

Injunction (Dkt. No. 136) is GRANTED IN PART and DENIED IN PART, and La Raza's

Motion for Preliminary Injunction Against § 5 of H.B. 497 (Dkt. No. 201) is DENIED.

## ANALYSIS

La Raza's first motion for preliminary injunction challenges the entirety of H.B. 497 on

its face based on the Supremacy Clause. It then makes specific facial challenges to individual

sections of the Act in its first and second motions for preliminary injunction. In contrast, while

the United States makes a facial challenge based on the Supremacy Clause, it only challenges

Sections 3, 10, and 11 of the Act rather than the Act as a whole. Nevertheless, the three motions

are highly interrelated and many of the controlling legal principles overlap. The court will

therefore address the motions together, starting first with the overall facial challenge, and then

reviewing H.B. 497 section by section,[4] to address the specific facial challenges that have been

made by La Raza and the United States.

## I.   OVERALL FACIAL CHALLENGE

### A.  Challenge

La Raza alleges that H.B. 497, as a whole, violates the Supremacy Clause of the United

States Constitution in at least two ways. First, La Raza claims that H.B. 497 is preempted as an

impermissible "state regulation of immigration," a power reserved solely to the federal

government. Preliminary Inj. Mem., at 9 (Dkt. No. 37). Additionally, La Raza claims that H.B.

497 is subject to conflict preemption because it creates an obstacle to accomplishing the purposes

of Congress' immigration legislation. *Id.*

---

[4]   Section 1 of the bill states the title of the Act. Section 2 provides definitions for terms used in the Act. Thus, the
court begins its analysis with Section 3.

## B. Legal Principle of Preemption

As the Supreme Court observed, "[f]ederal governance of immigration and alien status is extensive and complex." *Arizona*, 132 S. Ct. at 2499. Despite its complex nature, there are well-established principles which guide the interpretation and application of immigration-related legislation. The first and most prominent of these is the principle of preemption.

The principle of preemption has its roots in the Supremacy Clause of the U.S. Constitution, which states federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, § 1, cl. 2. Thus, when Congress, acting within the bounds of its constitutional authority, enacts legislation regulating some matter, it has the power to preempt any existing or subsequent state law. *See Arizona*, 132 S. Ct. at 2500-2501 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 210-211 (1824)). Under this authority, Congress may, by explicit edict, prohibit state legislation in a given area of law. *Id.*; *see Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008); *Jones v. Rath Packing Co*., 430 U.S. 519, 525 (1977). This type of preemption is known as "express preemption."

In addition to express preemption, there is another type of preemption – implied preemption – which may be broadly grouped into two sub-categories: "field preemption" and "conflict preemption."

Field preemption precludes a state "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501. The intent to occupy a field in such a way that state regulations become impermissible "can be inferred from a framework of regulation 'so pervasive

. . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see English v. Gen. Elec. Co.* 496 U.S. 72, 79 (1990)) (alteration in original). Matters left unaddressed, however, in a "comprehensive and detailed" regulatory "scheme are presumably . . . subject to the disposition" of state law. *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 85 (1994).

Conflict preemption preempts state laws which make "compliance with both federal and state regulations . . . a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963) (citations omitted). It also preempts state laws which stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Crosby*, 530 U.S. at 372-73. When state legislation is thus preempted, any conflicting state laws are "without effect." *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981) (citations omitted).

This dual-category of express and implied preemption guides the examination of both the overall facial challenge as well as the specific facial challenges to H.B. 497's individual sections.[5]

### C. Application

The Constitution commits to Congress the authority and power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, as well as the power "[to] regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. Taken together, these clauses

---

[5] For a fuller explication of the principle of preemption, as well as its relationship to the principle of Federalism in the context of immigration reform, see Parts I-III of the *Arizona* decision. As noted, *Arizona* deals with an Arizona law which bears many similarities to H.B. 497. It is the Supreme Court's most recent and definitive opinion on state regulation of immigration and, as such, its principles permeate this court's consideration of the motions before it.

include and necessitate a broad power to regulate immigration and the status of aliens. *See Toll v. Moreno*, 458 U.S. 1, 10 (1982). This power is underscored by Congress' "broad authority over foreign affairs," generally. *Id.* (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952); *Mathews v. Diaz,* 426 U.S. 67, 81 n.17 (1976)).

Pursuant to this power, Congress has enacted an extensive and complex scheme for regulating immigration and alien status, which is codified in Title 8 of the United States Code. *See Arizona*, 132 S. Ct. at 2499. This includes "specif[ying] categories of aliens who may not be admitted to the United States," 8 U.S.C. § 1182, prohibiting unlawful entry and reentry into the United States, *id.* §§ 1325, 1326, requiring registration and proof of registration status by aliens admitted to the country, *id.* §§ 1301-1306, as well as many other provisions. *Id.*

La Raza argues that the Constitution not only grants Congress these powers, but by so doing, the Supremacy Clause "forbids any state regulation of immigration," period. Memo. in Supp. Mot. for Preliminary Inj. (Dkt. No. 37, at 9). In other words, La Raza claims that Utah is prohibited from regulating immigration by virtue of field-preemption.[6] While it is clear that Congress has regulated extensively in the field of immigration, it is not clear that the regulation has been so pervasive that Congress left "no room" to supplement immigration regulation. If this were the case, the Court in *Arizona* could have simply struck down all of S.B. 1070 as field

---

[6] In La Raza's Reply, the structure of its argument would suggest a distinction between being an "impermissible state regulation of immigration" and being conflict or field preempted. However, the only way there could be such a distinction is if there were language in the Constitution or federal law expressly preempting state regulation of immigration. La Raza points to no such language, nor is any cited by the Supreme Court in *Arizona*. Indeed, if there were language expressly preempting any and all state regulation of immigration, both *Arizona* and this case could be summarily decided on that basis alone. Because no such language exists in the Constitution or federal law, any classification of legislation as "impermissible" must be inferred. True, some case law, like the heavily-relied upon *De Canas v. Bica*, 424 U.S. 351 (1976) case, suggests that the power to regulate immigration is exclusively a federal power. But any such language is a judicial declaration under either field or conflict preemption analysis. Thus, in order for the overall facial challenge to succeed, this court would have to find that H.B. 497, in its entirety, is either field preempted or conflict preempted.

preempted. On the contrary, however, the Court crafted a careful analysis, deliberately distinguishing among various fields within the broader field of state regulation of immigration. This resulted in the Court reaching varying conclusions for the four challenged provisions.

The provision most analogous to Utah's H.B. 497 is Section 2(B) of Arizona's S.B. 1070. That section requires an officer to make a reasonable attempt to verify the status of a person during a stop, detention, or arrest, if the officer has a reasonable suspicion that the person is an undocumented alien. *Arizona*, 132 S. Ct. at 2507 (citing Ariz. Rev. Stat. Ann. § 11-1051(B) (West 2012). It further requires that a person's immigration status be verified before that person is released from an arrest. *Id.* The Court found that Section 2(B) could be read to avoid constitutional concerns and enforcement of the provision was not inherently problematic. Accordingly, it held "[i]t was improper . . . to enjoin § 2(B) before the state courts had an opportunity to construe it and without some showing that enforcement of the provision in fact conflicts with federal immigration law and its objections." *Id.* at 2510.

In contrast, the court concluded the other three challenged provisions were preempted. Section 3 of S.B. 1070 made it a crime for a person to be in Arizona without proper immigration papers. The Court held the section was field preempted because it intruded on a specific area of immigration regulation, namely alien registration. *Arizona*, 132 S. Ct. at 2502.[7] As to Section 5(C), which made it a crime for a person to apply for or perform work if the person lacked proper immigration papers, the Court held the State was not expressly preempted, but it was conflict preempted. *Id.* at 2505. Section 6 of S.B. 1070 authorized officers to make warrantless arrests if an officer had probable cause to believe the person was subject to deportation. The Court held

---

[7] To the extent the specific reasoning of the Court in *Arizona* applies to the specific provisions challenged here, such as is the case with the provisions regarding alien registration, it will be discussed in more detail, *infra*. What is important here, however, is not what the Court did find, but what it did not find – namely, it did not find that it was entirely impermissible for the state to regulate immigration in any way.

Section 6 was also preempted because "the removal process is entrusted to the discretion of the Federal Government," and actions by Arizona could interfere with the Nation's foreign policy decisions. *Id.* at 2506-2507.

At no point, however, did the Court find that state regulation of immigration was *per se* impermissible, despite ample opportunity to do so. Instead, the Court opted to engage in a detailed, section-by-section analysis of the challenged provisions. Tellingly, the Court in its final paragraphs wrote, not that Congress has exclusive power to regulate immigration, as La Raza contends, but rather that "[t]he National Government has *significant* power to regulate immigration." *Id.* at 2510 (emphasis added). Accordingly, while a "state may not pursue policies that undermine federal law," it can pursue immigration regulation under limited circumstances. *Id.*

Therefore, in the absence of constitutional language expressly preempting all immigration-related state legislation, and given the Supreme Court's failure to hold that the entire field of immigration regulation is either conflict or field preempted, La Raza's overall facial challenge fails. This court now proceeds to address the specific section-by-section facial challenges of H.B. 497.

## II.     SECTION 3

### A.  Challenges

La Raza and the United States both challenged Section 3 of H.B. 497. Section 3 provides for mandatory and discretionary verification of a person's immigration status, subsequent to a lawful stop, detention, or arrest. Utah Code Ann. § 76-9-1003(1)(a) (2011). In the event an individual is determined to be an illegal alien, Section 3 also directs law enforcement officials to contact the Department of Homeland Security. *Id.* § 76-9-1003(4).

The United States initially challenged this section as conflict preempted because it "imped[es the] operation of federal enforcement systems and [precludes] cooperation with the federal government, despite an explicit federal statutory provision requiring such cooperation." (Dkt. No. 137, at 25). Following the Supreme Court's *Arizona* ruling, however, "the United States acknowledge[d] that, on the present record, the Supreme Court's ruling . . . does not require immediate preemption of Utah's analogous verification provision" stated in Section 3 of H.B. 497.[8] (Dkt. No. 194, at 2, 11-12). The court therefore focuses only on La Raza's challenge.

La Raza contends that Section 3 undermines federal immigration enforcement priorities. It also contends Section 3 violates the Fourth Amendment protection against unreasonable and prolonged detention and the individual Constitutional right to travel under the Privileges and Immunities provision. (Dkt. No. 37, at 14-30).

### B. Legal Principles

As stated above, the Supreme Court considered the lawfulness of a similar provision under Arizona's S.B. 1070, namely Section 2(B). In doing so, the Court noted that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns" because "it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." *Arizona*, 132 S. Ct. at 2509 (citations omitted). The Court then observed, however, the S.B. did *not* require detention solely to verify immigration status. Instead, it could be interpreted as only requiring that officers make a reasonable attempt to verify status – reasonability being understood to mean, among other things, verifying status in a way that does not prolong the stop. *Id.* (citing *Muehler*

---

[8]  To the extent Utah's enforcement of the statute, "or its interpretation by state courts, interferes with the administration of federal immigration laws," the United States reserved its right to challenge Section 3. (Dkt. No. 194, at 2).

*v Mena,* 544 U.S. 93, 101 (2005) ("finding no Fourth Amendment violation where questioning about immigration status did not prolong a stop.")).  Hence, it was possible for a state court to construe Section 2(B)[9] in such a way as to avoid concerns about unreasonable delays and warrantless arrests.  *Id.*

Finally, the Court noted that "[c]onsultation between federal and state officials is an important feature of the immigration system."  *Arizona*, 132 S. Ct. at 2508.  "Congress has done nothing to suggest it is inappropriate" for states to communicate with the federal government regarding immigration matters.  *Id.*  "Indeed, it has encouraged the sharing of information about possible immigration violations."  *Id.* (citing 8 U.S.C. § 1357(g)(10(A)).  "The federal scheme thus leaves room for a policy requiring state officials to contact [government officials] as a routine matter."  *Id.* (citation omitted).

Consequently, it held that "if Section 2(B) only requires state officers to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released, the provision would likely survive preemption—at least absent some showing that it has other consequences that are adverse to federal law and its objectives."  *Id.* at 2509.

## C.  Application

The provision of H.B. 497 at issue here, Section 3, is highly analogous to Arizona S.B. 1070, Section 2(B).  Like the Arizona law, it mandates or authorizes state officials to attempt to ascertain the immigration status of individuals detained pursuant to a lawful stop, detention, or arrest.  Whether verification of status is mandatory or discretionary depends on the underlying or

---

9   The Court noted "[t]he nature and timing of [the *Arizona*] case counsel[ed] caution" because state courts had not yet had the opportunity to provide "a definitive interpretation."  *Arizona*, 132 S. Ct. at 2509.

alleged crime, and whether an individual is arrested and/or booked into jail.[10]  Utah Code Ann. §

76-9-1003(1) (2011).

Like the Arizona law, Section 3 requires officials who discover relevant information

about the immigration status of a detained individual to communicate that information to federal

officials.  And like the Arizona law, Section 3 contains several safeguards for protecting the

constitutional rights of those detained.  For example, it requires status inquiries to be done within

a reasonable period of time, *id.* § 76-9-1003(2)-(3), and it prohibits officials from considering

race, color, or national origin, except to the extent permitted by the Constitution.  *Id.* § 76-9-

1003(5).  Likewise, it does not permit the stop, detention, or arrest of individuals solely to verify

their immigration status.  As in *Arizona*, these protections help to alleviate unsubstantiated

concerns about Section 3 in practice.

Moreover, in 2012, the Utah Attorney General issued an opinion on how Section 3 of

H.B. 497 is to be implemented.  When "'evaluating a facial challenge to a state law, a federal

court must, of course, consider any limiting construction that a state court or enforcement agency

has proffered.'"[11]  *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008) (quoting

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)).  The

opinion states, in most relevant part:

---

[10]   If an individual cannot identify him or herself after being arrested for a felony or class A misdemeanor, or is
arrested and booked for a class B or class C misdemeanor, then an officer is required to verify that person's
immigration status.  Utah Code Ann. § 76-9-1003(1)(a) (2011).  If, however, an officer stops a person for a class B
or C misdemeanor, and cannot identify the person, then Section 3 permits, but does not require, the officer to verify
immigration status.  *Id.* § 76-9-1003(1)(a)(ii).

[11]   As Defendants note in their brief, the Attorney General's Opinion on H.B. 497 is of no small significance, and
must be afforded due consideration.  (Dkt. No. 146, at 4 n.3).

Identification of an Arrested or Stopped Person:

In the absence of an underlying voluntary encounter, legal stop, detention, or arrest, state or local law enforcement is not authorized to either seek identification from persons for the purpose of ascertaining their citizenship status or nationality, nor are they authorized to attempt to verify the person's citizenship or immigration status.

Any time a person is lawfully stopped, detained, or arrested (again, for a reason unrelated to their citizenship status or nationality), law enforcement may seek to identify that person. A law enforcement officer may use his or her discretion in identifying the person and is not required to ask for, or demand, any specific documentation. An officer may identify a person based on a valid federal, state, or local identification document that includes a photo or biometric identifier of the holder, including a valid Utah driver license, a valid tribal enrollment card, or a valid license from another State.

Even in the absence of any of these specific documents, it is acceptable for an officer to otherwise verify the identification of a person through any other means on which the officer might normally and reasonably rely. The Act does not require any person to carry certain documents with them at all times[,] nor does it require or authorize State or local law enforcement to ascertain whether persons are carrying federally-required citizenship documents.


Verification of an Arrested or Stopped Person:

If an officer can verify the identity of a person who is lawfully stopped, detained, or arrested, the officer is not required to verify the person's citizenship status. If, however, the officer is unable to verify the person's identity, the Act requires verification of citizenship status in some instances.

- An officer is required to verify the person's citizenship status if: (1) the person is arrested for a felony or a class A misdemeanor, or (2) is arrested and booked for a class B or class C misdemeanor.

- An officer may, but is not required to attempt to verify the immigration status of a person stopped for a class B or C misdemeanor, if the person cannot be identified.

Whenever an individual is arrested, verification should take place at the time of booking and not in the field.

Verification of immigration status can only be determined by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), or other federal agency or law enforcement officer authorized to determine an alien's immigration status.

An officer's verification of immigration status may not measurably extend or prolong a stop or detention. Once the purpose for the underlying stop is complete, or if an arrestee is entitled to release from custody, law enforcement may not continue to detain the person solely for the purpose of verifying immigration status. Any further attempt to verify immigration status must be done without further detaining or maintaining control or custody over the person.

In the event the person is verified to be an alien unlawfully present in the United States, the law enforcement agency that has custody of the person shall request DHS to issue a detainer requesting transfer of the alien into federal custody.

An officer may forego verifying a person's immigration status if: (a) the determination could hinder or obstruct a criminal investigation; (b) the officer is acting as a school resource officer; or (c) a county or municipality has only one law enforcement officer on duty and response support from another law enforcement agency is not available.

*Utah Attorney General Mark Shurtleff, Opinion No. 2012-001* (hereinafter "*Shurtleff Op. No. 2012-001*").

A court may apply a proposed limiting construction when the statutory language is "*readily susceptible* to the narrowing construction." *ACLU v. Johnson*, 194 F.3d 1149, 1159 (10th Cir. 1999) (citing *Reno v. ACLU*, 521 U.S. 844, 884 (1997)). The court concludes that Section 3 is readily susceptible to the limiting construction stated in the Utah Attorney General's opinion because it merely clarifies existing language about when verification procedures may be applied and that such procedures may not inappropriately extend a stop, arrest, or detention. The court therefore adopts the construction.

When Section 3 is interpreted thus, the principles set forth in *Arizona* lead to the conclusion that Section 3 is not preempted. Nor does it violate the Fourth Amendment or the Privileges and Immunities clause. Section 3 sets clear standards for when law enforcement officials may and may not verify immigration status. These standards fall within the constitutional bounds of reasonableness. Section 3 only requires officials to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released. It does not provide an independent basis for stops, detentions or arrests. Nor may a stop, detention, or arrest be prolonged merely to confirm a person's immigration status. Finally, the communication regarding immigration status required by Section 3 does not interfere with federal regulatory schemes because it has been invited and encouraged by the federal government.

Therefore, to the extent Section 3 is interpreted consistent with the limiting construction in the Utah Attorney General's Opinion, La Raza's challenges fail, and its Motion for Preliminary Injunction, with respect to Section 3, is denied.

## III. SECTION 4

### A. Challenges

Plaintiff La Raza challenges Section 4 of H.B. 497. Section 4 provides that an individual may be presumed to be lawfully present in the United States, for the purpose of status verification, if the person provides an authentic copy of one of the following documents:

- A valid Utah driver license issued on or after January 1, 2010.

- A valid Utah identification card, issued on or after January 1, 2010.

- A valid tribal enrollment card, or other form of valid tribal membership which includes a photo.

- A valid identification document that includes a photo or biometric identifier and is issued by a federal, state, or local governmental agency that requires proof of verification of legal presence in the United States as a condition of issuance of the document.

Utah Code Ann. § 76-9-1004(1)(a)-(d).[12]

A person also may be presumed to be lawfully present if the person makes a statement or affirmation that he or she is a United States citizen or national. Utah Code Ann. § 76-9-1004(2). This presumption may be rebutted, however, if an officer has reasonable suspicion to believe the person's statement is false. *Id.* Additionally, Section 4 does not afford a non-citizen the opportunity to make an affirmation of being lawfully present in the United States. La Raza argues that Section 4 is preempted because "it creates an obstacle for the federal government's ability to properly allocate its resources" with respect to immigration enforcement, and it results in conflicting priorities. (Dkt. No. 116, at 7; Dkt. No. 195, at 10). In particular, it contends the section creates a *de facto* registration requirement. It further contends Section 4 acts together with Section 3 to authorize or mandate (1) detention without a lawful, independent basis; (2) violation of the Fourth Amendment because it allows for prolonged detention of individuals without a reasonable suspicion of illegal activity; and (3) interference with the Right to Travel. (Dkt. No. 37, at 27-31; Dkt. No. 195, at 5, 10).

**B. Legal Principles**

In *Arizona*, the Supreme Court considered a provision of S.B. 1070 that made it a misdemeanor for the "willful failure to complete or carry an alien registration document . . . in

---

[12] This section has been amended to also recognize a valid resident immigration permit issued pursuant to the Utah Pilot Sponsored Resident Immigration Program. *See* Utah Code Ann. § 76-9-1004(1)(e). That new provision, however, is not before the court. Consequently, the court does not address it here.

violation of 8 United States Code section 1304(e) or 1306(a)."[13]  *Arizona*, 132 S. Ct. at 2501

(citing Ariz. Rev. Stat. Ann. § 13-1509(A) (West Supp. 2011)).  Arizona's state provision had

the same aims as the federal scheme, and in many ways mirrored federal regulation.  The Court

concluded, however, that the Arizona law was conflict preempted because it required prosecution

and eliminated probation as a possible sentence for the offense of failing to register.  *Id.* at 2503.

Those two requirements conflicted with Congress' carefully balanced policy decisions.

Additionally, the Court held that this provision was field preempted because Congress

had extensively regulated the field of alien registration.  *Arizona*, 132 S. Ct. at 2502-2503.

Under federal regulation, an alien must register and carry proof of registration at all times.  *See* 8

U.S.C. §§ 1304, 1306.  Arizona, however, made it a new crime to fail to comply with existing

regulation.  This added an additional regulation to an area in which Congress had already

legislated.  Accordingly, the Supreme Court held Arizona had acted beyond its scope of authority

by legislating in the field of alien registration, which had already been fully occupied.

### C.  Application

In contrast to the Arizona statute, the Utah legislature has not imposed on aliens any new

requirement to register, nor has it made failure to register a state offense.  Rather, Section 4

simply outlines what forms of identification (or what affirmations) constitute acceptable

verification of immigration status, in accordance with the otherwise constitutionally permissible

requirement of Section 3 to verify immigration status in certain situations.  It does not take away

from, nor does it even seek to compliment the federal regulatory scheme.  It merely defines more

clearly the parameters of Section 3, which this court has just found to be a permissible exercise

---

[13]  This provision was contained in Section 3 of Arizona's S.B. 1070, which should not be confused with Section 3 of Utah's H.B. 497.

of state legislative powers. Unlike in *Arizona*, Section 4 is not a regulation at all. Therefore, the argument that it provides an independent basis for detention fails.

This is especially so when interpreted in light of the following limiting construction contained in the Utah Attorney General Opinion.

> In the absence of an underlying voluntary encounter, legal stop, detention, or arrest, state or local law enforcement is not authorized to either seek identification from persons for the purpose of ascertaining their citizenship status or nationality, nor are they authorized to attempt to verify the person's citizenship or immigration status.

*Shurtleff Op. No. 2012-001*, at 1.

The statute's language and the limiting construction negate La Raza's assertion that Section 4 "operates as a *de facto* alien registration law, requiring non-citizens to carry a state-approved qualifying identity document in order to avoid extended police questioning each time they encounter law enforcement." La Raza's Mot. for Preliminary Inj., at 24 (Dkt. No. 37). As discussed above, neither Section 3 nor Section 4 permit prolonging a stop, detention, or arrest to verify a person's immigration status. Moreover, the limiting construction provides, "The Act does not require any person to carry certain documents with them at all times nor does it require *or authorize* State or local law enforcement to ascertain whether persons are carrying federally-required citizenship documents." *Shurtleff Op. No. 2012-001*, at 1 (emphasis added).

Rather, Section 4 only addresses "[g]rounds for presumption of lawful presence." Utah Code Ann. § 76-9-1004 (section heading). It does not provide an exhaustive mechanism for verifying status during the *lawful* stops, detentions, or arrests contemplated by Section 3. Indeed, Section 3 and the limiting construction expressly allow for an officer to use "any other means on which the officer might normally and reasonably rely" to verify a person's identity and status. *See Shurtleff Op. No. 2012-001*, at 1; *see also* Utah Code Ann. § 76-9-1003(1)(a)

(stating only when an "officer is otherwise unable to verify the identity of the person," may an officer proceed with additional identification steps).

Thus, so long as Section 4 is interpreted in accordance with the limiting construction there is no field or conflict preemption. Nor, as discussed with Section 3, is there any violation of constitutional rights. If Section 4 were afforded an interpretation which allowed for broader detentions, it might be problematic. But, as in *Arizona*, there is no evidence that this has or will happen. La Raza's argument therefore fails, and its Motion for Preliminary Injunction, with respect to Section 4, is denied.

## IV. SECTION 5

### A. Challenges

La Raza challenges Section 5 of H.B. 497. Section 5 permits a state or local law enforcement agency to securely transport an alien who is lawfully in the custody of the agency, and whom the agency has verified is unlawfully present in the country, to an in-state federal detention facility, or with the permission of the federal agency, to a federal facility outside state boundaries. La Raza argues that this provision is both conflict and field preempted, and that it violates the Fourth Amendment. (Dkt. No. 202).

### B. Legal Principles

In *Arizona*, the Court did not directly address any such provision of law. Nevertheless, several principles articulated therein are relevant and applicable. First, as stated earlier, under the theory of field preemption, it is well established that congressional "intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same

subject.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947) (other citation omitted)) (alteration in original). The Court in *Arizona*, however, only inferred such intent in one area of immigration regulation – alien registration. Also relevant is the principle of conflict preemption, which preempts state legislation which conflicts with Congressional objectives and policies and the accomplishment of those objectives and policies, as discussed, *supra*. Finally, because La Raza's makes a facial challenge, it may "only succeed . . . by establishing that no set of circumstances exists under which the Act would be valid, i.e., that the law is unconstitutional in *all* of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (emphasis added) (quotations and alteration omitted).

### C. Application

La Raza contends that Utah is field preempted from regulating the detention and transport of unlawful aliens in any way. Yet, La Raza actually admits in an earlier section of their argument that federal law specifically provides for state participation in federal immigration enforcement. *See* Dkt. No. 202, at 5. If such participation is statutorily permitted, even under limited circumstances, then it cannot be said to be field preempted.

La Raza also argues that Section 5 conflicts with provisions of the Immigration and Nationality Act ("Immigration Act"), because it supersedes the specific grant of authority expressly made in the Immigration Act. La Raza argues that the Immigration Act's complex scheme only allows for state enforcement of immigration in "four narrow instances" (1) making arrests for crimes of transporting, smuggling, or harboring certain aliens, (2) arrest and detention for illegal reentry by a deported felon, with confirmation of status from a federal agency, (3) pursuant to the Attorney General's power to authorize local officials to enforce immigration laws

under certain circumstances, and (4) under written agreement with the Attorney General.[14]  *Id.* La Raza characterizes the ability to detain and transport aliens under Section 5 as "independent" and "unilateral" authority, not granted by the Immigration Act.  *Id.*

If Section 5 were read in isolation, this argument may have some merit.  Statutes, however, must be construed to give meaning to all of their parts.  *Bridger Coal Co./Pacific Minerals Inc. v. Director, Office of Workers' Comp. Programs*, 927 F.2d 1150, 1153 (10th Cir. 1991) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous.") (citations omitted)).  Moreover, when construing a statute, "the elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) (quotations and citation omitted).

Applying these principles, Section 5 must be considered in context and read in relation to other relevant sections, especially Section 3.  Pursuant to Subsection (4) of Section 3, a local official must request that federal officials issue a detainer requesting transfer of the illegal alien into federal custody.  The court construes this to mean the local official can act neither independently nor unilaterally when transporting an illegal alien to a federal detention facility in-state.  Rather, the local official must obtain a detainer before transporting the individual to such a facility.  Likewise, Section 5 provides that local officials may only transport aliens in their custody out of state with the "concurrence" of federal officials.  When read in conjunction with Section 3(4), the problems alleged by La Raza are not supported.  Thus, because the regulation neither creates an obstacle to the accomplishment of federal immigration policy, nor makes compliance with both the overall scheme and state law impossible, there is no conflict preemption.

---

[14]  *See also Arizona*, 132 S. Ct. at 2506.

Finally, although transportation of aliens takes time, there is no evidence that it unreasonably prolongs the detention of individuals in violation of the Fourth Amendment. Reading Section 5 in conjunction with the rest of H.B. 497 and the limiting construction, it is obvious that officials must have a lawful stop, detention, or arrest as a predicate to any verification, that verification may not prolong any such detention, that transportation may only take place when an individual is lawfully in custody of state officials, and that the state official must have authorization to transport the individual to a federal detention facility. If any of the predicates are missing, transportation of the individual is not permissible. If the person is lawfully in custody, then the stop is, by definition, not unreasonably prolonged. Therefore, there is no Fourth Amendment violation.

Thus, La Raza's arguments fail, and its Motion for Preliminary Injunction, with respect to Section 5 is denied. (Dkt. No. 201.)

## V.  SECTION 6

### A.  Challenges

La Raza challenges Section 6 of H.B. 497. Section 6 has two subsections. The first subsection prohibits local government from enacting an ordinance, regulation, or policy to limit assisting "the federal government in the enforcement of any federal law or regulation governing immigration." Utah Code Ann. § 76-9-1006(1). The second subsection prohibits local government from enacting an ordinance, regulation, or policy that limits "the authority of any law enforcement agency to investigate or enforce any violation" of two specific federal misdemeanors, namely, willful failure to register as an alien and willful failure to personally possess an alien registration document. La Raza argues Section 6 is an impermissible, field-preempted regulation of alien registration.

### B. Legal Principles

As discussed above, the legal province of immigration regulation, as a whole, is not a field preempted area of law. As also discussed above, however, the Supreme Court held in *Arizona* that Section 3 of S.B. 1070 was field preempted because it attempted to legislate in the area of alien registration – a field already fully occupied by federal law.

In reaching that conclusion, the Court reasoned that there was no room in the "complete" and "comprehensive" alien registration framework for Section 3, which made it a state crime to willfully fail to complete or carry an alien registration document. *Arizona*, 132 S. Ct. at 2501-2502. The Court cited *Hines* in which it held that, "because this 'complete scheme . . . for the registration of aliens' touched on foreign relations, it did not allow the States to 'curtail or compliment' federal law." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941)) (alteration in original). The Court then unequivocally declared "[t]he framework enacted by Congress leads to the conclusion here, as it did in *Hines*, that the Federal Government has occupied the field of alien registration," and "[w]here Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible." *Id.* at 2502 (citations omitted).

### C. Application

Section 6 of H.B. 497 reads as follows:

A state or local governmental agency of this state, or any representative of the agency, may not:

(1) limit or restrict by ordinance, regulation, or policy the authority of any law enforcement agency or other governmental agency to assist the federal government in the enforcement of any federal law or regulation governing immigration; or

(2) limit or restrict by ordinance, regulation, or policy the authority of any law enforcement agency to investigate or enforce any violation of the federal misdemeanor offenses of willful failure to register as an alien or willful failure to personally possess an alien registration document as required by 8 U.S.C. Sec. 1304(e) or 1306(a).

Utah Code Ann. § 76-9-1006.

Applying *Arizona*, the second subsection of Section 6 is impermissible because it seeks to regulate, albeit by way of encouraging cooperation, in the field of alien registration, which is fully occupied. *Arizona* makes clear that any regulation in the field of alien registration, regardless of what type, is preempted. Thus, the second subsection of Section 6 must be enjoined.

The first subsection of Section 6, however, does not specifically regulate in a field preempted area, and to the extent the assistance given to federal agencies is invited, as provided for in statute, or as authorized by the Attorney General, either by oral invocation or written agreement, it is not problematic.[15] Specifically, the statutory language that allows a local government "to assist the federal government in the enforcement of any federal law or regulation governing immigration," must be read to include assistance only with those activities that have been invited or expressly authorized. Otherwise, a local government would be acting beyond the scope of their authority and contrary to Section 9 of the Act, which states the Act must be implemented "in a manner that is consistent with federal laws that regulate immigration." Utah Code Ann. § 76-9-1009.

Thus, to the extent that La Raza challenges subsection two of Section 6 as an impermissible regulation of alien registration, La Raza's Motion for Preliminary Injunction is

---

[15] It is also relevant to note the existence of 8 U.S.C. § 1357(g)(10)(B), which permits state officers "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." To the extent "assistance" in paragraph one of Section 6 is interpreted to mean the same thing as "cooperate" in Section 1357(g)(10)(B), this reinforces the conclusion that it is not problematic.

granted and § 76-9-1006(2) is enjoined. To the extent subsection one of Section 6 does not intrude on the field of alien regulation, and any participation by local authorities is invited or expressly authorized by the federal government, La Raza's challenge fails, and La Raza's Motion for Preliminary Injunction is denied with respect to subsection one of Section 6.

## VI. SECTION 7

Neither La Raza nor the United States directly challenge Section 7 of H.B. 497. Section 7 permits local government agencies to send, receive, and maintain information related to the immigration status of an individual by communicating with federal, state, or local government agencies for any lawful purpose. Utah Code Ann. § 76-9-1007. Because there is no direct challenge to this provision, the court does not address it.

## VII. SECTION 8

Neither La Raza nor the United States specifically challenges Section 8 of H.B. 497. Section 8 requires agencies that provide state or local public benefits under 8 U.S.C. § 1621 to verify immigration status before providing benefits, except as otherwise exempted by federal law. Verification is done by signing a certificate of compliance confirming eligibility for public benefit, under penalty of perjury. Utah Code Ann. § 76-9-1008. Because there is no direct challenge to this provision, the court does not address it.

## VIII. SECTION 9

Neither La Raza nor the United States directly challenge Section 9 of H.B. 497. Section 9 reads, in its entirety: "All state and local agencies shall implement this part in a manner that is consistent with federal laws that regulate immigration, protect the civil rights of all persons, and establish the privileges and immunities of United States Citizens." Utah Code Ann. § 76-9-1009. Because there is no direct challenge to this provision, the court does not address it.

## IX.    SECTION 10

### A.  Challenges

Both La Raza and the United States challenge Section 10 of H.B. 497.  Section 10 makes it a crime to encourage or induce an alien to enter Utah or to engage in a conspiracy to harbor an alien for commercial or private gain.  Utah Code Ann. 76-10-2901.  La Raza argues that this provision is both field and conflict preempted. The United States argues that this provision is similarly preempted under the Supreme Court's ruling in *Arizona*.

### B.  Legal Principles

The Federal Government has significant authority to regulate immigration. *Arizona*, 132 S. Ct. at 2510.  As part of this authority, the government regulates the conditions of aliens' lawful entry and movement within the country.  *Mathews v. Diaz*, 426 U.S. 67, 84 (1976) ("[I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens."). Pursuant to this authority, Congress has enacted a detailed set of controls and sanctions for those who unlawfully enter the United States, and those who help them to do so.  *See* Part VIII of Chapter 12 of the Immigration and Nationality Act; 8 U.S.C. §§ 1325, 1326 (regarding unlawful entry); § 1323 (penalizing persons for unlawfully bringing aliens into the United States); § 1324 (penalizing persons for bringing in or harboring certain aliens); § 1327 (penalizing persons who assist certain inadmissible aliens to enter the country); § 1328 (penalizing the importation of aliens for immoral purposes). These statutory provisions provide criminal sanctions for those who assist or aid in entry.  *See* Dkt. No. 137, at 20.

As discussed above, when the Federal Government systematically and comprehensively regulates in a given area, states may be preempted from legislating in the same area, even if

legislation is complimentary. Relatedly, when a system of regulation reflects the reasoned policy choices of Congress to criminalize or not to criminalize certain conduct, states may not pass legislation which interferes with that careful balance. *Arizona*, 132 S. Ct. at 2505.

### C. Application

Here, as in *Arizona*, we are dealing with a state statute which purports to regulate an area in which Congress has already extensively regulated – that of regulating the entry and residence of aliens. Congress has balanced multiple concerns to make careful policy choices about what behavior should be punished, and how. Here, as in *Arizona*, the State has passed a bill which criminalizes the same types of behavior as federal law, making new state offenses for conduct that is otherwise already criminal. Criminalizing this behavior interferes with Congress' chosen balance.

Utah argues that Section 10 does not actually constitute an attempt to regulate immigration, but rather was only tangentially related to immigration. (Dkt. No. 146, at 40-42). This argument fails. Section 10 directly concerns the transportation, movement, and attempt to move unlawful aliens within the borders of the United States. It makes criminal the conduct of third parties who assist or encourage violations of federal immigration law. Moreover, the conduct it criminalizes is also criminalized by Congress' existing immigration regulation scheme.[16]

In *Arizona*, the Court held that states cannot regulate behavior in a field that is occupied by a complete and comprehensive system of regulation, and that States cannot criminalize behavior already made criminal by federal law. Such enactments, irrespective of whether they seek to counter or compliment federal law, are impermissible.

---

[16] The only difference between the two is that Utah's regulation purports to relate to activity that takes place within the State boundaries only.

Because Section 10 is preempted by federal law, it must be enjoined and Plaintiffs' Motions for Preliminary Injunction, as to Section 10, are granted.

## X.  SECTION 11

### A.  Challenges

Both La Raza and the United States challenge Section 11 of H.B. 497.  Section 11 allows for warrantless arrest when an officer has "reasonable cause" to believe a person is subject to civil removal or has committed an aggravated felony.  Both La Raza and the United States contend this section is preempted under the Supreme Court's ruling in *Arizona*.  La Raza also contends it violates the Fourth Amendment because it allows for an arrest without probable cause.

### B.  Legal Principles

In *Arizona*, the Court considered Section 6 of S.B. 1070, which permitted state officers "without a warrant [to] arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes him removable from the United States." *Arizona*, 132 S. Ct. at 2505 (quoting Ariz. Rev. Stat. Ann. § 13-3883(A)(5) (West Supp. 2011)) (alteration in original).  In considering the legality of this provision, the Court laid out several important facts and principles that influenced its ultimate holding.

First, the Court noted, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United Sates." *Id.* "If the police stop someone" purely for "possible removability, the usual predicate for an arrest is absent." *Id.* Even when a person is suspected of being in the country unlawfully, the proper form of action is not arrest, but the issuance of a Notice to Appear, and then conducting a removal hearing. *Id.* (citing 8 U.S.C. § 1229).

Second, the court noted "[t]he federal statutory structure instructs when it is appropriate to arrest an alien during the removal process." *Id.* The Attorney General has the discretion whether to issue a warrant pending decision on an individual's removability. If this discretion is not exercised, no warrant is issued until after a hearing is held and a determination regarding removability is made. *Id.* at 2506. In both of these cases, the warrant issued is executed by federal officers. Where no federal warrant is issued, officers have more "limited authority" to make arrests. *Id.*

Third, the court observed that Section 6 of S.B. 1070 "attempt[ed] to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress" gave to trained federal immigration officers. *Id.* "This state authority could be exercised without any input from the Federal Government," irrespective of whether a warrant was issued or a suspect was likely to escape, and had the potential to effectively establish a state immigration policy. *Id.*

Next, the Court noted that "[f]ederal law specifies [the] limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 132 S. Ct. at 2506. These are, respectively (1) making arrests for crimes of transporting, smuggling, or harboring certain aliens, (2) arrest and detention for illegal reentry by a deported felon, with confirmation of status from a federal agency, (3) pursuant to the Attorney General's power to authorize local officials to enforce immigration laws under certain circumstances, and (4) under written agreement with the Attorney General.[17] *Id.* (citations omitted).

Fifth, the Court observed that "authorizing state officers to decide whether an alien should be detained for being removable . . . violates the principle that the removal process is

---

[17]    Agreements reached with the Attorney General must contain written certification that officers have received adequate training to carry out the duties of an immigration officer.

entrusted to the discretion of the Federal Government." *Id.* (citing case law and policy reasons for the existence of such a principle). The Court acknowledged there is federal statutory law that permits officers to cooperate with the Attorney General in identifying, apprehending, detaining and removing unlawful aliens. *Id.* at 2507 (citing 8 U.S.C. § 1357(g)(10)(B)). Nevertheless, it ultimately concluded that, whatever cooperation means, "no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Id.*

Ultimately, the Court held that, considering Section 6 in light of these facts and principles, the section "create[d] an obstacle to the full purposes and objectives of Congress." *Id.* Because "Congress [had] put in place a system in which state officers may not make warrantless arrests of aliens . . . except in *specific*, *limited circumstances*," Arizona was precluded from "engag[ing] in these enforcement activities as a general matter." *Id.* (emphasis added).

### C. Application

Section 11 of H.B. 497 is similar to Section 6 of S.B. 1070. It grants peace officers the authority to make warrantless arrests when the officer has reasonable cause to believe (1) a person is an alien subject to civil removal, (2) a civil detainer warrant has been issued for the individual, or (3) a person has been charged or convicted of an aggravated felony in another state. Utah Code Ann. § 77-7-2(5). As in *Arizona*, by authorizing warrantless arrests, Section 11 seeks to bestow on state officers greater discretion and authority than that possessed by federal immigration officials. The section exceeds the four Congressionally authorized scenarios in which state officers may perform the functions of federal immigration officials. Exceeding authority and statutory constraints in this way establishes a *de facto* state immigration policy which may be in conflict with Congress' carefully crafted policy. Finally, by committing the

decision of whether to remove aliens to state officers, Section 11 violates the same principle violated by *Arizona*'s Section 6 – it violates the removal process that has been entrusted to the Federal Government.

Taken together, all of these facts illustrate that Section 11 creates the same "obstacle to the full purposes and objectives" of Congress that were problematic under Section 6 of Arizona's law. Accordingly, Section 11 of H.B. 497 is preempted by federal law. The court therefore grants the Plaintiffs' Motions for Preliminary Injunction as to Section 11.

## CONCLUSION

For the foregoing reasons, La Raza's Motion for Preliminary Injunction (Dkt. No. 36) is GRANTED IN PART and DENIED IN PART; the United States' Motion for Preliminary Injunction (Dkt. No. 136) is GRANTED IN PART and DENIED IN PART; La Raza's specific Motion for Preliminary Injunction Against § 5 of H.B. 497 (Dkt. No. 201) is DENIED. Pursuant to this ruling, the State is enjoined from enacting and enforcing subsection 2 of Section 6. It is also enjoined from enacting and enforcing Section 10 and Section 11. While the State may implement the remaining sections of the Act, such implementation is subject to the limiting constructions outlined in this decision.

DATED this 18th day of June, 2014.

BY THE COURT:

_Clark Waddoups_

Clark Waddoups
United States District Judge